IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, et. al | : : : : | |
| v. | : : : | Civil Action No. CCB-08-2576 |
| RITE AID CORPORATION | : : : : | |

## MEMORANDUM

The United States Equal Employment Opportunity Commission ("EEOC") and Christopher Fultz have sued Rite Aid Corporation ("Rite Aid") under the Americans with Disability Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, and Maryland anti-discrimination laws, Md. Code Ann., State Gov't § 20-601 *et seq.*, for discrimination, harassment and hostile work environment, retaliation, and failure to accommodate. Now pending before the court is the defendant's motion for summary judgment. For the reasons stated below, the motion will be granted in part and denied in part.

## BACKGROUND

Christopher Fultz was diagnosed with epilepsy at age six. During childhood, he began taking anti-seizure medications, which lessened the frequency and severity of his seizures. Because the seizures were not fully eliminated through medication, in 2002 Mr. Fultz underwent a right temporal lobectomy to remove the part of his brain believed to be the source of his seizures. Unfortunately, the surgery did not eliminate Mr. Fultz's seizures, and he has continued using medication to control the frequency of his seizures. In addition to medication, Mr. Fultz

1

manages his epilepsy through stress management techniques.  Despite these treatments, Mr. Fultz continues to experience generalized tonic-clonic seizures (also known as grand mal seizures), complex partial seizures, and brief episodes when he "zones out" and stares for a few minutes.  Due to his epilepsy, Mr. Fultz cannot bathe, swim, hunt, or fish by himself.  He also cannot drive long distances, climb ladders, or engage in activities where climbing at elevated heights is necessary.

In 1998, Rite Aid hired Mr. Fultz to work in its distribution center in Perryman, Maryland.  Mr. Fultz fully disclosed his epilepsy to Rite Aid at the time he was hired.  According to the record currently before the court, during his first five years of employment with Rite Aid, Mr. Fultz experienced only two seizures at work.  One of those seizures occurred while Mr. Fultz was operating a fork lift, and, as a result, Rite Aid restricted him from operating heavy machinery.

In 2004, Mr. Fultz suffered two grand mal seizures at work.  After Mr. Fultz's first seizure that year, Rite Aid ordered him to undergo a fitness exam with Dr. Barry Rowecamp, whose occupational health practice was under contract with Rite Aid to provide basic medical services for the Perryman facility.  On May 12, 2004, Mr. Fultz's own neurologist, Dr. Ronald Lesser, director of the Johns Hopkins Epilepsy Center, cleared Mr. Fultz for work without height restrictions.  On November 4, 2004, Mr. Fultz suffered his second seizure, this time on the second floor of the warehouse.  Based on this incident, Dr. Rowecamp advised Rite Aid to restrict Mr. Fultz from working on the second floor.  Mr. Fultz transferred to the Pharmacy Department where he was assigned to an area on the first floor called the Cooler, where refrigerated drugs are stored at a required temperature.  From 2004 through mid-2006, Mr. Fultz

experienced no seizures at work.

Starting in mid-2006 through the end of the year, Mr. Fultz experienced between four and five grand mal seizures. During one of these seizures, Safety Manager Corey Williams ordered security officers to pin Mr. Fultz to the ground. Neither Mr. Fultz nor any other Rite Aid employee was injured during these seizures. Following these seizures, Mr. Fultz returned to Dr. Lesser for an evaluation, and was cleared once again to participate in all his occupations at work, including working at heights. Based upon this recommendation, Mr. Fultz requested the 2004 height restriction imposed by Dr. Rowecamp be removed. His request was denied.

In 2006, Mr. Fultz also applied for a promotion to a Pharmacy Lead position. On August 6, 2006, he interviewed for the job, but was not selected for the position. Based on this denial and alleged harassment he experienced in the workplace due to his epilepsy, Mr. Fultz filed an EEOC charge of discrimination on September 17, 2006.

On January 8, 2007, Mr. Fultz contacted Rite Aid's employee hotline to make a complaint regarding how management at the Perryman facility was treating him based on his epilepsy. Mr. Fultz alleged that management would interrogate him about the cause of his seizures even while he was experiencing a seizure and accuse him of willfully bringing on his seizures by not following his doctor's advice. In response, Rite Aid scheduled a fitness for duty exam with Dr. Allan Krumholz, a professor of neurology at the University of Maryland School of Medicine and director of the Maryland Epilepsy Center. Dr. Krumholz examined Mr. Fultz on March 30, 2007 and concluded that Mr. Fultz was fit for duty and did not need to be restricted from working on the second floor of the Perryman facility. Despite this recommendation, Rite Aid maintained Mr. Fultz's work restriction to the first floor.

On August 20, 2007, the EEOC issued a Letter of Determination finding that Rite Aid violated the ADA by subjecting Mr. Fultz to unequal terms and conditions of employment, including a hostile work environment, and by denying him an opportunity for promotion. Less than a month after the EEOC's decision, Rite Aid asked Dr. Krumholz to reconsider his recommendation to lift the height restriction imposed against Mr. Fultz. Dr. Krumholz refused. Rite Aid then approached Dr. Rowekamp, its contract physician with no experience treating epilepsy, to conduct a third fitness for duty examination of Mr. Fultz. On January 23, 2008, Dr. Rowekamp issued a letter to Rite Aid declaring Mr. Fultz unfit for duty.

On February 8, 2008, Rite Aid placed Mr. Fultz on administrative leave. On February 20, 2008, Mr. Fultz filed an EEOC charge alleging that his termination amounted to retaliation by Rite Aid. During the next several months, Mr. Fultz made several requests, all of which were supported by Dr. Lesser, to be reinstated to his position at Rite Aid. Rite Aid failed to respond to any of his requests. On May 14, 2008, the EEOC issued a determination finding that Rite Aid violated the ADA by terminating Mr. Fultz. On October 2, 2008, Rite Aid offered to reinstate Mr. Fultz. Mr. Fultz refused the offer.

On September 30, 2009, the EEOC filed suit against Rite Aid in this court. On December 12, 2009, Mr. Fultz filed a motion to intervene in the suit. On March 29, 2010, Rite Aid filed a motion for summary judgment. The EEOC and Mr. Fultz have opposed the motion.

## **ANALYSIS**

Federal Rule of Civil Procedure 56(c) provides that summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment

as a matter of law." Fed. R. Civ. P. 56(c)(2). The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion. "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). Whether a fact is material depends upon the substantive law. *See id.*

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)). The court must "view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion,'" *Scott v. Harris*, 550 U.S. 372, 378 (2007) (alteration in original) (quoting *United States v. Diebold*, 369 U.S. 654, 655 (1962)), but the court also must abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993) (internal quotation marks omitted).

    A.    *Disability Requirement*

Rite Aid contends that the plaintiffs' ADA claims fail as a matter of law because Mr. Fultz is not considered "disabled" within the meaning of the ADA.[1] A person is disabled within

---

[1] The defendant raises this same argument that Mr. Fultz is not "disabled" with respect to Maryland's anti-discrimination law. Maryland law, however, defines "disability" to include individuals with epilepsy. COMAR 14.03.02.02(B)(6)(a). Moreover, because Mr. Fultz's discrimination, retaliation, failure to accommodate, and improper discharge claims include alleged acts of discrimination that occurred after October 1, 2007, Mr. Fultz has stated a claim even though Maryland did not create a private right of action until October 1, 2007. Thus,

5

the meaning of the ADA if he (1) has a physical or mental impairment that substantially limits one or more of his major life activities; (2) has a record of such an impairment; or (3) is regarded as having such an impairment. 42 U.S.C. § 12102(1). Rite Aid specifically argues that Mr. Fultz is not substantially limited in a major life activity due to his epilepsy and therefore is not disabled under the ADA. (*See* Def.'s Mem. for Summ. J. at 15-17).

The determination of whether an individual is disabled under the ADA is an "individualized inquiry, particular to the facts of each case." *EEOC v. Sara Lee Corp.*, 237 F.3d 349, 352 (4th Cir. 2001). "A person with epilepsy can certainly be disabled under the ADA. Indeed epilepsy is one of the disabling conditions that Congress contemplated when it passed the ADA." *Id.* (citing H.R. Rep. No. 485(II), 101st Cong., 2d Sess. 52 ("epilepsy" can be an impairment that substantially limits a major life activity)). Epilepsy may not be disabling within the meaning of the ADA when it is completely controlled by medication or when the symptoms are mild. *See, e.g.*, *id.* at 353 (holding that epilepsy was not a disability where the plaintiff did not have major motor or grand mal seizures, but rather "less severe" complex partial seizures causing her to "zone out" sporadically during the day). This is not the case here.

It is uncontested that Mr. Fultz suffers from grand mal seizures, as well as complex partial seizures and relatively minor episodes when he "zones out" and stares for a few minutes.[2] The defendant also admits that in the two years prior to Mr. Fultz's termination, he experienced at least eight seizures, the majority of which were grand mal seizures, at work. (*See* Def.'s Mot.

---

defendant's motion for summary judgment on the ground that Mr. Fultz is not "disabled" under Maryland law will be denied.

[2] The more severe nature of Mr. Fultz's epilepsy is what distinguishes this case from *Sara Lee*. While the plaintiff in *Sara Lee* suffered from only the less severe complex partial seizures, Mr. Fultz routinely experiences grand mal seizures and has undergone brain surgery to attempt to address his condition. Given these differences, the court cannot conclude that no genuine issue exists as to whether Mr. Fultz's epilepsy is a disability under the ADA.

for Summ. J. at 5-12). The plaintiffs have submitted evidence showing that Mr. Fultz's epilepsy prevents him from bathing on his own, and that during a seizure he cannot stand, loses control over body movements, cannot speak, may lose control over his bladder, and is unable to remember the event. Mr. Fultz's seizures, especially his grand mal seizures, can last over 20 to 25 minutes, followed by five to ten minutes of confusion during which he cannot communicate with others. (*See* Fultz Dep. 49:18-51:5, May 8, 2009). After having a grand mal seizure, Mr. Fultz also experiences a postictal period lasting up to 10 to 15 hours during which he feels "muscle fatigue, tiredness, and completely worn out." (*Id.* at 55:2-56:7). Based on this evidence, a reasonable juror could conclude that Mr. Fultz is substantially limited in his ability to perform major life activities, such as caring for himself, walking, seeing, and hearing. *See* 29 C.F.R. § 1613.702(c) (defining major life activities to include "functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, and working.").[3]

Alternatively, there is a genuine dispute of material fact as to whether Rite Aid regarded Mr. Fultz's epilepsy as substantially limiting the major life activity of working when it placed him on administrative leave. Under the ADA, an employee is "regarded as" being disabled "when the employer 'mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities.'" *Wilson v. Phoenix Specialty Mfg. Co., Inc.*, 513 F.3d 378, 384-85 (4th Cir. 2008) (quoting *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 489 (1999)).

---

[3] *See also Otting v. J.C. Penney Co.*, 223 F.3d 704, 710 (8th Cir. 2000) (holding that while ladder-climbing is not a major life activity, the inability of a plaintiff with epilepsy to speak, walk, see, work, or control the left side of her body during a seizure should be considered in determining whether she qualified as "disabled" under the ADA); *Dicksey v. New Hanover Cnty. Sheriff's Dep't.*, 522 F. Supp. 2d 742, 747 (E.D.N.C. 2007) (holding that a reasonable juror could find that a plaintiff who suffered over ten grand mal seizures was substantially limited in a major life activity); *Rowles v. Automated Prod. Sys., Inc.*, 92 F. Supp. 2d 424, 429 (M.D. Pa. 2000) (finding unpersuasive a defendant's argument that because the plaintiff suffered about one seizure a year, no reasonable juror could conclude that his epilepsy substantially limited a major life activity).

To support a claim that an employee is "regarded as" substantially limited in the major life activity of working, the employee must show that the employer viewed him as "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities." 29 C.F.R. § 1630.2(j)(3)(i); *see, e.g.*, *Russo v. Sysco Food Servs. of Albany, L.L.C.*, 488 F. Supp. 2d 228, 235 (N.D.N.Y. 2007) (holding that an employee was "regarded as" disabled by an employer because the employer's company physician concluded that the plaintiff's epilepsy precluded him from holding a commercial driver's license, operating a forklift, or driving any company vehicle). The plaintiffs have produced evidence suggesting that Rite Aid placed Mr. Fultz on leave because it viewed him as being unable to work alone, move up and down stairs easily, or reliably call in to obtain his work schedule due to his epilepsy. (*See* Letter from Dr. Rowekamp to Ms. Lazor, Ex. 53). The plaintiffs also have provided evidence suggesting that, based on Rite Aid's perceptions, Mr. Fultz would have been substantially limited in 90% of warehouse jobs and 97% of all jobs in the Baltimore-Towson, Maryland Metropolitan area. (*See* Vocational Analysis of Daniel Rappucci, Attach. 1, at 3-6). Based on these facts, a reasonable juror could conclude that Rite Aid regarded Mr. Fultz as having a substantial impairment when it placed him on administrative leave in 2008.

Finally, Rite Aid contends that even if Mr. Fultz is "disabled" under the ADA, it was permitted to place him on administrative leave because he posed a direct threat of harm to himself and to his co-workers.[4] There is a genuine dispute of fact on this issue. The plaintiffs

---

[4] The ADA allows employers to set "qualification standards," including the requirement that an individual with a disability "shall not pose a direct threat to the health or safety of other individuals in the workplace." 42 U.S.C. § 12113(b).

have presented evidence that Mr. Fultz never injured himself beyond minor cuts and scratches during a seizure at work. (*See* Fultz Dep. 82:20-83:11). The plaintiffs also have provided statements from Rite Aid's own managers and employees that Mr. Fultz never injured a co-worker during a seizure and never was considered a threat to the safety of his co-workers. (*See, e.g.*, McDaniel Dep. 339:15-21; 341:7-16, November 5, 2009; Williams Dep. 197:13-20; 198:3-6, June 2, 2009). Accordingly, the defendant's motion for summary judgment on the grounds that Mr. Fultz does not qualify as disabled under the ADA will be denied.

### B. *Failure to Accommodate*

There also exists a genuine dispute of material fact concerning whether Rite Aid refused to accommodate Mr. Fultz's epilepsy. To establish a prima facie case for failure to accommodate, a plaintiff must show: "that he was an individual who had a disability within the meaning of the statute; (2) that the [employer] had notice of his disability; (3) that with reasonable accommodation he could perform the essential functions of the position . . .; and (4) that the [employer] refused to make such accommodations." *Rhoads v. Fed. Deposit Ins. Corp.*, 257 F.3d 373, 387 n. 11 (4th Cir. 2001). The parties do not dispute that Mr. Fultz requested a reasonable accommodation in the form of an electronic code so that he could enter and exit an area known as the "Cage" on his own if he felt the onset of a seizure. There is a dispute, however, whether Rite Aid actually provided Mr. Fultz this accommodation. (*See, e.g.*, Brown Dep. 94:22-95:6, June 3, 2009). A dispute also exists regarding whether Rite Aid's placement of Mr. Fultz on administrative leave amounted to a refusal to reasonably accommodate his epilepsy. Accordingly, the defendant's motion for summary judgment on this ground will be denied.

C. *Retaliation Claim*[5]

A genuine dispute of material fact also exists concerning whether Rite Aid's placement of Mr. Fultz on administrative leave on February 8, 2008 constituted an act of retaliation under the ADA. To establish a prima facie case of retaliation under the ADA, "a plaintiff must show that: (1) she engaged in a protected activity; (2) her employer acted adversely against her; and (3) her protected activity was causally connected to her employer's adverse action." *Rhoads*, 257 F.3d at 392. An indefinite suspension or removal without pay can amount to retaliation even if the employee is eventually rehired and given back pay. *See Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53, 72-73 (2006). Rite Aid argues that Mr. Fultz's protected activity was not causally connected to Rite Aid's decision to place him on administrative leave. The plaintiffs have provided evidence to suggest that, less than one month after Rite Aid received the EEOC's determination that it had violated the ADA, it initiated steps to have Mr. Fultz declared unfit for duty, including pressuring Dr. Krumholz to reconsider his recommendation that Mr. Fultz was fully capable of working, even without height restrictions. Based on this evidence, there is a genuine dispute regarding whether Rite Aid retaliated against Mr. Fultz for filing his ADA claim with the EEOC. Accordingly, the defendant's motion for summary judgment on this ground will be denied.[6]

D. *Hostile Work Environment Claim*

---

[5] The defendant also contends that compensatory and punitive damages are not available for anti-retaliation claims under the ADA. (*See* Def.'s Mem. For Summ. J. at 36-37). This is a disputed question that does not need to be addressed prior to trial.

[6] The defendant also contends that Mr. Fultz has no right of intervention to pursue recovery for retaliation under the ADA because the EEOC never issued a "right to sue" letter. A right to sue letter is necessary for a plaintiff to proceed only when the EEOC chooses not to bring a civil action against an employer. *See* 29 C.F.R. §1601.28(b). Here, the EEOC *chose* to pursue a civil action against Rite Aid, and under 42 U.S.C. § 2000e-5(f)(1), Mr. Fultz has the right to intervene.

To establish a hostile work environment claim under the ADA, a plaintiff must show: "(1) he is a qualified individual with a disability; (2) he was subjected to unwelcome harassment; (3) the harassment was based on his disability; (4) the harassment was sufficiently severe or pervasive to alter a term, condition, or privilege of employment; and (5) some factual basis exists to impute liability for the harassment to the employer." *Fox v. Gen. Motors Corp.*, 247 F.3d 169, 177 (4th Cir. 2001). In the Fourth Circuit, a plaintiff "must clear a high bar in order to satisfy the severe or pervasive test." *See EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315 (4th Cir. 2008). To prove that alleged harassment is sufficiently "severe or pervasive," a plaintiff must show both that he subjectively perceived the environment to be abusive and that the harassing conduct was objectively "severe or pervasive." *Id.* Based on the record before the court, Mr. Fultz has not shown that the harassment he allegedly suffered was sufficiently "severe or pervasive" to satisfy this test.

The court will assume for purposes of this motion that Mr. Fultz subjectively perceived the alleged harassment to be "severe or pervasive," and will focus its attention on the objective component of the element. Whether harassment is objectively "severe or pervasive" "is not, and by its nature cannot be, a mathematically precise test." *Sunbelt Rentals*, 521 F.3d at 315. A court must weigh all the circumstances of the harassing conduct, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* This standard prohibits an employment atmosphere that is "permeated with discriminatory intimidation, ridicule, and insult" but does not make actionable conduct that

11

amounts to "simple teasing, offhand comments, and isolated incidents (unless extremely serious)." *Id.*

The plaintiffs point to three forms of conduct by Rite Aid employees and managers that they allege amount to "severe and pervasive" harassment: (1) attempts by Rite Aid employees to restrain Mr. Fultz while he was experiencing a seizure; (2) Rite Aid employees allegedly blaming Mr. Fultz for having seizures; and (3) placing work restrictions on Mr. Fultz despite the opinions of his neurologist that such restrictions were unnecessary. (*See* Pls.' Opp'n to Summ. J. at 54). Viewed in the light most favorable to the plaintiffs, the evidence does not indicate that Mr. Fultz suffered harassment due to his epilepsy that was "persistent, demeaning, unrelenting, and widespread." The record reflects that Rite Aid employees attempted to restrain Mr. Fultz during his seizures on a few occasions, either by physically restraining him or blocking him from leaving a certain area. (*See, e.g.*, Fultz Dep. 243:5-13). On one occasion, a Rite Aid security guard also announced that he hoped he would not have to "go out there and throw [Fultz] to the ground" during a seizure." (*See* Warren Dep. 41:7-19, March 10, 2010). The evidence suggests, however, that Rite Aid employees attempted to restrain Mr. Fultz during his seizures because they believed it would keep him and those around him safe, not out of any hostility towards Mr. Fultz. Moreover, Mr. Fultz admits that after he informed his manager, safety manager, and employees who worked with him that they should not attempt to restrain him, Rite Aid employees complied. (*See* Fultz Dep. 151:11-18; 155:4-7).

The plaintiffs also contend that Rite Aid managers consistently blamed Mr. Fultz for having seizures and accused him of not following his doctor's orders. The record demonstrates that Human Resources Director Dan McDaniel ordered his Safety Manager Corey Williams to

investigate why Mr. Fultz was having an increased number of seizures at work.  (*See* McDaniel Dep. 123:2-12).  But, Mr. McDaniel made his request only after hearing from Mr. Fultz himself that he had consumed alcohol despite his doctor's order to refrain from doing so, and a separate report that he was not taking his medication.  (*See id.* at 123:13-21).  The plaintiffs also argue that on one occasion, Mr. Williams "got in Fultz'[s] face and repeatedly questioned Fultz about whether he had consumed alcohol the evening prior to the seizure."  (*See* Pls.' Mem. in Opp'n to Mot. for Summ. J. at 54).  Although Mr. Williams did ask Mr. Fultz while he was coming out of his seizure whether he had been drinking the previous evening, a review of the record demonstrates that Mr. Williams only asked Mr. Fultz the question twice.  (*See* Warren Dep. 39:5-21).  This conversation occurred after Mr. Fultz admitted that his doctor had advised him not to consume alcohol, to help control his seizures.  No reasonable jury could find that this conduct constituted "severe or pervasive" harassment sufficient to alter a term of employment.

 Likewise, Rite Aid's restriction of Mr. Fultz's movements throughout the facility despite his neurologist's opinion that he did not require any restrictions does not constitute "severe or pervasive" harassment.  The plantiffs provide no evidence that Rite Aid's decision to place Mr. Fultz on restricted duty was motivated by any intent to intimidate or ridicule him because of his epilepsy.  While these actions may support some other aspect of Mr. Fultz's discrimination claims, they are not sufficient to establish a hostile work environment.

 The plaintiffs also highlight as evidence of harassment one incident during which Mr. McDaniel ordered Human Resources Training Manager Gail Boyle to photograph Mr. Fultz while he was having a seizure.  (*See* Pls.' Opp'n to Summ. J. at 54).  During this particular seizure, Mr. Fultz removed his pants and was photographed by Ms. Boyle in his boxer shorts.

The court recognizes that a reasonable juror could find this incident to be objectively offensive and humiliating. Because it was an isolated occurrence, however, the incident is not sufficient to sustain the plaintiffs' hostile work environment claim. Accordingly, the defendant's motion for summary judgment on the hostile work environment claim will be granted.

    *E.*    *Failure to Exhaust*

The defendant also contends that the court should dismiss Mr. Fultz's claim for compensatory damages because he failed to exhaust his administrative remedies. Rite Aid relies on *Fitzgerald v. Sec'y, United States Dep't of Veteran Affairs*, 121 F.3d 203 (5th Cir. 1997), to support its argument. In *Fitzgerald*, however, the Fifth Circuit held that a federal employee failed to exhaust administrative remedies when he refused to accept an offer for full relief by the EEOC. *Fitzgerald*, 121 F.3d at 206. Here, the EEOC could not reach conciliation and was unable to offer Mr. Fultz relief. Thus, *Fitzgerald* is not on point, and Mr. Fultz's claim for compensatory damages will not be dismissed.

## **Conclusion**

For the foregoing reasons, the defendant's motion for summary judgment will be denied, except as to the hostile work environment claim. A separate Order follows.


<u>November 10, 2010</u>                                              <u>    /s/    </u>
Date                                                                  Catherine C. Blake
                                                                        United States District Judge