# EXHIBIT 1

1

1          IN THE UNITED STATES DISTRICT COURT

2             FOR THE DISTRICT OF MARYLAND

3                  (Northern Division)

4

5   U.S. EQUAL EMPLOYMENT

6   OPPORTUNITY COMMISSION

7   and CHRISTOPHER FULTZ,

8              Plaintiffs

9   vs.                              CIVIL ACTION NO.

10  RITE AID CORPORATION,            08-CV-02576 CCB

11             Defendant

12  _____/

13

14          The deposition of MICHAEL K. SPODAK, M.D.

15  was held on Friday, November 13, 2009, commencing at

16  10:35 a.m., at the Offices of Equal Employment

17  Opportunity Commission, Baltimore Field Office, 10

18  South Howard Street, 3rd Floor, Baltimore, Maryland

19  21201, before Susan M. Wootton, Notary Public.

20

21  REPORTED BY: Susan Wootton, RPR, CLR

U.S. EEOC, et al. vs
Rite Aid Corporation

Michael K. Spodak, M.D.
November 13, 2009

---

Page 2

1   APPEARANCES:

2

3        ON BEHALF OF THE PLAINTIFFS:

4        MARIA L. MOROCCO, ESQUIRE

5            Equal Employment Opportunity Commission

6            10 South Howard Street, 3rd Floor

7            Baltimore, Maryland 21201

8            Telephone:  410-962-3932

9            Facsimile:  410-962-4270

10           Email: maria.morocco@eeoc.gov

11

12       ON BEHALF OF THE INTERVENOR, CHRISTOPHER FULTZ:

13       JEREMY P. MONTEIRO, ESQUIRE

14           Webster, Fredrickson, Correia & Puth, PLLC

15           1775 K. Street, N.W. Suite 600

16           Washington, D.C. 20006

17           Telephone:  202-659-8510

18           Facsimile:  202-659-4082

19           Email: jmonteiro@wfcplaw.com

20

21   (APPEARANCES continued on next page.)

---

Page 3

1   (APPEARANCES continued.)
2
3        ON BEHALF OF THE DEFENDANT:
4        JAMES A. ROTHSCHILD, ESQUIRE
5            Anderson, Coe & King, LLP
6            201 N. Charles Street, Suite 2000
7            Baltimore, Maryland 21201
8            Telephone:  410-752-1630
9            Facsimile:  410-752-0085
10           Email: rothschild@acklaw.com
11
12
13
14
15
16
17
18
19
20
21

---

Page 4

1                          INDEX

2            Deposition of MICHAEL K. SPODAK, M.D.

3                    November 13, 2009

4

5   EXAMINATION BY:                                      PAGE

6   Ms. Morocco                                             6

7

8   EXHIBIT NUMBER:                                      MARKED

9   1       Subpoena                                        8

10  2       Notes                                          23

11  3       E-Mail from Mr. Rothschild                     67

12  4       Documents sent to Dr. Spodak                   68

13  5       Table of contents                              70

14  6       Records dated October 8, 2009                  86

15  7       E-mails containing driving information         100

16  8       Printout from EEOC Website RE: Epilepsy        106

17  9       Correspondence file                           112

18  10      Table of contents                             115

19  11      Revised timeline                              124

20  12      Dr. Spodak's report                           125

21   (INDEX continued on next page.)

---

Page 5

1  (INDEX continued.)

2    MICHAEL K. SPODAK, M.D.

3    EXHIBIT NUMBER: MARKED

4  13   Revised timeline #2                  129

5  14   List of testimony                    131

6  15   Dr. Spodak's CV                      134

7  16   Article, Psychiatrist as a Witness      149

8  17   IME file                         155

9  18   Medical records from Dr. Lesser         196

10 19   Fee schedule                     230

11 20   Methodology from IME                 230

12

13

14

15

16

17

18

19

20

21

---

Page 6

1   PROCEEDINGS
2   Whereupon,
3       MICHAEL K. SPODAK, M.D.,
4   called as a witness, having been first duly sworn to
5   tell the truth, the whole truth, and nothing but the
6   truth, was examined and testified as follows:
7       EXAMINATION BY MS. MOROCCO:
8   Q   Good morning, Dr. Spodak.  I'm Maria
9   Morocco.  I'm counsel for the EEOC.
10      Jerry Monteiro, who is seated next to me,
11  and I will be taking your deposition this morning.
12      I just want to establish some basic ground
13  rules for the deposition.  I'm sure you're familiar
14  with all of these things but we'll just get them on the
15  record.
16      I need you to answer my questions as fully
17  as you're capable of doing.  You're under oath so
18  obviously you need to answer honestly.
19      If you don't understand a question for any
20  reason, if it's poorly phrased, please let me know and
21  I will be happy to restate it.

Page 7

1       If you don't hear me for any reason such as
2   the noise outside, let me know and I'll repeat the
3   question.
4       If you do answer my questions, I will
5   assume that you understood the question.
6       I need to know whether you are under any
7   medication today that will impair your ability to
8   testify for any reason.
9   A   No.
10  Q   And I need to know whether you have a
11  medical condition which will impair your ability to
12  testify for any reason.
13  A   No.
14  Q   And some additional ground rules in terms
15  of how we're going to proceed.  I will ask that you and
16  I endeavor not to speak over each other.
17      You wait for me to ask my question, I will
18  wait for you to complete your answer, and that will
19  make the court reporter's job a lot clearer and we'll
20  have a better transcript that way.
21      Some additional standard questions in a

Page 8

1   deposition is whether you have ever been convicted of a
2   crime?
3   A   No.
4   Q   Have you ever been arrested?
5   A   No.
6   Q   Have you been served with a subpoena for
7   your deposition?
8   A   Today's deposition?
9   Q   Yes.
10  A   I was served with a deposition notice.  I
11  don't know if it was specifically a subpoena, but I
12  think so.
13  Q   I'm handing you Exhibit 1 to your
14  deposition.  Please review the document and let me know
15  whether it was given to you by Mr. Rothschild at any
16  point.
17      (Whereupon, a document was marked as Spodak
18  Deposition Exhibit Number 1.)
19      MR. ROTHSCHILD:  She's going to give you
20  this.
21      THE WITNESS:  Yes.

Page 9

1   Q   When did Mr. Rothschild give you this
2   document, send it to you?
3   A   November 9th, 2009.
4   Q   And other than the documents that
5   Mr. Rothschild --
6   A   I'm sorry.  November 11th, 2009.  This was
7   sent to him from you on November 9th it looks like.  It
8   was forwarded to me by fax on 11/11/09.
9   Q   Okay.  Other than the documents
10  Mr. Rothschild provided to me this morning, which are
11  an amended table of contents, a list of cases, is there
12  anything else that you're providing today in response
13  to the subpoena?
14  A   Yes.
15  Q   What?
16  A   A revised time line.
17  Q   And that's also been provided to me,
18  correct?
19  A   Yes.
20  Q   Okay.  You have not provided any
21  correspondence in response to the subpoena between

U.S. EEOC, et al. vs
Rite Aid Corporation

Michael K. Spodak, M.D.
November 13, 2009

Page 10

1  yourself and any of Rite Aid's attorneys and what I
2  mean by correspondence is things such as E-Mails.
3      Did you look on your computer to see
4  whether any such documents exist after you received the
5  subpoena?
6  A  I did. It was copied and sent to you. It
7  was provided to Mr. Rothschild. I understood it was
8  forwarded to you.
9      MR. ROTHSCHILD: Yes, I believe I forwarded
10 it to you yesterday as an attachment.
11     MS. MOROCCO: And did you actively look
12 through your computer to find any other E-Mails that
13 have not been produced?
14     THE WITNESS: No.
15 Q  What efforts did you go through to locate
16 correspondence on your computer that would be
17 responsive to the subpoena that Mr. Rothschild provided
18 to you on November the 11th?
19 A  My standard practice in the office is when
20 an E-Mail is sent, it's downloaded and printed and
21 provided and filed into the applicable file that it

Page 11

1  belongs.
2      So it looked to me like that was a pretty,
3  whatever I provided Mr. Rothschild looked to be
4  complete.
5  Q  Okay. So, am I understanding you correctly
6  that you looked through a paper file to locate any
7  correspondence that would be responsive to the
8  subpoena, is that correct?
9  A  Yes.
10 Q  But you did not look on your computer for
11 any E-Mails that would be responsive to the subpoena?
12 A  I didn't personally.
13     I ask my secretary, in the normal course of
14 her duties, to look through the computer every day for
15 E-Mails and when they come, to download them, print
16 them and put them in the proper files.
17     And I didn't do anything beyond that.
18 Q  Okay. Well, the subpoenas, as all
19 subpoenas these days, covers electronically stored and
20 captured information.
21     So I'm going to request that you or

Page 12

1  somebody who reports to you look through your
2  electronic E-Mail files to determine whether there was
3  any correspondence responsive to the subpoena that has
4  not been produced.
5      I'm going to request that you provide that
6  to Mr. Rothschild and I'm sure he will provide it to
7  me.
8      MR. ROTHSCHILD: I'm going to object.
9      MS. MOROCCO: Are we in agreement that you
10 will do that?
11     MR. ROTHSCHILD: Objection. The, you
12 request electronically stored information. Under the
13 rules there is a procedure for electronically stored
14 information.
15     You have not followed the procedure, and
16 therefore, I don't think, and I don't believe that you
17 can simply send out a subpoena asking for
18 electronically stored information and require someone
19 to look in their computer system for it.
20     You need to come up -- there's a whole
21 procedure that the local U.S. District Court has on how

Page 13

1  to request electronically stored information and the
2  procedure for getting electronically stored
3  information, and so I don't think you can require
4  Dr. Spodak, who is simply a witness in this case, to do
5  that without you following through or following the
6  procedure.
7      MS. MOROCCO: The ESI meet and confer, as
8  I'm sure you are well aware, refers to Rule 34, not to
9  Rule 45.
10     The subpoena was issued pursuant to Rule
11 45. It covers electronic information.
12     Any electronically stored information has
13 to be produced responsive to the subpoena.
14     So I will have an outstanding request that
15 there be a supplemental production of any information
16 responsive that is stored on any of Dr. Spodak's
17 computers.
18     MR. ROTHSCHILD: I don't believe that you
19 are correct. I think all ESI is subject to the rules
20 at the local district rules which were specifically for
21 ESI. That's why they were passed.

Page 14

1  I don't think they're restricted to whether
2  it's a subpoena or a document production, especially a
3  subpoena with a document production because you could
4  just then circumvent the rule.
5      So I don't think you're correct. I'll look
6  into it further.
7      MS. MOROCCO: Are you refusing to ask to
8  have Dr. Spodak look in his computer for information
9  that's responsive to the subpoena?
10     MR. ROTHSCHILD: Yes, I am until I'm
11 satisfied that you are permitted to do that without
12 following the ESI protocol established by the U.S.
13 District Court for the northern district.
14     MS. MOROCCO: Okay. Well, my request
15 stands.
16     MR. ROTHSCHILD: I understand.
17     MS. MOROCCO: And counsel can work this out
18 afterwards.
19     But in this day and age it would be
20 ridiculous to be served with a subpoena and then to
21 circumvent production responsive to that subpoena

Page 15

1  merely because a document resides on the computer.
2      All right. Let's continue.
3      MR. ROTHSCHILD: First of all, I object.
4      Dr. Spodak said his procedure was that all
5  ESI E-Mails are printed out, so to characterize his
6  actions as circumventing production I think is
7  inaccurate.
8      MS. MOROCCO: Okay.
9  Q  Dr. Spodak, did you provide any drafts of
10 your report in this matter to counsel for Rite Aid?
11 A  No.
12 Q  What was your, so you only provided them
13 with a final version of the report, is that correct?
14 A  Yes.
15 Q  Did you read a copy of the report to
16 counsel for Rite Aid over the telephone before
17 providing it to them?
18 A  I don't recall one way or the other.
19 Q  What is your normal procedure with regard
20 to providing or sharing drafts of reports to people who
21 have retained you prior to sending them a final copy?

Page 16

1  A  My normal procedure is, in what I'll call
2  routine cases, I send a final report in cases that have
3  some possibly novel mental health question and I'll put
4  this case in that category.
5      I'll often ask the attorney if he'd like me
6  to send a draft or simply send a final report.
7      I looked through my correspondence and the
8  only thing I have as a fax is one dated 10/5/09 to
9  Mr. Carlson which says hard copy and bill to follow.
10     From that, my standard practice if it was a
11 draft, I would have said draft report, please call upon
12 receipt.
13     Since it doesn't say that, I'm going to
14 assume that he didn't request a draft and I didn't send
15 him one. And I can't remember one way or the other if
16 I read him my opinions or not before I sent them.
17     MS. MOROCCO: I'm going to assume that
18 counsel is going to have a standing objection with
19 regard to the ESI issue so we don't have to go through
20 that every time.
21     MR. ROTHSCHILD: Yes.

Page 17

1      MS. MOROCCO: I'm going to request that you
2  look on your computer for any drafts of the report.
3      THE WITNESS: I'll make it simple. I
4  don't -- I don't want to step over your question again.
5      MS. MOROCCO: Or have your assistant or
6  your associate do so and if there are any drafts
7  residing on any computers, that those be provided.
8      Was there something you wanted to say about
9  that process?
10     THE WITNESS: Yeah. We typed these in a
11 typewriter, not particularly a computer, so they're not
12 stored in a computer.
13     Well, I guess they are stored in a
14 typewriter that has computer storage capacity. It does
15 drafts but it's not really --
16 Q  Okay.
17 A  It's not stored in a computer, but anyway.
18 Q  You're going to have to take me back in
19 time and explain to me what this typewriter is.
20 A  We don't store drafts.
21 Q  Okay.

Page 18

1 A  I mean, if I had, my standard procedure is
2 my secretary will type something up and she'll give it
3 to me.
4      I'll review it for typographical errors and
5 any changes I want to make. I'll hand it back to her.
6      She will type over it with the changes and
7 give me a final copy so there's no drafts saved or kept
8 in that regard.
9 Q  What kind of typewriter or computer is this
10 that we're talking about?
11 A  I don't know.
12 Q  So it's some sort of a typewriter that —
13 A  No, it's a computer. It just doesn't save,
14 we don't, it's our standard practice not to save
15 drafts. She types over it in a word —
16 Q  Okay. So she saves over the draft?
17 A  Yes. I guess that's, that's what you would
18 call it but we don't save —
19 Q  We're not talking about an actual like
20 Selectric IBM typewriter?
21 A  No.

Page 19

1 Q  It's a computer?
2 A  It's a computer that, in Word, where she
3 saves over the draft and doesn't save drafts.
4 Q  Okay.
5 A  It's not my standard practice to do that.
6 Q  Did you make any notes when you were
7 reviewing any documents for this case?
8 A  Yes.
9 Q  What happened to those notes? They have
10 not been produced.
11 A  They were typed onto the time line in
12 little scraps of paper that were used to type on the
13 time line.
14      Again, my routine practice is to destroy
15 them after they're typed onto a time line, so they
16 weren't saved.
17 Q  Okay. So those notes are reflected in,
18 essentially you've produced notes on top of notes with
19 some of the background information with regard to
20 Mr. Fultz.
21      Is that what you're referring to?

Page 20

1 A  No. I've produced three versions of the
2 time line and you have all three versions.
3 Q  Okay. So you're saying that your notes are
4 the time line?
5 A  Correct.
6 Q  Your report, was that dictated by you?
7 A  Yes.
8 Q  Okay. And the tape that was, it was
9 dictated onto, was that retained?
10 A  It's retained and taped over, reused.
11 Q  Okay. And have you checked to see whether
12 the report, the tape for this report was, in fact,
13 taped over?
14 A  Not specifically, no.
15 Q  I would ask that you would do that, and if
16 it wasn't taped over that it be provided to
17 Mr. Rothschild and then provided to me.
18      MR. ROTHSCHILD: I think that's an issue of
19 whether he has the — one, the subpoena asks for that
20 and two, whether he has to produce that.
21      MS. MOROCCO: The subpoena asks for all

Page 21

1 drafts. It's clearly responsive.
2      In addition, apparently Mr. Monteiro sent a
3 letter asking that all handwritten notes be preserved
4 so there shouldn't have been any typing over of
5 anything in this case with regard to the expert report.
6      Were you informed of that preservation
7 request, Dr. Spodak, by, did Rite Aid's counsel inform
8 you of that?
9      THE WITNESS: No.
10 Q  That was not shared with you?
11 A  No.
12 Q  How did you first become involved in this
13 case, Dr. Spodak?
14 A  My office was contacted by Michael Carlson
15 of Anderson, Coe & King on or about July 8th, 2009.
16 Q  You spoke to Mr. Carlson at that time?
17 A  I don't recall if I spoke to him or if he
18 just called into the office and requested an evaluation
19 date for someone and I probably spoke to him after
20 that.
21 Q  Okay. Can you describe for me the first

U.S. EEOC, et al. vs
Rite Aid Corporation

Michael K. Spodak, M.D.
November 13, 2009

Page 22

1 conversation you had with Mr. Carlson concerning any

2 substance in this case?

3 A The best of my recollection is that we

4 spoke about his request for me to examine Mr. Fultz and

5 some of the reasons for the evaluation as to whether he

6 was, he suffered any emotional harm as a consequence of

7 various actions that were allegedly taken by Rite Aid.

8 Q Did he tell you what those actions were?

9 A I don't recall specifically but I think he

10 said they would be provided in the documentation that

11 he was going to send me.

12 I think I do recall him saying that he

13 wasn't supposed to go up on the second floor, was

14 certainly one of them.

15 He wasn't supposed to drive a forklift was

16 another one.

17 Q How many conversations have you had with

18 Mike Carlson about this case?

19 A I don't know for sure but I would say

20 probably two or three at least.

21 Q How many conversations have you had with

Page 23

1 Mr. Rothschild about this case?

2 A I've spoken with him at least three or four

3 different times about it.

4 Q Okay. Why don't you go back in time to the

5 one that occurred --

6 A Actually let me just amend something.

7 When I looked on my time sheet that was

8 attached to the billing, it looks like the first

9 conversation I had would have probably been with

10 Mr. Carlson, would have been on June 26th of '09 where

11 he might have outlined or I'm presuming he outlined the

12 scope of the requested evaluation and may have given me

13 some things like I mentioned earlier such as his being

14 an individual who was asked not to go up in the second

15 floor and not to drive a forklift, would I evaluate him

16 to see if he suffered any emotional harm.

17 (Whereupon, a document was marked as Spodak

18 Deposition Exhibit Number 2.)

19 Q This will be Exhibit 2 to your deposition.

20 I will represent it's in documents produced

21 by Rite Aid in response to your subpoena yesterday,

Page 24

1 November 12th, 2009.

2 I believe that the billing statements that

3 you just referred to are contained in this set of

4 documents.

5 Could you please turn to the billing

6 statements so I could ask you some questions about

7 them?

8 A Sure.

9 Q Give me a minute to do the same.

10 MR. MONTEIRO: It's about 20 pages in or

11 so.

12 Q Have you found the billing statement,

13 Dr. Spodak?

14 A Yes.

15 Q I'll state for the record that this is in

16 Exhibit 2. It is an invoice from Dr. Spodak to Michael

17 Carlson, dates from 9/9/09 starting with 6/26/09.

18 Can you identify, please, Dr. Spodak, with

19 regard to the statement, where are, which items

20 represent communications you had with counsel?

21 A The first one.

Page 25

1 Q The 6/26 of '09?

2 A Yes.

3 Q Okay. And then just walk me through what

4 the rest of the notations are with regard to the

5 various entries there.

6 A Actually they're noted on the bottom, but I

7 can. I mean, SUT is the forensic consultation

8 telephone.

9 CR is record review. Miscellaneous would

10 be the time line assistant spent interviewing Mr. Fultz

11 the day of his, his first day at the office.

12 PSYT on 8/3/09 is the psychological testing

13 Mr. Fultz took.

14 Then I did further record review prior to

15 my interview with Mr. Fultz on 8/17/09 which is FE,

16 forensic evaluation.

17 Then it looks like more record review.

18 Whether that was part of the preparation of my report

19 or part of it was additional records that came in, I

20 don't know.

21 Q So from 6/26 through — well, 6/27 through

U.S. EEOC, et al. vs
Rite Aid Corporation

Michael K. Spodak, M.D.
November 13, 2009

---

Page 26

1  9/9 you did not have any communications with counsel,
2  is that correct?
3  A  Correct.
4  Q  So you did not communicate with counsel
5  when records were provided.  Is that also correct?
6  A  Yes.
7  Q  And you did not communicate with counsel
8  during the time that Mr. Fultz was undergoing his
9  evaluation at your office?  Is that also correct?
10 A  Yes.
11 Q  So after 9/9 of '09 when was the next time
12 that you communicated with Rite Aid's counsel?
13 A  And I have a summarized bill from 9/14/09
14 through 10/05/09. I don't have the breakout of the
15 individual hours from that.
16    A total of four hours including
17 communication with counsel, review additional records
18 and preparation of my report.
19 Q  And these would have been consultations
20 with Michael Carlson, is that correct?
21 A  Yes.

---

Page 27

1  Q  Did you have any communications with
2  Mr. Rothschild during this time period?
3  A  No.
4  Q  Do you know approximately how many
5  consultations you had with Mr. Carlson in the time
6  period from 9/14 to 10/5 of '09?
7  A  No.  I would guess one or two.  Probably in
8  a case like this I would have called him before I did
9  the report and said I've seen Mr. Fultz.
10    What are the opinions you would like me to
11 or what questions would you like me to try to answer in
12 the report?
13    What are the areas you would like me to
14 opine about. And my presumption is he would have told
15 me that and that's reflected in my report in the
16 opinions I expressed.
17 Q  Did you have a discussion with Mr. Carlson
18 about the opinions that you were going to provide prior
19 to your evaluation of Mr. Fultz?
20 A  Sure.  In a case like this which is not a
21 standard type of case I've done, I always want to know

---

Page 28

1  the questions I'm being asked to answer when I do an
2  evaluation of someone.
3  Q  Okay.  So when you said that you likely had
4  a conversation with Mr. Carlson after you did the
5  evaluation in which you asked him what opinions he
6  wanted you to render, what did he say?
7  A  Well, it's reflected in my report.  Those
8  are the opinions I -- I addressed were the ones on page
9  10 of my report.
10 Q  Okay.  So, Mr. Carlson told you that the
11 opinions that Rite Aid was retaining you to provide,
12 those are the opinions that are stated on page 10 of
13 your report, is that correct?
14 A  I don't understand your question.
15 Q  The opinions that Mr. Carlson — the
16 question is whether the opinions that Mr. Carlson told
17 you to provide are the opinions that are stated on page
18 10 of your report.
19 A  He didn't tell me, he asked me to provide.
20 I mean, do I have an opinion as to, for example, do I
21 have an opinion as to whether Mr. Fultz or whether an

---

Page 29

1  employee who is restricted from driving a forklift,
2  would that typically lead to a mental illness or
3  disorder, and down the list.
4  Q  Okay.  So the opinions that are stated on
5  page 10 of your report are the opinions that Rite Aid's
6  counsel asked you to provide in this case, correct?
7  A  Yes.
8  Q  Did he ask you to provide any other
9  opinions that are not expressed in your report?
10 A  I don't recall any, no.
11 Q  After October 5th, excuse me, of 2009, when
12 was the next time you spoke with counsel for Rite Aid?
13 A  I don't have a time sheet but I believe the
14 next time was a call from Mr. Rothschild's assistant
15 asking me to set aside some deposition time.
16 Q  To set aside some deposition time?  I'm
17 sorry.  I didn't hear you.
18 A  Yes, deposition time.
19 Q  Okay.  When was the next substantive
20 conversation you had with Rite Aid's counsel?
21 A  Probably yesterday morning.

---

U.S. EEOC, et al. vs
Rite Aid Corporation

Michael K. Spodak, M.D.
November 13, 2009

Page 30

1  Q  Did you meet with Mr. Rothschild yesterday
2  morning?
3  A  Yes.
4  Q  Where?
5  A  My office.
6  Q  How long did this meeting last?
7  A  Approximately an hour.
8  Q  Did you take notes at this meeting?
9  A  No.
10 Q  Okay.  And what was discussed?
11 A  Well, actually before that he called me
12 after I received the deposition notice and we went
13 through the list and I told him what things I had and
14 could provide and what things I didn't have and
15 therefore couldn't provide.
16    I don't know if you call that substantive
17 or not, but basically what we discussed yesterday
18 morning, he looked through my file and wanted to go
19 through and make sure he copied the various things in
20 there that were requested in the Notice of Deposition
21 to forward on to the EEOC.

Page 31

1     And then we talked some about the bases for
2  some of the opinions I expressed in my report.
3  Q  Okay.  What else did you discuss?
4  A  That would basically be it.  We also
5  discussed what time we would meet today and where the
6  deposition was being held and things like that.
7  Q  Logistics?
8  A  Excuse me?
9  Q  Logistics?
10 A  Yes, logistics.
11 Q  And did you meet with Mr. Rothschild this
12 morning?
13 A  Yes.
14 Q  How long did that meeting last?
15 A  Approximately an hour.
16 Q  Where was this meeting?
17 A  At the Dunkin' Donuts shop in the first
18 floor of this building.
19 Q  A lot of business is transacted there.
20    MR. ROTHSCHILD: At a select table.
21    MS. MOROCCO: And what was discussed at the

Page 32

1  meeting with you and Mr. Rothschild at Dunkin' Donuts?
2     THE WITNESS: Other than the potential for
3  donuts being addicting?
4  Q  That's a given.
5  A  The main thing of substance I expressed to
6  him that I did have, having gone through all the
7  records last night, first that I revised the time line.
8     I provided that to him.  I revised the
9  table of contents.  I provided that to him.
10    I did also share with him that I did have
11 an opinion, if he wanted me to provide it, about the
12 suitability of doing IMEs at employer's request versus
13 obtaining information from an employee's personal
14 physician which is likely to be more reliable and valid
15 for employer purposes.
16 Q  Okay.  Can you -- I didn't quite understand
17 the last component of -- that when you were talking about
18 your opinion about the suitability of doing IMEs at the
19 employee's request versus information provided by the
20 treating physician.
21    Can you flesh that out a little bit for me?

Page 33

1  A  Sure.
2  Q  I didn't follow you.  I'm sorry.
3  A  Over my years of experience number one, I
4  was --
5  Q  Well, first let ask you -- I don't mean to
6  interrupt you.
7  A  Yes.
8  Q  But let me ask you what exactly your
9  opinion is that you're rendering on that subject in
10 this case if you are, in fact, doing that.
11 A  I would be rendering an opinion that it's
12 much more appropriate and reliable to rely on an IME
13 assessment by an independent physician than on an
14 employee's physician in matters of workplace
15 accommodations, issues, safety and things like that.
16 Q  Okay.  And what is the basis for that
17 opinion?
18 A  Well, first, in my years of experience I've
19 done evaluations at the request of patients.  I've done
20 them at the request of employers.
21    I was on the occupational health committee

U.S. EEOC, et al. vs                                                    Michael K. Spodak, M.D.
Rite Aid Corporation                                                           November 13, 2009

Page 34

1  of MedChi for many years where we talked about
2  guidelines for doing workplace assessments.
3      I was an impartial medical opinion
4  evaluator for General Motors. I've been an impartial
5  evaluator for the Department of Labor.
6      I've been impartial evaluator for the
7  Workers Compensation Commission of Maryland.
8      And I have frequently reviewed reports
9  provided by patient physicians at their request and by
10 independent evaluators and typically, in my opinion,
11 the, in terms of looking at something that is more
12 likely to be fair and balanced, they typically come
13 from IME evaluators, not from patient physicians who
14 are often advocates for the patient and have many times
15 limited and sanitized information usually only provided
16 by the patient.
17 Q  Are you aware of any medical literature
18 that supports your, the opinion that you've just
19 rendered?
20 A  No.
21 Q  So this is based on your, your personal and

Page 35

1  professional experience, what you're rendering this
2  opinion, the basis for your opinion?
3  A  Well, I've seen literature about it. I
4  don't have, I'm not familiar with a specific article.
5      I've talked with colleagues. I've been on
6  committees and we've discussed these things.
7  Q  Well, can you —
8  A  And I've been requested to do independent
9  evaluations by government agencies and others so I
10 presume that there is a reason they do that beyond
11 simply beyond taking what the patient's physician says
12 at face value.
13 Q  Well, what I'm asking again is whether you
14 can point me to any, anything in the medical literature
15 that supports the opinion, specific articles or books
16 or treatises that support the opinion that you just
17 rendered.
18 A  Sure. Well, I just point to -- I don't
19 have it off the top of my head.
20     The main one I'd look to right now is if
21 you look in the ethical guidelines of the American

Page 36

1  Academy of Psychiatry and the law, it's often
2  recommended that you try to avoid what's called dual
3  agency and that is you don't treat a patient and be a
4  forensic expert for them at the same time.
5      It's generally considered — you try to
6  avoid that when you can. And any time a personal
7  physician starts treating a patient and then starts
8  writing employment letters, you can start approaching
9  that line.
10     The question becomes whether -- a simple
11 sick slip is not necessarily a forensic consultation,
12 but if you're going to get involved in complex
13 litigation relating to accommodation under ADA, hostile
14 work environment, emotional impact from various actions
15 employer may or may not take, then that becomes
16 definitely a far more forensic type of situation and it
17 raises all kinds of issues if you're the treating
18 physician or therapist at the same time.
19 Q  Is it your opinion -- well, first of all,
20 you are familiar with the ADA's requirements with
21 regard to reasonable accommodations, correct?

Page 37

1  A  Yes.
2  Q  Okay. Is it your opinion that whenever an
3  employee requests that their disability be accommodated
4  under the ADA that the employer send them for an
5  independent medical examination as opposed to relying
6  on medical documentation provided by their
7  practitioner?
8  A  I don't, in my opinion, it's not a specific
9  guideline. It really depends on the nature of the
10 accommodation and the nature of the circumstances.
11     If it's something pretty routine such as
12 our ergonomic chair because someone has back pain, no,
13 I don't think so.
14     But if you're getting into something that
15 is complicated and a little unusual, then I think it's
16 very advisable to have an IME doctor do the evaluation.
17 Q  And in the case where the medical condition
18 is complicated or unusual, is it your opinion that if
19 an IME is performed, then it's best to send the patient
20 to the doctor with the highest level of specialization
21 in that condition?

U.S. EEOC, et al. vs
Rite Aid Corporation

Michael K. Spodak, M.D.
November 13, 2009

Page 38

1  A  No. I think it's best to send the person
2  to a doctor who is familiar with the workplace
3  environment, who's visited the environment, who's
4  familiar with the nature of the job, the requirements
5  of the job, the circumstances under which the employee
6  is working and has as full breadth of information about
7  the individual.
8      I think that's more important because to me
9  accommodation is not about an illness. It's about how
10  the illness affects your ability to work.
11     And you don't need to be the expert in the
12  illness. You need to be the expert in how the illness
13  impacts on someone's day-to-day job responsibilities,
14  in my opinion.
15  Q  You testified that you yourself have done
16  many IMEs, correct?
17  A  Yes.
18  Q  And have you ever done an IME for a
19  condition other than a psychiatric condition?
20  A  Yes.
21  Q  What was that? What was the condition?

Page 39

1  A  It happens all the time. You don't -- I'm
2  not doing them for the other condition but I'm often
3  asked to comment about the emotional impact that comes
4  from a physical condition or an injury.
5  Q  Let me rephrase the question.
6      Have you ever provided an opinion when
7  you've done an IME that, have you ever been retained to
8  do an IME and to opine on a condition other than a
9  psychiatric condition?
10     I'm not talking about how a physical
11  condition manifests itself in psychiatry. I'm asking
12  you whether your IMEs have been limited to psychiatric
13  issues.
14  A  Typically they are although in a more
15  common example, if someone who is on high doses of pain
16  medication even though provided by a pain doctor, I'll
17  often opine about the potential impact the side effects
18  of the medication are having on an individual's ability
19  to function and function in the workplace and things
20  like that.
21     So that's I guess sort of slightly --

Page 40

1  Q  That's a psycho-pharmaceutical type issue,
2  isn't it?
3  A  Well, that's fair to say, sure.
4  Q  Yes. So it, it falls under --
5  A  But no, I don't routinely provide IMEs in
6  any area of specialization other than psychiatry if
7  that's your question, or I don't think I've ever done
8  that actually.
9  Q  If you were asked to provide an IME in an
10  area of medicine that you are not, that you didn't do a
11  residency in or that you're not board certified in,
12  would you agree?
13  A  To do it?
14  Q  To do it?
15  A  No.
16  Q  That's because you're not qualified to do
17  it, correct?
18  A  It's not my area of expertise, no.
19  Q  Okay. Have you ever evaluated an
20  employee's workplace setting as part of doing an IME?
21     Have you gone, physically gone or looked at

Page 41

1  pictures to evaluate the workplace?
2  A  Yes.
3  Q  How many times have you done that?
4  A  Oh, probably about three or four times over
5  the years I've been in practice.
6  Q  When did you first discuss with Rite Aid's
7  counsel this additional opinion that you're providing
8  in this case concerning IMEs?
9  A  This morning.
10  Q  This morning in the Dunkin' Donuts?
11  A  Yes.
12  Q  Have you, as part of your work in this
13  case, reviewed all of the IMEs that Rite Aid had -- I'm
14  sorry.
15     Have you reviewed all of the IMEs that Rite
16  Aid had that Mr. Fultz -- that were performed upon
17  Mr. Fultz at Rite Aid's direction?
18  A  I don't know if I reviewed them all.
19     I reviewed what was provided to me which
20  included the evaluations by Dr. Lesser, Dr. Krumholz,
21  Dr. Rowekamp, Dr. Dillen and Mr. Lewis, I believe was

U.S. EEOC, et al. vs
Rite Aid Corporation

Michael K. Spodak, M.D.
November 13, 2009

Page 42

1 the PA.

2 Q When did you see Dr. Krumholz's IME?

3 A That was provided early on and I reviewed

4 it again yesterday.

5 Q Can you show me where in your report or in

6 the table of contents Dr. Krumholz's IME is listed?

7 A Sure. It's in 14, University of Maryland

8 Medical Center.

9 Q Which table of contents are you reading

10 from?

11 A They're all, the first page is the same on

12 all of them.

13 Q Okay.

14 A It's number 14.

15 Q Okay. I see it. Thank you.

16    Have you stated your complete opinion with

17 regard to IMEs in this case?

18 A I think so. I mean, substantively, yes.

19 Q Okay. Again, I'm asking whether there's

20 any documentation that you reviewed in rendering this

21 opinion?

Page 43

1 A I've reviewed things over the years, not

2 specifically for this case, though.

3 Q Okay. And other than the ethical

4 guidelines for psychiatry, is there any other

5 literature that you're relying upon that you can tell

6 me with any specificity?

7 A I'm not relying on any literature per se.

8    I'm just telling you I've reviewed

9 literature over the years that comment on the

10 differences between IME evaluations and personal

11 physician evaluations.

12 Q Are there generally -- is there a general

13 procedure that you think should be followed when a

14 physician perform a workplace IME?

15 A It depends on the situation and

16 circumstances. If you're talking about this particular

17 case --

18 Q No, I'm not. I'm talking general

19 guidelines, you know, what should be done in every

20 instance with regard to an IME.

21 A And I guess it also depends on IME for what

Page 44

1 purpose?

2 Q An IME for the purpose of an employer

3 deciding whether the employee has to be restricted for

4 any reason because of a medical condition.

5 A I think the employee ought to be reviewed.

6 I think there ought to be a job description provided.

7    I think the employer ought -- the IME

8 doctor ought to be familiar with the situation of the

9 work.

10    It doesn't, you don't always have to see

11 the workplace but you have to be familiar with the

12 circumstances under which an employee's working.

13 Q Okay.

14 A I think you also have to know collateral

15 information other than just what the employee is

16 providing as to what potential circumstances have

17 happened in the workplace that might precipitate the

18 request for an IME.

19    So it's useful to have a personnel file,

20 for instance.

21    I'll say again it's not necessarily

Page 45

1 required in every case but I think it's certainly

2 helpful to make sure that's available and review it if

3 there are some things in there that would be helpful to

4 get the full scope of the situation.

5 Q Do you ever speak with the treating

6 physician when you perform IMEs?

7 A Sometimes.

8 Q How often have you done that,

9 approximately?

10 A Oh, I don't know because most of the time I

11 have reports from treating physicians that outline

12 their opinions.

13    So I don't do it as a routine but if I

14 don't have sufficient information I'll call them. I'd

15 be guessing how many times over the years but it's

16 certainly been at least a few dozen.

17 Q Okay. And when you were describing to me

18 sort of the general guidelines, sort of best practices

19 type guidelines, I'm going to interpret that as being,

20 for IMEs, you talked about an interview.

21    Now, is that an interview performed by the

U.S. EEOC, et al. vs
Rite Aid Corporation

Michael K. Spodak, M.D.
November 13, 2009

Page 46

1  doctor who is doing the IME?
2  A  Yes.
3  Q  What is the purpose of the interview?
4  A  Well, it can be for a multitude of — are
5  you talking about psychiatry or just generally?
6  Q  Generally.
7  A  Because I can really speak predominantly to
8  psychiatry.
9  Q  Okay.
10 A  The purpose is to obtain a history from the
11 individual, to -- and I certainly say that --
12 Q  Medical history?
13 A  Medical and psychiatric history.
14    And the -- and when I'm doing a fitness for
15 duty evaluation, for example, and I have -- I'll get
16 the job description.
17    I'll go through each and every duty and
18 I'll ask the person to describe for me whether he
19 thinks he can do it or he can't do it, what limitations
20 there might be, what problems there might be with it,
21 and if he can do it, how he can do it successfully

Page 47

1  given the circumstances of the possible symptomatic
2  condition.
3    I'll look at the medications they're on,
4  see whether they're having, the individual is having
5  side effects or potential side effects from the
6  medication.
7    I'll look for other, and again, this again
8  goes to the scope of the IME.
9    If it's strictly fitness for duty, that's
10 one thing.
11    If it's a question of whether the
12 individual is experiencing emotional distress because
13 of -- and you're looking for causation, then you also
14 have to interview the individual to find out what
15 potential collateral stresses there are in their life.
16    Sometimes, not always, it requires
17 interviewing someone else to request additional
18 information to see how the person is functioning from
19 the eyes of someone who knows them well.
20    Has there been a change in their function,
21 are there other collateral stressors going on that

Page 48

1  someone close to them would be able to share with you.
2  That might help get a better complete picture of what's
3  going on with an individual.
4  Q  Your, the opinion that you're rendering in
5  this case concerning fitness for duty examinations is
6  not limited to psychiatric fitness for duty
7  examinations, is it?
8  A  Those are the only ones I do.
9  Q  Okay. So, your opinion in this case with
10 regard to fitness for duty is limited to fitness for
11 duty examinations related to psychiatric issues, is
12 that correct?
13 A  Well, when you say in this case, I wasn't
14 asked to do a fitness for duty evaluation in this case.
15 Q  No, but you are rendering an opinion on
16 fitness for duty examinations, correct?
17 A  Yes.
18 Q  Okay. And that is not limited to fitness
19 for duty examinations conducted to assess a psychiatric
20 condition?
21    We're talking fitness for duty examinations

Page 49

1  generally, correct?
2  A  Yes.
3  Q  Your opinion is broader than just
4  psychiatry, is that right?
5  A  Yes.
6  Q  Okay. So would you agree with me that,
7  with regard to a fitness for duty examination for any
8  medical condition, it would be a good practice for the
9  doctor who's performing the fitness for duty to obtain
10 a detailed, to do a detailed medical interview of the
11 patient, that that would be a good practice?
12    Is that do, do you agree with me?
13 A  Again, it depends on the facts and
14 circumstances and the reason that the IME is being
15 requested.
16    If you're talking about fitness for duty,
17 yes, I think it would be certainly important to
18 interview the --
19 Q  How are you defining fitness for duty, sir?
20 A  Well, it comes up in several circumstances
21 again, and I'm speaking from personal experience.

U.S. EEOC, et al. vs
Rite Aid Corporation

Michael K. Spodak, M.D.
November 13, 2009

Page 50

1    I've been asked to interview and evaluate
2 individuals as to whether they are fit to do their job
3 and then the question is either full-time or part-time
4 either with or without restrictions.
5    So it's typically two components. One is
6 whether it's, the amount of time that they can do it
7 and the second is the degree of responsibility they can
8 have in terms of whether they can do all of the duties
9 or some of the duties.
10 Q  Okay. And would you agree with me that
11 when fitness for duty examinations are conducted for
12 those reasons that it is a good practice for the
13 physician to conduct an extensive medical interview of
14 the patient?
15 A  Well, when you say extensive medical
16 interview, I'm not sure I understand what you mean.
17 Q  To obtain all necessary medical history
18 from the patient.
19 A  I think that's reasonable, sure.
20 Q  And that could involve discussing the
21 patient's medical records with him or her if there are

Page 51

1 questions in the records, correct?
2 A  It could, yes.
3 Q  And it could also involve talking to the
4 treating physician about issues that may present
5 themselves in the records.
6    Is that -- would you also agree with me
7 that that would be a good practice?
8 A  Depending on the circumstances it could be,
9 yes.
10 Q  And you said that you typically go through
11 the job description with the employee.
12    Would you agree that that would be, that
13 that's a good practice for physicians who do fitness
14 for duties examinations to do?
15 A  Again, it depends on the question being
16 asked.
17    For instance, if somebody is being asked
18 can a person climb a ladder to a certain height, you
19 don't need to see the job description to do, to answer
20 that question.
21    If the person is being asked can the

Page 52

1 employee do all of his duties versus some of his
2 duties, then you probably do need a job description to
3 answer that question.
4    So it really depends on what question
5 you're being asked as to the scope of the evaluation to
6 answer it.
7 Q  But you, yourself, have gone through job
8 descriptions item by item with the persons that you
9 are, that you have done fitness for duties for,
10 correct?
11 A  If I'm asked whether they can perform all
12 the duties of their job, yes, I have to know what the
13 duties of their job is.
14 Q  And if there is a specific duty that's at
15 issue with regard to an accommodation or a restriction,
16 you'll discuss with them that component of their job,
17 right?
18 A  Depending on the circumstances, yes.
19 Q  Have you stated your opinion with regard to
20 fitness for duties in this case in its entirety with
21 regard to the testimony that you've just given?

Page 53

1 A  Well, the only, the information I offered
2 to Mr. Rothschild was I think that, in general, an
3 employer is, it's more advisable to rely on, in a
4 complicated case it's more reliable to rely on an
5 independent examiner than it is to rely on a personal
6 physician.
7    Beyond that, there are other opinions but
8 it sort of falls under that broad heading.
9    I mean, for instance, in a case like this,
10 I think seeing the workplace, making a visit to the
11 workplace is far superior than seeing a photograph of
12 the workplace if that were -- I mean, again, that's not
13 a psychiatric opinion.
14    That just makes common sense to me. It's
15 better to see what the person is dealing with than to
16 look at a picture of it.
17    It's important in a case like this to have
18 seen the various descriptions of Mr. Fultz's seizure
19 activity to have a full understanding of the amount of
20 time that they were taking, the degree of behaviors,
21 the nature of the behaviors that were, that he was

U.S. EEOC, et al. vs
Rite Aid Corporation

Michael K. Spodak, M.D.
November 13, 2009

Page 54

1 undergoing during these various episodes.
2    I think if one were going to opine about
3 his fitness for duties with or without restriction it
4 would be extremely important to know that from a
5 collateral source other than just Mr. Fultz.
6 Q  What is the medical basis for that?
7 A  The medical basis?
8 Q  For what you've just said, yes.
9 A  It's far more of a common sense basis. My
10 experience is that employees tend to minimize and
11 understate their conditions in many cases, or sometimes
12 they exaggerate and embellish them depending on the
13 secondary gain they're looking for.
14 Q  Is there anything in the medical literature
15 you can point me to that supports that conclusion?
16 A  I suspect there's lots and lots of things.
17 Q  Well, I'm not asking you to guess. I'm
18 asking you to point me to specific articles because I'd
19 like to read them.
20 A  I would have to do a search of them. I
21 don't have them off the top of my head.

Page 55

1    I've read them over the years, many
2 articles in terms of how you conduct IMEs, how you try
3 to remain independent, the role of advocacy that
4 certain patient's physicians have versus the
5 impartiality of an independent exam.
6    I mean, there are all kinds of articles. I
7 don't have any off the top of my head but there's
8 certainly lots and lots of things out there.
9 Q  You would agree with me that the, and I
10 think this is a basis for your opinion, that the
11 impartiality of the physician conducting the IME is
12 essential, correct?
13 A  Yes.
14 Q  And the qualifications of the physician
15 conducting the IME also matters with regard to the
16 validity of the opinions rendered, doesn't it?
17 A  It can have a, it can be a factor, yes.
18 Q  So if there are two doctors and one is less
19 qualified and one is more qualified to conduct the IME,
20 you're always going to want the more qualified doctor
21 to conduct the IME, correct?

Page 56

1 A  Except I don't understand when you say
2 qualified. That's not qualified by necessarily
3 education or your position in the community.
4    It may be qualified by whether you are an
5 advocate for the people with certain conditions versus
6 an impartial evaluator trying to look out for not only
7 the individual but for those around them.
8    It can also involve whether you are, your
9 experience with workplace issues versus experience with
10 just treating someone.
11    You can have treated all kinds of people,
12 thousands of them, but if you've never really looked at
13 the workplace and the experiences of the individual
14 within specific jobs, you may not be as qualified as
15 someone else who has done fewer examinations but has
16 great familiarity with the issues related to the
17 workplace.
18    So when you say qualifications, I say
19 definitely but it depends on the nature of the
20 qualifications.
21 Q  And is it your opinion that it's more

Page 57

1 important for the doctor conducting the IME to be
2 familiar with the workplace than it is for the doctor
3 to be, to be knowledgeable about the medical condition
4 that's at issue?
5 A  Depending on the question. If the question
6 is what's the ideal treatment for the patient, no. The
7 person who is more familiar with the treatment of the
8 illness is probably better qualified.
9    If the question is what are the reasonable
10 accommodations or adjustments to be made for a
11 particular individual in a particular work setting, I
12 think the person who is more qualified with the work
13 setting would be better qualified to answer that
14 question.
15 Q  Okay. What is the basis for your opinion
16 in that regard?
17 A  It's common sense.
18 Q  Okay. Anything other than common sense?
19 A  Yeah. I mean, the guidelines for doing
20 independent exams are, if you're going to answer a
21 question about a workplace issue, you have to have some

Gore Brothers Reporting & Videoconferencing
410 837 3027 - Nationwide - www.gorebrothers.com

U.S. EEOC, et al. vs
Rite Aid Corporation

Michael K. Spodak, M.D.
November 13, 2009

Page 58

1  familiarity with the workplace.
2  Q  But wouldn't those same guidelines also
3  indicate that if you're doing an IME concerning
4  restrictions that are based upon a medical condition
5  you have to be thoroughly knowledgeable about the
6  medical condition at issue?
7      Otherwise how could you provide a valid
8  opinion?
9  A  You have to be, sure you have to be
10  thoroughly knowledgeable about the condition but you
11  also have to be thoroughly knowledgeable about the
12  circumstances under which the employee is working.
13  Q  I am setting aside for a moment the issue
14  of the familiarity with the workplace.
15      I'm focusing exclusively on the doctor's
16  familiarity with the condition.
17      The doctor conducting the IME has to be
18  thoroughly familiar with the condition at issue,
19  correct?
20  A  It depends on the question you're being
21  asked to answer.

Page 59

1      But yes, I think you can't argue that it's
2  good to know what the condition is but it depends, the
3  degree to which that's important depends on the
4  question you're being asked and answering.
5  Q  As general matter, it's better to know more
6  than to know less about the condition that you're
7  opining about, correct?
8  A  Yes.
9  Q  Especially if what you're opining about may
10  result in some somebody losing their job.  Also
11  correct?
12  A  Or somebody else being injured as a
13  consequence of their behavior, sure.
14  Q  Sure.  Better to know more than to know
15  less, right?
16  A  Yes.
17      MS. MOROCCO: All right.  I need to go off
18  the record for a minute.
19      (A discussion was held off the record.)
20  Q  Dr. Spodak, one final area with regard to
21  the opinions that you have stated with regard to IMEs.

Page 60

1      Has Rite Aid's counsel informed you that
2  Rite Aid is retaining you to provide those opinions in
3  this case?
4  A  No.
5  Q  So you were merely told that you should
6  provide those opinions in your deposition, is that
7  correct?
8  A  No.  When I met with Mr. Rothschild this
9  morning, I said after I prepared for the deposition and
10  reviewed everything again, it occurred to me that
11  looking at the bases for the opinions by the various
12  doctors who offered opinions about Mr. Fultz's
13  accommodations at work, that I thought the one, that
14  Dr. Rowekamp was far more familiar with the
15  circumstances at work than it appeared that Dr. Lesser
16  or Dr. Krumholz were.
17      And I said that, in general, my experience
18  doing evaluations and IMEs and knowing the kinds of
19  standards that are expected, that the ones done at Rite
20  Aid's request by Dr. Rowekamp were more comprehensive
21  and probably more reliable than the ones done by Drs.

Page 61

1  Krumholz or Lesser.
2      Well, mostly Lesser more than Krumholz
3  because Krumholz was asked to do it by Rite Aid but
4  certainly the one by Lesser.
5  Q  When was the first time you saw
6  Dr. Rowekamp's IMEs?
7  A  I think it was yesterday.
8  Q  Okay.  And was that, Mr. Carlson showed
9  them to you yesterday?  I'm sorry Mr. Rothschild showed
10  them to you?
11  A  No, actually when I met with Mr. Rothschild
12  yesterday morning I asked if I could get a copy of
13  Mr. Fultz's personnel file and he provided that later
14  in the day which included Dr. Rowekamp's opinions and
15  Dr. Dillen's opinion.
16  Q  So you have reviewed Mr. Fultz's personnel
17  file as of yesterday, is that correct?
18  A  Yes.
19  Q  And you had not previously seen
20  Dr. Rowekamp's fitness for duty reports prior to
21  yesterday.  Is that also correct?

U.S. EEOC, et al. vs
Rite Aid Corporation

Michael K. Spodak, M.D.
November 13, 2009

---

Page 62

1 A  Yeah, I don't believe so because I didn't
2 see them in any of the other information I was
3 provided.
4 Q  Okay.  It's not listed in the table of
5 contents, the original table of contents to your
6 report, correct?
7 A  Correct.
8 Q  At what time yesterday did you receive the
9 personnel file or did Mr. Rothschild bring that with
10 him?
11 A  No, he faxed it, and I guess the fax, well
12 the fax was received at 16:12.
13    I didn't review it myself until last night.
14 Q  I wasn't in the military.  What time is
15 that?
16 A  4:12.
17 Q  4:12.  See, but I can add.
18    MR. ROTHSCHILD: You missed an experience
19 in your life by not being in the military.
20    THE WITNESS: Indeed.
21    MS. MOROCCO: My brother is an air force

---

Page 63

1 captain so we got it covered.  Okay.  Go on.
2    THE WITNESS: I didn't review it until last
3 evening.
4    MS. MOROCCO: Okay.  Mr. Rothschild, I
5 don't think we have -- let me ask you this.
6    The documents that Dr. Lesser is referring
7 to -- I'm sorry, Dr. Spodak is referring to as the
8 personnel file, are those documents that were listed in
9 the E-Mail that you sent to me yesterday?
10    MR. ROTHSCHILD: No.  They were the
11 documents -- right.  They were the documents listed by
12 Bates numbers in the E-Mail and they were -- let me
13 just correct that.
14    I did not send Dr. Spodak a, quote,
15 unquote, personnel file.  He asked for information with
16 regard to, certain information with regard to --
17    MS. MOROCCO: Let me let him tell me what
18 he asked for.
19    MR. ROTHSCHILD: Well, you just asked me.
20    MS. MOROCCO: You're verifying that what
21 you sent him were the documents you listed by Bates

---

Page 64

1 number in the E-Mail that you sent me, correct?
2    MR. ROTHSCHILD: Yes.  And I believe
3 they're all documents that are already in the record
4 that you already have.
5 Q  Okay.  Dr. Spodak, tell me exactly what
6 documents you asked Mr. Rothschild to send you.
7 A  I asked for records from Mr. Fultz's
8 personnel file.
9    When we spoke yesterday morning,
10 Mr. Rothschild indicated that there were some documents
11 in there that had a more complete description of
12 Mr. Fultz's seizures and the nature of them so I said
13 well, that would be helpful to take a look at.
14    So that and also the medical documentation
15 from the people that Rite Aid asked to see Mr. Fultz
16 which would be Dr. Rowekamp and it looks like
17 Dr. Dillen and a PA.
18    So I said, you know, send me whatever along
19 those lines that you have that would be, that I could
20 review and I got a fax that had about --
21 Q  Did you could ask him for the complete --

---

Page 65

1 A  -- 20 --
2 Q  -- personnel file?  Sorry.
3 A  I don't recall if I did or not.  I asked
4 him for the things that would be relevant to do with
5 anything to do with Mr. Fultz's condition.
6    I don't know --
7 Q  Now --
8 A  I don't know what they contain in the
9 standard personnel file.
10 Q  You confused me.  You've said twice that
11 you asked for the personnel file.
12    Then there was some testimony about asking
13 for documents concerning his seizures and then other
14 testimony about asking for documents related, showing
15 the fitness for duty examination.
16    So, you know, think back and tell me what
17 it is you asked for.
18 A  I asked for anything in the personnel file
19 that would be helpful to understand what was going on
20 with Mr. Fultz in the workplace, I mean, basically.
21    I'm not interested in his time sheets.  I'm

---

Gore Brothers Reporting & Videoconferencing
410 837 3027 - Nationwide - www.gorebrothers.com

U.S. EEOC, et al. vs
Rite Aid Corporation

Michael K. Spodak, M.D.
November 13, 2009

Page 66

1  not interested in every canceled check that he had.
2  I'm not interested in a lot of things that may also be
3  in a personnel file.
4      So when I spoke with Mr. Rothschild, the
5  understanding was anything related to Mr. Fultz's
6  condition at work, the nature of the seizures, the
7  evaluation reports, things like that.
8      Beyond that I didn't say specifically here
9  is what I need, but certainly when we spoke it was
10 clear that that was the kind of information I was
11 seeking.
12 Q  Why didn't you ask for these documents at
13 an earlier point in your work on the case?
14 A  I don't know.  I guess I relied on
15 Mr. Carlson to send me whatever he thought was relevant
16 and until you start getting ready for a deposition and
17 going through everything again, sometimes you don't
18 realize what you haven't seen.
19     That often happens with me and then I call
20 the attorney and say listen, I don't have this, that or
21 the other thing.  If you have it, send it.

Page 67

1      Sometimes it involves depositions,
2  sometimes it's involves other discovery, sometimes it
3  involves personnel records, depending on the
4  circumstances.
5  Q  I'm handing you Exhibit 3 to your
6  deposition.
7      (Whereupon, a document was marked as Spodak
8  Deposition Exhibit Number 3.)
9  Q  I'll represent to you that this is an
10 E-Mail that Mr. Rothschild sent to me yesterday
11 afternoon listing additional documentation that you've
12 reviewed.
13     Do you recognize this as the documentation
14 that he faxed you yesterday?
15     And I'll represent that OMS is Occupational
16 Medical Services.  That's Dr. Rowekamp's practice.
17     TUC is Total Urgent Care.  That's
18 Dr. Dillen's practice.
19     Do you, is that a copy of all the -- are
20 you looking through the fax?
21 A  Yes.

Page 68

1  Q  Why don't you just give that to me and I'll
2  have that made an exhibit and I'll just return it to
3  you.  Thank you.
4  A  That would be easier because mine are
5  not -- well, these are not in order Bates stamped so
6  I'd have to go through each one if you wanted me to
7  check off whether I, in fact, got each and every one of
8  them because I don't know.
9      I mean, they look basically like the same
10 ones but without going through each Bates number and
11 checking it, I don't know if they're, if it's every
12 one.
13     MS. MOROCCO:  Okay.  Let me step out and
14 have this made an exhibit and I will be right back.
15     (Whereupon, a document was marked as Spodak
16 Deposition Exhibit Number 4.)
17 Q  Dr. Spodak, I'm handing you Exhibit 4 to
18 your deposition.
19     Can you take a minute to review it and let
20 me know whether these are the documents that
21 Mr. Rothschild sent to you yesterday?

Page 69

1  A  Yes.
2  Q  And you, this fax was sent to you at about
3      4:12 in the afternoon, is that right?
4  A  Yes.
5  Q  And did you review all these documents
6  after you received them?
7  A  Yes.
8  Q  And as a result of reviewing these
9  documents, have your original opinions in the case
10 changed at all?
11 A  No.
12 Q  And are you relying on these documents with
13 regard to any of your original opinions in the case?
14 A  I don't know that I'm relying on them.  I'm
15 certainly considering them and factoring them into the
16 opinions, yes.
17 Q  But your review of the documents has not
18 resulted in any change in the original opinions which I
19 believe are on page 10 of your report, correct?
20 A  Correct.  These are the same.
21     MR. MONTEIRO:  Can we mark that and we'll

Page 70

1  switch it at the break.

2      THE WITNESS: Do you want the original

3  back?

4      MS. MOROCCO: If you don't mind giving it

5  to me at a break, that would be great.

6      Now, my understanding from the testimony

7  you gave a few minutes ago was that you, that you asked

8  Mr. Rothschild to provide you with documents related to

9  Mr. Fultz's employment situation at Rite Aid, correct?

10      THE WITNESS: Yes.

11  Q   And all of the documents that he provided

12  with regard to that request are contained in Exhibit 4,

13  right?

14  A   Yes.

15  Q   And all the documents previously provided

16  to you by Rite Aid are listed in the original table of

17  contents to your report.  Is that also correct?

18  A   Yes.

19  Q   You're being handed Exhibit 5 to your

20  deposition.

21      (Whereupon, a document was marked as Spodak

Page 71

1  Deposition Exhibit Number 5.)

2  Q   Can you identify what this document is for

3  me, please?

4  A   That's a table of contents I completed last

5  night in anticipation of the deposition today.

6  Q   Okay.  Can you, starting with, walk me

7  through the changes and tell me what they are.

8  A   The first 42 items were those that were

9  originally provided to me by Mr. Carlson and which I

10  believe I had at the time I evaluated Mr. Fultz with

11  the exception of the deposition of Jodi French.

12      I didn't have that at the time I evaluated

13  Mr. Fultz.

14  Q   Okay.  And when did you get Dr. French's

15  deposition?

16  A   There's probably a fax that or an E-Mail

17  copy that might have that.  Oh, let me amend something

18  else I just remembered.

19      I did ask Mr. Rothschild to provide one

20  additional document and at my request he did provide me

21  item 43, which was the EEOC determination letter.

Page 72

1  Q   Okay.  Is that in exhibit, is the

2  determination in Exhibit 4?

3  A   No, it's item 43.  Exhibit 4 is item 50 on

4  my, on my time line.  I mean on my table of contents.

5  Q   So, was the determination included in the

6  fax or did you receive it at a different time?

7  A   I receive it earlier.

8  Q   So during your meeting with Mr. Rothschild

9  yesterday was the first time you saw the EEOC's

10  determination?

11  A   No, that was E-Mailed to me a couple days

12  before that.

13  Q   Okay.  I don't think we have a copy of that

14  E-Mail.  It hasn't been provided and we asked for all

15  correspondence.

16      MR. ROTHSCHILD: Well, I'll look to see it

17  but I didn't think an E-Mail cover sheet was what was

18  considered correspondence since all it says is

19  enclosed.

20      MS. MOROCCO: Well, it creates a chronology

21  and documents information provided to the expert so of

Page 73

1  course.

2      MR. ROTHSCHILD: I'll be glad to provide

3  it.

4  Q   There were two EEOC determinations in this

5  matter.  Do you know, Dr. Spodak, which one was

6  provided to you?

7  A   The one I have is dated August 20th, 2007.

8  Q   And do you know why that was provided to

9  you?

10  A   Yes.

11  Q   Why?

12  A   Because I asked for it.

13  Q   And remind me approximately when you

14  requested it?

15  A   Sometime earlier this week.  I think Monday

16  or Tuesday perhaps.

17  Q   Okay.  And why did you decide you would

18  like to review that document?

19  A   Because when I reviewed this case I was

20  scratching my head how the EEOC could possibly find any

21  fault for Rite Aid that looked to me like they kind of

U.S. EEOC, et al. vs
Rite Aid Corporation

Michael K. Spodak, M.D.
November 13, 2009

---

Page 74

1 bent over backwards to accommodate Mr. Fultz and I was
2 curious if there was any information in there that
3 might help explain that.
4 Q   What is your understanding of the claims
5 that are being brought by the plaintiffs in this case?
6 A   Well, that may be a legal question, but I
7 can review the complaint if you want.
8 Q   Well, you have reviewed the complaint,
9 correct?
10 A   Yes.
11 Q   So based on your review of the complaint,
12 what is your understanding?
13 A   My understanding is that Mr. Fultz believes
14 that he was discriminated against because he was not
15 allowed to go up on the second floor, which his
16 physician said he could do and which the IME doctor
17 said that it was unsafe for him to do.
18     And also he claimed that he was in a
19 hostile work environment, although when I interviewed
20 Mr. Fultz he tended to negate that.
21     And that he was denied a promotion to lead

Page 75

1 as a result of his claims of discrimination in the
2 workplace based on his inability to go up on the second
3 floor, which was a consequence of his seizure disorder.
4 Q   Are you aware of any other claims that the
5 plaintiffs are bringing?
6 A   Not without looking through the -- actually
7 I don't have the complaint. Not without looking
8 through something else.
9     No, I'm not aware of anything else
10 specifically.
11 Q   Okay. Why don't you take a look at your
12 report and let me know if that helps refresh your
13 recollection about the claims that are at issue in this
14 case?
15 A   Well, I don't know if it was a claim but
16 one of the, one of the remedies Mr. Fultz was seeking I
17 guess was damages because he claimed that he developed
18 some mental illness as a consequence of the actions by
19 Rite Aid.
20 Q   Okay.
21 A   And that's the main basis for which I was

Page 76

1 evaluating him. I don't know if that would be a, what
2 you consider a claim or a request for relief.
3 Q   With regard to the claims, I am really
4 asking you what your understanding is with regard to
5 the adverse employment actions that Mr. Fultz is
6 complaining about and the EEOC is complaining about.
7     You've listed not allowed to go on the
8 second floor, the hostile work environment, denial of
9 promotions.
10     Is there anything else that you're aware of
11 that's at issue in this case with regard to Rite Aid's
12 actions towards Mr. Fultz?
13 A   Well, when you said why don't I review my
14 report to better answer that, I assumed you felt there
15 was something in my report that helped clarify it.
16     I don't see anything there that helps
17 clarify it.
18 Q   No, I just, you know, I don't like people
19 guessing and if there's a document that will help you,
20 and I'm assuming that it --
21 A   Well, a document that might help me is the

Page 77

1 complaint which I was not provided.
2 Q   You were not provided a copy of the
3 complaint in this case?
4 A   That's correct.
5 Q   Rite Aid has not given you a copy of the
6 complaint?
7 A   That is correct.
8 Q   Have you had any discussions with Rite
9 Aid's attorneys about the claims that are at issue in
10 this case?
11 A   Yes.
12 Q   And what were you told?
13 A   I already responded to that when you asked
14 me about my original conversation with Mr. Carlson.
15 Q   What was that?
16 A   I've had conversations with Mr. Rothschild
17 that I've tried to summarize for you as to the areas
18 of, that I was being requested to opine about which was
19 presumably based on claims or complaints that Mr. Fultz
20 has made.
21 Q   Okay. Well, just for the purpose of my own

---

U.S. EEOC, et al. vs                                    Michael K. Spodak, M.D.
Rite Aid Corporation                                         November 13, 2009

Page 78

1  clarification, what did Rite Aid's attorneys tell you
2  with regard to the legal claims that are at issue in
3  this case?
4  A  That --
5  Q  And let me just try to simplify it.
6      What did Rite Aid's attorneys tell you with
7  regard to what Mr. Fultz is complaining about in the
8  lawsuit and what the EEOC is complaining about in the
9  lawsuit?
10 A  That Mr. Fultz felt he was improperly
11 denied access to the second floor.
12     That apparently Rite Aid should have
13 listened to his doctor instead of their own IME
14 physician on restrictions in the workplace to
15 accommodate his seizure disorder.
16     That as a result of being denied access to
17 the second floor, he was denied a promotion.
18     That because of being denied the promotion
19 and because of the restrictions placed on him he
20 suffered mental and emotional harm, and that the EEOC,
21 it's my understanding, believes that Rite Aid acted

Page 79

1  discriminatorily toward Mr. Fultz in the way they
2  addressed his seizure disorder.
3  Q  With regard to the issues that you've just
4  listed, correct?
5  A  Well, not with regard to the emotional
6  harm --
7  Q  Right.
8  A  -- but with regard to the restriction of
9  the second floor and the denial of the promotion and
10 also there is somewhere in here a claim of hostile work
11 environment that I believe, and I don't know how
12 further that got flushed out.
13 Q  Have you told me about all the claims that
14 you're aware of that are being brought in this action?
15 A  Yes.
16 Q  Okay.  Let's go back to Exhibit 5, which is
17 your revised table of contents.
18     You were walking me through the changes and
19 you were explaining about the EEOC determination
20 letter.
21     Can you continue with number 44, please?

Page 80

1  A  44 is my, the psychological testing
2  Mr. Fultz completed during my evaluation.
3      45 are the interview notes that I obtained
4  during my evaluation.
5      46 is Dr. Biondo's records which I received
6  on October 8th, 2009 by fax.
7  Q  Okay.  Can I see those, please?
8  A  Sure.
9      MS. MOROCCO:  Again, I just would state for
10 the record that these fax cover sheets are responsive
11 to the EEOC's rule 34 request.
12     They were also responsive to the rule 45
13 subpoena served upon this witness.  They've not been
14 provided prior to the deposition and they should have
15 been.
16     So if there's any other communications with
17 this expert that have not been provided that exist,
18 those need to be produced.
19     MR. ROTHSCHILD:  Well, I frankly don't view
20 fax cover sheets that don't contain anything more than,
21 like aren't any more than a cover sheet --

Page 81

1      MS. MOROCCO:  Well, this one says it's --
2      MR. ROTHSCHILD:  Let me just finish.
3      MS. MOROCCO:  This one is more than that.
4      MR. ROTHSCHILD:  Can you give me --
5      MS. MOROCCO:  Of course.
6      MR. ROTHSCHILD:  -- the respect of letting
7  me finish?
8      MS. MOROCCO:  Mm-hmm.
9      MR. ROTHSCHILD:  A correspondence, to the
10 extent they have any information in them, I would agree
11 with that.
12     I don't know -- you looked at one.  Are you
13 contending it was never produced?  I don't know.
14     MS. MOROCCO:  It was not produced and
15 neither was this attached for your review is a complete
16 copy of the medical records received in response to the
17 subpoena issued to Thomas Biondo, M.D. and Union
18 Medical Clinic.
19     So this fax cover sheet would have informed
20 us of documents not listed in the report at the time
21 that were reviewed by this expert.

U.S. EEOC, et al. vs
Rite Aid Corporation

Michael K. Spodak, M.D.
November 13, 2009

Page 82

1    MR. ROTHSCHILD: Well, frankly I was
2 unaware of that.  No, they're listed on this table of
3 contents.
4    MS. MOROCCO: The new table of contents
5 that was produced this morning.
6    MR. ROTHSCHILD: Well, I guess that's the
7 way they were produced because they weren't, the
8 witness didn't recall that he reviewed them at the
9 time.
10    I can't produce something I'm unaware of.
11    MR. MONTEIRO: You have a fax cover sheet
12 right here, (indicating).
13    MS. MOROCCO: It's from —
14    MR. MONTEIRO: From your office.
15    MR. ROTHSCHILD: One person at a time,
16 please.
17    MS. MOROCCO: Is Michael Carlson your
18 partner, was he your partner?  Is he your partner?
19    MR. ROTHSCHILD: I'm not answering your
20 questions.  If you have questions for this witness,
21 let's go ahead.

Page 83

1    You're spending an inordinate amount of
2 time on things that don't relate to the opinions of
3 this witness and I would ask you to go ahead.
4    If you have some questions about production
5 and the fax cover sheets, we can talk about it after
6 the deposition.
7    MS. MOROCCO: I think that Rule 26(a)(2)
8 makes clear that any information considered by the
9 witness needs to be revealed in the witness's report.
10    Here I'm looking at 44 pages of documents
11 identified in the fax cover sheet which I'm just
12 learning about now that were reviewed by this witness.
13 So, I take issue with your characterization.
14    All right.  I'm going to proceed.
15    Dr. Spodak, you have shown me this fax you
16 received.  It's dated Thursday, October 8th of 2009.
17    It contains 44 pages of, well, it says
18 records of Thomas Biondo and Union medical clinic.
19    I'm going to hand this back to you and ask
20 you why, do you know why you were receiving this
21 information at that time?

Page 84

1    MR. ROTHSCHILD: Let me just ask you,
2 Miss Morocco, have you previously had copies of
3 Dr. Biondo's records?
4    MS. MOROCCO: I believe so, yes.  That's a
5 separate issue as to what the expert considered though.
6    THE WITNESS: They were sent to me by
7 Mr. Carlson.  I guess you would have to ask him why he
8 sent them.
9    I would add that a number of them are
10 duplicates of things that I had already reviewed in
11 other files, particularly the Johns Hopkins information
12 contained in the 44 pages.
13    But beyond that, if you're asking why I
14 received it, I presume — I don't want to presume for
15 Mr. Carlson.
16    I assume as things came in, and as in many
17 cases, I'm provided information as it comes in in
18 response to various discovery requests.
19 Q    Did you have any communications with
20 Mr. Carlson at this time explaining why he was sending
21 you nearly 50 pages of medical records on October the

Page 85

1 8th?
2 A  No, I don't recall any specifically.  Like
3 I say, routinely I am, when I'm involved in cases, as
4 things come in, I'm provided them.
5 Q  Well, did you review these documents after
6 Mr. Carlson sent them to you on October the 8th?
7 A  Yes.
8 Q  And did these documents change your
9 opinions that you've rendered in your report in any
10 way?
11 A  No.
12 Q  Have they changed, are you making any
13 additional opinions in the case as a result of your
14 review of these documents?
15 A  No.
16 Q  I'm going to I think attach the documents
17 as an exhibit but I don't want to take the time to deal
18 with the photocopying now.
19    Can we make a note that it is Exhibit 6?
20    These are records that were attached to the
21 fax cover sheet from Michael Carlson to Dr. Spodak

U.S. EEOC, et al. vs                                                    Michael K. Spodak, M.D.
Rite Aid Corporation                                                        November 13, 2009

Page 86

1   dated October 8th of 2009, will be Exhibit 6 to the
2   deposition.
3   A   Do you want to mark them?
4   Q   Yes.  I will return these.  How's that?
5       (Whereupon, a document was marked as Spodak
6   Deposition Exhibit Number 6.)
7   Q   Okay.  Let's continue with the table of
8   contents please, Dr. Spodak.
9   A   47 was something I looked up because --
10  let's see.
11      I was curious what the responsibility is on
12  a driver in Maryland to report to the DMV if the
13  individual has a seizure disorder and whether they
14  should be able to drive.
15      It's my understanding Mr. Fultz did not
16  report to the DMV, particularly when he renewed his
17  license, and on an ongoing basis that he was having
18  these seizures that were rendering him basically
19  incapable of driving.  I thought that was risky.
20      48 --
21  Q   I'm not finished with 47.

Page 87

1   A   Oh, okay.
2   Q   Sorry.  So 47 was provided to you by Rite
3   Aid's attorneys, correct?
4   A   No, 47 I found myself online.
5   Q   Okay.  So you accessed Mr. Fultz's driving
6   record?
7   A   No.  I went to a generic Web site that said
8   how long do you have to be seizure free in order to
9   drive in Maryland and then additional DMV records about
10  what the responsibility is of the individual to report.
11      If they have a seizure disorder, do they
12  have a responsibility to report to the DMV if they do,
13  and my understanding is the answer is yes.
14  Q   So you looked up the driving laws?
15  A   Yes.
16  Q   And what prompted you to look up the
17  driving laws?
18  A   Because I thought it was very irresponsible
19  of Mr. Fultz to be driving around with the condition
20  he's got.
21  Q   How did you know he was driving?

Page 88

1   A   Because my recollection is it was in his
2   deposition that he was driving and I think when I
3   evaluated him he was driving.
4       I can look back in my notes.
5   Q   Didn't his wife accompany him to his
6   evaluation?
7   A   She did at least one of the days.  I don't
8   know if she did both days.
9   Q   Okay.  And you have no personal knowledge
10  of how Mr. Fultz got to your office, do you?
11  A   No.
12  Q   Okay.  Did you have any discussions with
13  any of Rite Aid's attorneys about this issue about
14  Mr. Fultz's driving?
15  A   I mentioned to Mr. Rothschild I thought it
16  was irresponsible of him and probably illegal for him
17  to be driving without reporting to the DMV the nature
18  of, the full nature of his seizure disorder.
19      It seemed consistent with Mr. Fultz's
20  efforts to minimize and understate the severity of his
21  condition, in my opinion.

Page 89

1
2       MR. MONTEIRO: Sorry.  Can you read back
3   the last answer?
4       (The reporter read back as requested.)
5       MR. MONTEIRO: Thank you.
6       MS. MOROCCO: What is the basis for your
7   understanding of whether Mr. Fultz's reported anything
8   concerning his seizures to the DMV?
9       THE WITNESS: In his deposition he stated
10  that when he renewed his license I think it was '07,
11  he did not tell the DMV that he had a seizure disorder,
12  although he did tell them five years earlier.
13      It's also that he I believe stated in his
14  deposition that he routinely drove his car, and I think
15  that's the basis.
16  Q   Are you providing any expert opinions in
17  this case about the Maryland driving regulations with
18  regard to persons with seizure disorders?
19  A   I think they speak for themselves.
20  Q   Okay.
21  A   I don't know if they need an expert

Page 90

1  interpretation.
2  Q   The question is whether you are providing
3  expert opinion on that subject.
4       MR. ROTHSCHILD: Objection. He answered
5  the question.
6       MS. MOROCCO: No, he did not.
7       MR. ROTHSCHILD: Well, in your opinion.
8       THE WITNESS: I have not specifically been
9  asked by counsel to provide an expert opinion on my
10 interpretation of the Maryland driving regulations, no.
11 Q   And you are not providing an expert opinion
12 as to whether Mr. Fultz has complied with these laws,
13 are you?
14 A  No.
15 Q   Because you are not an attorney, correct?
16      MR. ROTHSCHILD: Objection. It assumes you
17 have to be an attorney to understand the Maryland
18 regulations.
19      If that's true, nobody would be allowed to
20 drive.
21      MS. MOROCCO: This is not within the scope

Page 91

1  of your professional expertise, is that correct?
2       THE WITNESS: It's within the scope of my
3  being a responsible driver.
4  Q   Okay. You've been retained because of your
5  expertise as a psychiatrist, correct?
6  A  Yes.
7  Q   So the question I had was whether issues
8  concerning driving and epilepsy are within the scope of
9  your expertise as a psychiatrist.
10 A  No.
11 Q   And you're not rendering opinions on this
12 issue in this case under Rule 26, correct?
13 A  Well, I don't know what the opinion would
14 be. There's no opinion.
15      The law speaks for itself and Mr. Fultz's
16 conduct speaks for itself. I'm not sure there's an
17 opinion in there.
18 Q   Okay.
19 A  But no, the answer is I don't plan to offer
20 an opinion about, about that.
21 Q   When was the first time you had a

Page 92

1  discussion with any attorney for Rite Aid concerning
2  this issue about Mr. Fultz's driving?
3  A  Probably with Mr. Rothschild, in one of my
4  conversations with him, I think.
5  Q   Okay. When was the first time you spoke
6  with him, again?
7  A  Probably a week or so ago.
8  Q   Okay. So it's within a week of today?
9  A  Yes.
10 Q   Has the information concerning Mr. Fultz,
11 Mr. Fultz's driving affected your, the opinions that
12 you've rendered in this case at all?
13      Does it form the basis for any of your
14 opinions?
15 A  I think it would be consistent with my
16 opinion that whatever emotional difficulties he
17 suffered, they were from collateral sources.
18      One important collateral source is if
19 you're driving around worried that you might, you could
20 lose your license at any time because of your medical
21 condition, that would certainly be a huge stressor in

Page 93

1  someone's life.
2  Q   Okay. Can you, can you point to me in the
3  notes of the intake interviews with Mr. Fultz where he
4  said he was stressed about driving because he has
5  epilepsy?
6  A  I don't have to have it in the notes.
7       It's just my general knowledge as a
8  psychiatrist from years of experience that those kind
9  of things are huge stressors.
10 Q   You're assuming that this issue caused Mr.
11 Fultz stress, correct?
12      MR. ROTHSCHILD: Objection. He's not
13 assuming. It's his, it's part of his opinion as an
14 expert.
15      MS. MOROCCO: He's not, he just stated he
16 is not providing an expert opinion on this matter.
17      MR. ROTHSCHILD: That's not correct.
18      He said that he was providing an expert
19 opinion that anyone who is driving when they shouldn't
20 be driving, that would create stress.
21      He's talking about the stress issue.

U.S. EEOC, et al. vs
Rite Aid Corporation

Michael K. Spodak, M.D.
November 13, 2009

Page 94

1  Q   You're assuming though, with regard to
2  Mr. Fultz as an individual, that that caused him
3  stress, is that correct?
4  A   I am assuming that that is an important
5  collateral stressor.  Whether he admitted it or not, it
6  is a stressor.
7       In my opinion, for anyone, including
8  Mr. Fultz, to be driving knowing that they are not
9  supposed to be risking their life and other people's
10 life on the highway every time they get behind the
11 wheel of the car, is in my opinion a huge stressor for
12 anyone in that situation, Mr. Fultz and others.
13 Q   Was Mr. Fultz asked by yourself or by
14 anybody else in your practice who interviewed him
15 whether driving with his epilepsy caused him to have
16 stress?
17 A   I would have to look through my notes to
18 answer that question.
19 Q   Okay.  Why don't you go ahead and do that.
20 A   I don't see any reference in my notes to
21 his driving or being stressed by whether he was a

Page 95

1  danger on the road or not or in fear of losing his
2  license because of his seizure disorder.
3  Q   So he was not, based on your review of your
4  notes, it appears that he was not asked about that
5  particular stressor, correct?
6  A   That appears to be the case, yes.
7  Q   Speak up, please.  I can't hear you.
8  A   Yes, that appears to be the case.
9  Q   Okay.
10 A   However, going through my notes, in
11 response to an earlier question, it looks like -- when
12 you asked me about my understanding of the claims in
13 this case, there is information in the notes that
14 Mr. Fultz believed that the Rite Aid requirement that
15 someone else be present in the cage where the
16 medications were kept, I believe he felt that was
17 discriminatory.
18      And that was one of his claims, at least
19 from my interview with him.
20 Q   Okay.  There is actually a reference to
21 driving in your notes.

Page 96

1  A   Oh.
2  Q   If you turn to page 56.
3  A   Thank you.
4  Q   It's about halfway down.  But it's in the
5  context of Mr. Fultz having to think about the
6  discrimination at Rite Aid when he's driving to work,
7  correct?
8  A   That answers the question of whether he was
9  driving.
10 Q   Every day I had to drive to work thinking
11 about what they were doing to me and then walk through
12 the door of the RX department and what I couldn't do
13 anymore.
14      So the reference to driving is him telling
15 you or your assistant about being consumed with
16 thoughts about the restrictions while he was driving to
17 work, correct?
18 A   Yes.  Thank you.
19 Q   Okay.
20 A   That helps clarify how he keeps missing the
21 elephant in the living room.

Page 97

1       MR. ROTHSCHILD:  What page did you say that
2  was?
3       THE WITNESS:  56.
4       MS. MOROCCO:  Okay.  Can you continue with
5  walking me through your table of contents which is
6  Exhibit 5 to your deposition?
7       THE WITNESS:  Sure.  48, I went on line and
8  looked up some information on, from the ADA and the CDC
9  about accommodation and seizure disorders.
10 Q   Okay.  Let me just stop you for a minute.
11      The driving, did you print out the driving
12 restriction information that you looked up?
13      Is it part of your file?
14 A   Well, the simple answer is here is what I
15 printed out.
16 Q   Okay.
17      MR. ROTHSCHILD:  It was provided to you.
18      MS. MOROCCO:  Is that correct?
19      MR. MONTEIRO:  I don't recall seeing it.
20      MS. MOROCCO:  I think what was provided to
21 us was a, some sort of background search that your

Page 98

1 office did of his driving record, but I don't --
2     MS. MOROCCO: This looks right.
3     MR. ROTHSCHILD: Did you get a copy of
4 that?
5     MS. MOROCCO: Yes, we did. I apologize.
6     MR. ROTHSCHILD: That's okay.
7     MS. MOROCCO: Thank you.
8     So this printout is dated 11/11 of 2009.
9 Is that when you accessed this information on the
10 internet, sir?
11     THE WITNESS: Yes.
12 Q  That was yesterday or the day before?
13 A  Two days ago.
14 Q  Two days ago?
15 A  Yes.
16 Q  Okay. Let's just state for the record
17 that -- do you have a Bates number?
18     MR. MONTEIRO: There's no Bates number.
19     MS. MOROCCO: Okay. Well, let's state for
20 the record that number 47 is --
21     MR. ROTHSCHILD: What were you going to

Page 99

1 mark?
2     MS. MOROCCO: I just want to say what it is
3 for the record.
4     Number 47 of the supplemental table of
5 contents is in Exhibit 2, and it's the Sober College,
6 well, Laws Regarding Epilepsy and Driving by State.
7     It's a computer printout dated on
8 November 11th of 2009.
9     THE WITNESS: Actually there's more that
10 goes with that. This is something I printed out last
11 evening from the Maryland Drivers Handbook online.
12 Q  Were you, was it suggested to you by Rite
13 Aid's counsel that you look up this information --
14 A  No.
15 Q  -- with regard to driving and epilepsy?
16 A  No.
17 Q  Okay. So, who is Carol Fisher?
18 A  That's my fiancee.
19 Q  Why was your -- the E-Mail appears to be
20 from your fiancee to yourself. Why was she sending you
21 information about driving with epilepsy?

Page 100

1 A  Because last night when I was reviewing
2 this case I asked her if she could please, she's great
3 at finding things on the Internet.
4     I said please find out what the
5 responsibility is for a driver, in various medical
6 conditions, to report it.
7     So she found that and sent it to me and I
8 printed it out.
9 Q  What is Miss Fisher's profession?
10 A  She's not, doesn't have, right now she's
11 unemployed but she was, did sell car insurance in the
12 past.
13 Q  Okay. I'm going to mark the E-Mails as,
14 the E-Mail containing this additional driving
15 information as Exhibit 7.
16     I'm going to copy it and return it to you
17 at a break. Is that okay?
18     THE WITNESS: Sure. That would go in
19 section 47.
20     MS. MOROCCO: Okay.
21     (Whereupon, a document was marked as Spodak

Page 101

1 Deposition Exhibit Number 7.)
2     MR. ROTHSCHILD: What did you mark as 6?
3     MR. MONTEIRO: That's the Dr. Biondo
4 E-Mail.
5     MR. ROTHSCHILD: Okay.
6     MR. MONTEIRO: Right.
7     MS. MOROCCO: It's the fax from Michael
8 Carlson to Dr. Spodak containing Dr. Biondo's records.
9     Let's continue with number 48. Do you have
10 a printout of that?
11     THE WITNESS: You've been provided it.
12 Q  I'm sorry. Was that Exhibit 7?
13 A  No.
14 Q  Can you identify that for me, where it is?
15 A  It's in Exhibit 2.
16 Q  Okay.
17 A  At the end.
18 Q  Yeah, but this has not been made an exhibit
19 yet, correct?
20 A  Excuse me?
21 Q  This has not been made an exhibit yet, has

U.S. EEOC, et al. vs
Rite Aid Corporation

Michael K. Spodak, M.D.
November 13, 2009

Page 102

1  it?

2  A  Yeah, it's part of 7.  Or part of 2 I mean.

3  I'm sorry.

4      MS. MOROCCO: 2?  Okay.

5      MR. MONTEIRO: Yes.

6      THE WITNESS: You also had, this has been

7  provided to you already.

8      MS. MOROCCO: Yes, thank you.

9      THE WITNESS: In 47.  It's in, behind the

10  number 48.

11  Q  And when did you --

12  A  Oh, excuse me a second.  You also had the

13  fax that Mr. Carlson provided as to the, when I

14  received the transcript of Jodi French's deposition.

15  Q  Now, when --

16  A  Wednesday, September 23rd, 2009.

17  Q  Thank you.

18  A  That's also in Exhibit 2.  I think you were

19  asking about that before.

20  Q  At the time you received the transcript,

21  had you finalized your report?

Page 103

1  A  No.

2  Q  Did you read the transcript?

3  A  Yes.

4  Q  Did it cause you to change your opinions in

5  any way?

6  A  It didn't change it.  It caused me to

7  expand the opinions based on what Miss French said in

8  her deposition.

9  Q  Okay.  In what way did you expand your

10  opinions?

11  A  Well, I think that's what this, that's what

12  prompted opinions, opinions 5 and 6.

13  Q  So, prior to reading the transcript you

14  were not going to -- these opinions resulted from your

15  reading the transcript, is that correct, or how were

16  they informed?

17  A  Well, certainly 5, in Miss French's or

18  Dr. French's deposition she said that her opinion was

19  that Mr. Fultz had developed posttraumatic stress

20  disorder as a consequence of witnessing someone dying

21  in an emergency room.

Page 104

1      I found no evidence that he had

2  posttraumatic stress disorder from it and that

3  generally that sort of, that sort of event, even if it

4  occurred, does not usually result in the development of

5  posttraumatic stress disorder.

6      She also made a diagnosis of depressive

7  disorder, I think dysthymic Disorder at one point and

8  she said major depressive disorder recurrent, 296.33 in

9  the DSM-IV, and opined that it was a consequence of the

10  actions taken by Rite Aid in terms of employment

11  restrictions.

12      It was my opinion that that was not the

13  case.

14  Q  Okay.  Prior to reading Dr. French's

15  transcript, were you going to make, render these

16  opinions in this case or opinions similar to 5 and 6?

17  A  Probably not 5, no.

18  Q  Okay.  What about 6?

19  A  6 probably, I think would have been

20  generally under the scope of what I was doing but 5 was

21  more specifically, I believe, in response to Miss or

Page 105

1  Dr. French's testimony in her deposition.

2  Q  We're going to go through all of your

3  opinions and the basis for them so I'm going to set

4  that aside for a moment.

5      I would like you to continue going through

6  the table of contents for me.

7  A  Picking up where?

8  Q  I think we finished with -- actually, let

9  me quickly take a look at this ADA, CDC information

10  that's contained in Exhibit 2.

11      Can you identify for me exactly what, which

12  documents from Exhibit 2 comprise number 48?

13  A  The ones you're holding in your right hand?

14  Q  So this would be questions and answers

15  about epilepsy in the workplace and the Americans with

16  Disabilities Act?

17  A  Yes.

18  Q  What's the CDC component of this?

19  A  The last page.

20  Q  Can you show me where or explain to me

21  where there is a reference to the CDC?

U.S. EEOC, et al. vs
Rite Aid Corporation

Michael K. Spodak, M.D.
November 13, 2009

Page 106

1 A  If we're looking at the same thing.
2   MS. MOROCCO: We don't have that.
3   MR. MONTEIRO: No.
4   THE WITNESS: How many pages? I have 1, 2,
5 3, 4, 5, 6.
6   MS. MOROCCO: You have 6 pages?
7   THE WITNESS: I have 6.
8   MR. MONTEIRO: 3.
9   MS. MOROCCO: We have 3 pages which is the,
10 from what you're looking at, we have the questions and
11 answers on epilepsy which is an EEOC publication.
12   So we have 3 out of what appears to be 6.
13   THE WITNESS: Okay.
14   MS. MOROCCO: So I need the rest of the
15 information.
16   THE WITNESS: There's the 5 and you have 6
17 there (indicating).
18   MS. MOROCCO: I'm marking this as Exhibit 8
19 to your deposition.
20   (Whereupon, a document was marked as Spodak
21 Deposition Exhibit Number 8.)

Page 107

1   MR. ROTHSCHILD: Can you just identify it,
2 please?
3   MS. MOROCCO: Yes. It is a printout from
4 the EEOC's Web site and it's questions and answers
5 about epilepsy in the workplace and the Americans with
6 Disabilities Act.
7   Now, the printout indicates November 11th
8 of 2009. Is that when you accessed, first accessed
9 this information?
10   THE WITNESS: Not first. The first time
11 for this case. I've done it in other cases.
12 Q  Okay. for this case. That's fair.
13 A  Yes.
14 Q  Okay. Have you accessed this information
15 in other cases relating to people with epilepsy?
16 A  I don't recall specifically to epilepsy but
17 certainly for other ADA cases I've been involved in.
18 Q  Okay. Well, why would you be reading Q and
19 As about epilepsy for other ADA cases if it did not
20 involve somebody with epilepsy, or I'll expand that, a
21 seizure disorder?

Page 108

1 A  I didn't say that. All I said is I can't
2 recall one way or the other whether I specifically did
3 it for epilepsy in the past.
4   I know I've done it for ADA cases. And I
5 don't recall in each case what the issues were, but if
6 it was epilepsy I probably would have accessed it for
7 epilepsy.
8 Q  Okay. Well, I'm going to give you back
9 this part of it, the Q and A, and take a minute to look
10 at it and tell me what other cases you've accessed this
11 information for.
12 A  I couldn't tell you right now. I don't
13 remember. I don't recall.
14   I've done lots and lots of ADA cases over
15 the years.
16   I couldn't tell you whether, or the number
17 of them that may have involved epilepsy in the past and
18 whether I've looked at this or not so I don't know.
19 Q  Why were you, why did you access this
20 information, the Q and A about epilepsy in the
21 workplace and the ADA on November 11th of 2009 for this

Page 109

1 case?
2 A  I was curious what the ADA Web site said
3 about how they approached the issue of epilepsy in the
4 workplace.
5 Q  And did reviewing this information cause
6 you to change any of the opinions that you're making in
7 this case?
8 A  No.
9 Q  And then the last part of Exhibit 8 appears
10 to be a printout from the Centers for Disease Control
11 entitled Centers for Disease Control and Prevention,
12 Epilepsy.
13   The printout is dated November 11th of
14 2009.
15   Is that when you accessed this information
16 for this case?
17 A  Yes.
18 Q  And why did you do so at that time?
19 A  The same reason as the ADA. I was curious
20 what the CDC had to say about epilepsy.
21 Q  And did the information that you read with

U.S. EEOC, et al. vs
Rite Aid-Corporation

Michael K. Spodak, M.D.
November 13, 2009

Page 110

1 regard to the CDC change cause you to change any of
2 your opinions in this case?
3 A No.
4 Q Will you please continue with 49?
5 A 49 you've been provided.
6 Q Well, identify it for the record, please,
7 what it is.
8 A It's my correspondence file.
9 Q Of what? Is that an exhibit to your
10 deposition thus far?
11 A Well, it's part of Exhibit 2.
12 Q Okay. Is it contained, is your
13 correspondence file contained in its entirety in
14 Exhibit 2. Or Exhibit 4 -- I'm sorry, not Exhibit 4.
15 That's the wrong one.
16 A Well, it looks to be, other than the Notice
17 of Deposition, my correspondence file is ten pages. So
18 you have to add them up to see if it's all there, I
19 guess.
20 Q May I see it? May I see the file, please?
21 A Yes.

Page 111

1 Q Thank you.
2 A It also helps answer some earlier
3 questions. There are some phone messages in there.
4   When you were asking when I was contacted
5 about deposition times and so forth, there's some phone
6 messages that help, state the dates that those were,
7 that that happened.
8   MS. MOROCCO: I'm going to go off the
9 record.
10   (A discussion was held off the record.)
11 Q The copy of Dr. French's deposition that
12 was faxed to you on September the 23rd, did that
13 include the exhibits to the deposition which are her
14 notes?
15 A No, but I had been provided those earlier.
16 Q Okay.
17 A They were on table, my table of contents
18 that's item number 5.
19 Q Okay. Thank you for that clarification.
20 A It did help me read them. I think she read
21 into the record some of her handwriting that I couldn't

Page 112

1 really figure out.
2 Q Okay. Have you provided or is everything
3 that is supposed to be encompassed in number 49 in the
4 correspondence file that you've just handed me?
5 A Yes.
6 Q Okay. I'm marking that as --
7 A Well, no. I took out the Notice of
8 Deposition.
9 Q Okay.
10 A That was where I stuck it in there too.
11 Q Well, why don't we just keep the file
12 intact and I'll return it to you intact.
13   I'm marking the correspondence file as
14 Exhibit 9 to Dr. Spodak's deposition.
15   MR. ROTHSCHILD: Can I see it, please?
16   (Whereupon, a document was marked as Spodak
17 Deposition Exhibit Number 9.)
18 Q Dr. Spodak, is item number 50 the same as
19 Deposition Exhibit Number 5?
20 A If that's the fax of the 29 pages, I
21 believe that would be the same, yes.

Page 113

1   MR. MONTEIRO: Exhibit 4.
2   MS. MOROCCO: Exhibit 4. Excuse me.
3   THE WITNESS: I don't know by number but if
4 it's the 29 pages --
5   MS. MOROCCO: Yes, the 29 pages.
6   THE WITNESS: Okay. That would be 50.
7 Q And nothing else is encompassed in number
8 50, is that correct?
9 A That's correct.
10 Q Okay. And number 51, is that the time
11 lines that are contained in the report and then I
12 believe there's a revised one that was provided today?
13   Is that what that refers to?
14 A Actually there are two revisions. One was
15 a four-page revision and the second was a seven-page
16 revision.
17 Q Okay.
18   MR. ROTHSCHILD: Do you need to put this
19 intake sheet with the correspondence file?
20   MS. MOROCCO: Well, if that's part of his
21 correspondence file, then --

U.S. EEOC, et al. vs
Rite Aid Corporation

Michael K. Spodak, M.D.
November 13, 2009

---

Page 114

1    MR. ROTHSCHILD: I'm just asking.
2  Q   Okay.  And number 52, what is that?
3  A   That was last night when I have reviewing
4  things, I just became curious about the various side
5  effects of the different medications that Mr. Fultz was
6  prescribed.
7     So I went on line to this Web site and
8  downloaded information about the side effects of
9  Tegretol, Keppra and Topomax.
10 Q   You had not previously looked into that
11 information as part of this case, is that correct?
12 A   I generally knew about Tegretol and Topomax
13 from personal experience.
14    I was not familiar with Keppra so I looked
15 at that one in particular.
16 Q   By personal experience do you mean your
17 professional experience?
18 A   Yes.  I prescribe those medications from
19 time to time.
20 Q   And did you print out the information about
21 the medication side effects that's encompassed in

---

Page 115

1  number 52?
2  A   Yes.
3  Q   May I include that as part of the record to
4  your deposition?
5     (Whereupon, a document was marked as Spodak
6  Deposition Exhibit Number 10.)
7  Q   Thank you.  Did reviewing the information
8  that's been marked as Exhibit 10, which is encompassed
9  as number 52 table of contents, cause you to change
10 your opinions at all in this case?
11 A   No, it didn't cause me to change it.
12    It did help clarify one thing because it
13 appeared that Mr. Fultz was first prescribed Keppra on
14 January 16th, 2008.
15    He was placed on short-term disability on
16 February 8th, 2008.
17    When you look at some of the side effects
18 from Keppra, that might explain some of the changes he
19 underwent.  I don't know.
20    But that's the only, that's context in
21 which I looked at it.

---

Page 116

1  Q   What are you referring to as changes?
2  A   I'm sorry, I don't understand your
3  question.
4  Q   I don't understand what you're, when you
5  say —
6  A   He became homicidal on February 8th, among
7  other things.
8  Q   Well —
9  A   And Keppra does have as one of the side
10 effects personality changes, so it's possible that
11 would explain that.
12 Q   When you say he became homicidal, you're
13 talking about having sort of violent thoughts, is that
14 correct?
15 A   It was reported he had homicidal ideation,
16 yes.
17 Q   Okay.  And it's also your understanding
18 that, at that time, he had also been told that he was
19 being removed from the workplace, correct?
20 A   Yes.
21 Q   And so do you know for sure whether those

---

Page 117

1  thoughts were the product of the medication or whether
2  those thoughts were the product of learning that he was
3  losing his job?
4  A   No, I don't.
5  Q   Do you know whether Christopher Fultz, you
6  say he was placed on short-term disability and that's
7  shorthand that's also in your report.
8     What do you mean by that?  When you're
9  describing what happened to Mr. Fultz —
10 A   My understanding is that Dr. Rowekamp
11 opined that he was not fit for duty so he was placed on
12 an off-duty status, and it's my understanding that as a
13 consequence of that he was entitled to disability.
14    I assume they had short-term disability
15 benefits.  I think that I read that somewhere and that
16 that was the status in which he went out.
17    But he was, it was based on his not being
18 fit for duty according to Dr. Rowekamp.
19 Q   Do you know whether, in fact, Mr. Fultz was
20 entitled to receive short-term disability at this time?
21    MR. ROTHSCHILD: You're asking him a legal

---

U.S. EEOC, et al. vs
Rite Aid Corporation

Michael K. Spodak, M.D.
November 13, 2009

Page 118

1 question.
2     MS. MOROCCO: I'm asking him whether he
3 knows whether Mr. Fultz was able to obtain short-term
4 disability.
5     It's not a legal question. It's a factual
6 question.
7     MR. ROTHSCHILD: I think that's different
8 than the first question.
9     MS. MOROCCO: It is. I clarified it.
10     MR. ROTHSCHILD: Okay. That's why I ask.
11     THE WITNESS: What I have in my notes, page
12 63, Mr. Fultz said that he was terminated on
13 February 8th, 2008.
14     I understand -- and then I asked him about
15 if he understood the circumstances for that.
16     He said that it was unclear why he was
17 fired. Earlier on the page it says he was placed on
18 short-term disability and then fired.
19     I've reviewed records which contradict that
20 but that's what he said anyway.
21 Q  Okay. So, in rendering your opinions in

Page 119

1 this case, what is your understanding with regard to
2 Mr. Fultz's employment status at Rite Aid after he was
3 put on the disability status -- I'm sorry, after he was
4 put on leave status?
5 A  He was placed on leave. From my time line,
6 he was offered -- let's see.
7     On or about October 8th of 2008 he was, I
8 saw I believe an E-Mail stating that he was being
9 offered a job to return to Rite Aid and he declined the
10 offer and --
11 Q  So what is your understanding as to what --
12 A  -- that was the end of his employment
13 there.
14 Q  What is your understanding as to what
15 Mr. Fultz's employment status was at Rite Aid between
16 February 8th and you say that was March the, October
17 the 2nd?
18 A  I don't have a factual understanding. From
19 what Mr. Fultz said he was on short-term disability.
20 Q  Okay. Do you know whether Mr. Fultz --
21 strike that.

Page 120

1     Was it your understanding --
2 A  Let me add to that also --
3 Q  Was it your understanding that he was paid
4 benefits?
5     MR. ROTHSCHILD: Can he finish his answer,
6 please?
7     MS. MOROCCO: Uh-huh.
8     THE WITNESS: It was my understanding that
9 he found another job in June 2008.
10     So at that point I don't know if he went
11 off disability, he told the people he had found another
12 job, he continued getting disability benefits despite
13 working.
14     I don't have the answer to that but it's my
15 understanding from my chronology that he found a job at
16 a storage warehouse in June of 2008 and was working
17 there at that time.
18 Q  Okay. Was your understanding -- turn to
19 page 63 of your notes, please.
20 A  Okay.
21 Q  Actually, have you done that already?

Page 121

1 A  Yes.
2 Q  Okay. Now, this indicates that Mr. Fultz
3 informed either you or your associate that he was not,
4 that he was fired and he was not paid.
5     His doctor would not fill out the paperwork
6 stating that he qualified for disability and that he
7 was terminated after filing a charge at the EEOC,
8 correct?
9 A  That's what he said.
10 Q  Okay. So, help me understand.
11     When you rendered your opinions in this
12 case, specifically about an opinion that you rendered
13 about Mr. Fultz, the termination of Mr. Fultz's
14 employment, what was your understanding about whether
15 or not Mr. Fultz was collecting any disability payments
16 after he was terminated from Rite Aid?
17     MR. ROTHSCHILD: Objection to the word
18 terminated.
19     MS. MOROCCO: When his employment ended.
20 Did you have an understanding of --
21     THE WITNESS: Well, it's my understanding

U.S. EEOC, et al. vs
Rite Aid Corporation

Michael K. Spodak, M.D.
November 13, 2009

---

**Page 118**

1 question.
2    MS. MOROCCO: I'm asking him whether he
3 knows whether Mr. Fultz was able to obtain short-term
4 disability.
5    It's not a legal question. It's a factual
6 question.
7    MR. ROTHSCHILD: I think that's different
8 than the first question.
9    MS. MOROCCO: It is. I clarified it.
10    MR. ROTHSCHILD: Okay. That's why I ask.
11    THE WITNESS: What I have in my notes, page
12 63, Mr. Fultz said that he was terminated on
13 February 8th, 2008.
14    I understand -- and then I asked him about
15 if he understood the circumstances for that.
16    He said that it was unclear why he was
17 fired. Earlier on the page it says he was placed on
18 short-term disability and then fired.
19    I've reviewed records which contradict that
20 but that's what he said anyway.
21 Q  Okay. So, in rendering your opinions in

**Page 119**

1 this case, what is your understanding with regard to
2 Mr. Fultz's employment status at Rite Aid after he was
3 put on the disability status -- I'm sorry, after he was
4 put on leave status?
5 A  He was placed on leave. From my time line,
6 he was offered -- let's see.
7    On or about October 8th of 2008 he was, I
8 saw I believe an E-Mail stating that he was being
9 offered a job to return to Rite Aid and he declined the
10 offer and --
11 Q  So what is your understanding as to what --
12 A  -- that was the end of his employment
13 there.
14 Q  What is your understanding as to what
15 Mr. Fultz's employment status was at Rite Aid between
16 February 8th and you say that was March the, October
17 the 2nd?
18 A  I don't have a factual understanding. From
19 what Mr. Fultz said he was on short-term disability.
20 Q  Okay. Do you know whether Mr. Fultz --
21 strike that.

**Page 120**

1    Was it your understanding --
2 A  Let me add to that also --
3 Q  Was it your understanding that he was paid
4 benefits?
5    MR. ROTHSCHILD: Can he finish his answer,
6 please?
7    MS. MOROCCO: Uh-huh.
8    THE WITNESS: It was my understanding that
9 he found another job in June 2008.
10    So at that point I don't know if he went
11 off disability, he told the people he had found another
12 job, he continued getting disability benefits despite
13 working.
14    I don't have the answer to that but it's my
15 understanding from my chronology that he found a job at
16 a storage warehouse in June of 2008 and was working
17 there at that time.
18 Q  Okay. Was your understanding -- turn to
19 page 63 of your notes, please.
20 A  Okay.
21 Q  Actually, have you done that already?

**Page 121**

1 A  Yes.
2 Q  Okay. Now, this indicates that Mr. Fultz
3 informed either you or your associate that he was not,
4 that he was fired and he was not paid.
5    His doctor would not fill out the paperwork
6 stating that he qualified for disability and that he
7 was terminated after filing a charge at the EEOC,
8 correct?
9 A  That's what he said.
10 Q  Okay. So, help me understand.
11    When you rendered your opinions in this
12 case, specifically about an opinion that you rendered
13 about Mr. Fultz, the termination of Mr. Fultz's
14 employment, what was your understanding about whether
15 or not Mr. Fultz was collecting any disability payments
16 after he was terminated from Rite Aid?
17    MR. ROTHSCHILD: Objection to the word
18 terminated.
19    MS. MOROCCO: When his employment ended.
20 Did you have an understanding of --
21    THE WITNESS: Well, it's my understanding

U.S. EEOC, et al. vs
Rite Aid Corporation

Michael K. Spodak, M.D.
November 13, 2009

---

Page 126

1  documents, 11 and 12, and tell me how the time line has
2  changed?
3      I believe the time line is the last page of
4  the report.
5      MR. MONTEIRO: Do you have a copy?
6      MS. MOROCCO: I don't.
7      MR. MONTEIRO: That's okay.
8      MS. MOROCCO: Yes, I do.
9      MR. MONTEIRO: Thanks.
10      THE WITNESS: On the first one there's
11  nothing between 1977 and 1992. On the second one
12  there's an entry 1978, father stroke when age 7.
13      1987, fired for being drunk at work. 1989,
14  age 18, MVA with loss, LOC concussion.
15  Q  Let me stop you for a minute. With regard
16  to the entry of fired for being drunk at work, that was
17  when Mr. Fultz was a teenager, correct?
18  A  It was in 1987. He was born in 1971 so he
19  would have been 16.
20  Q  Okay. Why did you add that to the time
21  line?

---

Page 127

1  A  Because -- I don't have a reason. I put
2  things in a time line when I see that there's a date
3  and there's something factual that could be next to the
4  date.
5      In this case I did it because one question
6  was, in my mind, whether he had a long history of
7  either drinking or being irresponsible or not caring
8  about workplace rules or things like that, and that
9  would be preliminary information to better understand
10  whether that was any kind of pattern.
11  Q  Okay.
12  A  1989, age 18, MVA with LOC concussion.
13      1989, began smoking up to two packs per
14  day.
15      1992 is on the other time line. Then
16  '96/'97 fired when fell asleep and wrecked a company
17  dump truck. Was drinking.
18  Q  Let me just stop you for a minute.
19      These entries, the revisions, were you, was
20  this a result of reviewing additional documents in the
21  case or were you looking over previous documents that

---

Page 128

1  you already had?
2      Obviously you just didn't have all this
3  stuff in your head. What was the process that you
4  followed with regard to revising the time line?
5  A  Both. That is, every time I re-reviewed
6  documents I had and I see something I maybe didn't
7  include before I'll add it to a time line, or as I
8  review new documents, if something comes up that I
9  didn't see before, then I'll add it to the time line.
10  Q  Okay. And at the point -- you said you
11  revised the time line about a week ago, is that
12  correct?
13  A  Yes.
14  Q  And at that point you had begun the process
15  of preparing for your deposition. Is that also
16  correct?
17  A  Yes.
18  Q  Okay. So was the time line revised as part
19  of the process by which you prepared for your
20  deposition?
21  A  Yes.

---

Page 129

1  Q  Okay. We don't have to finish going -- I
2  think the documents speak for themselves in terms of
3  how they're different.
4      So let's set aside Exhibit 7. Actually I'd
5  like to you compare Exhibit 7 to Exhibit 8 which is the
6  second revised time line.
7      The revised time line we were just talking
8  about should be Exhibit --
9  A  11.
10  Q  11. I don't have an 11.
11  A  It was already marked.
12  Q  I see. So we're on Number 13? What's 12?
13  A  12 is my original report.
14      (Whereupon, a document was marked as Spodak
15  Deposition Exhibit Number 13.)
16  Q  Okay. You've been handed Exhibit 13.
17      If you could please compare that to the
18  revised time line you were just testifying about, which
19  is Exhibit 10, is that right?
20  A  Actually what you handed me was another
21  copy of Exhibit 11.

---

Page 130

1 Q  I'm sorry. My apology. This is
2 Exhibit 13. It's the seven-page revised time line
3 number 2. Can you please tell me when you created this
4 document?
5 A  Last night.
6 Q  Did you create this document after you
7 consulted with Mr. Rothschild yesterday?
8 A  Yes.
9 Q  Okay. And was the purpose in creating this
10 document to prepare for your deposition?
11 A  Yes.
12 Q  And is this time line going to be appended
13 to your report or is it just a sort of self-standing
14 document?
15 A  I hadn't given any thought to that. At
16 this point it's a self-standing document.
17 Q  Okay. Did any of the items that you added
18 either to time line, the revised time line or revised
19 time line 2, the two documents that you were just
20 testifying about, cause you to change any of the
21 opinions in your report?

Page 131

1 A  No.
2    (Whereupon, a document was marked as Spodak
3 Deposition Exhibit Number 14.)
4 Q  You're being handed Exhibit 14 to your
5 deposition. It was provided today. It appears to be a
6 list of your testimony.
7    It's entitled Previous Cases, 2004 to 2009.
8 Is this a complete list of all of your deposition or
9 trial testimony for the time period indicated?
10 A  I would say for the most part. I couldn't
11 guarantee one hundred percent it's complete but I
12 certainly try to make it complete.
13 Q  Take a minute to review it and let me know
14 if there's anything that you notice is missing.
15 A  Well, I wouldn't notice anything missing or
16 it would be on here.
17    If there are things missing, it's because I
18 was in court on a Friday and by the time I got to the
19 office on Monday I may have not remembered to have it
20 added, or I don't know.
21    Like I say, I try to keep it as complete as

Page 132

1 I can consistent with the Federal Rules.
2 Q  Is this something that you keep -- from
3 what you're saying, I'm inferring that this is
4 something that you add to as you testify and you add to
5 the list.
6    Is that an accurate description of how this
7 document is maintained?
8 A  Yes.
9 Q  Can you please go through the document and
10 tell me if any of these cases involved the Americans
11 with Disabilities Act, the Rehabilitation Act or any
12 state version of those disability statutes?
13 A  Just for clarification, would that include
14 sexual harassment in the workplace or not?
15 Q  No. Disability discrimination.
16 Employment-based disability discrimination is what I'm
17 specifically asking about.
18 A  There are two cases on the last page that
19 involve the postal service in front of the EEOC and
20 those would be the only ones that may have involved
21 employment discrimination.

Page 133

1    I don't remember the exact posture of the
2 cases but it's possible that both of those involve some
3 form of employment discrimination allegation.
4 Q  Okay.
5 A  Matter of fact, I think they did.
6 Q  I'm going to ask that you focus on the
7 specific question that's been asked of you.
8    The question was disability discrimination,
9 not just the broader category of employment
10 discrimination.
11    Did those postal service cases involve
12 disability discrimination?
13 A  I don't know. They may have.
14    I mean, I don't specifically recall the
15 complaint and the allegations and whether that was one
16 of the components of the allegations made.
17 Q  Having reviewed your list of testimony, is
18 there, there is no case that you can identify with any
19 degree of certainty in that list which involved
20 disability discrimination, is that correct?
21 A  Other than the two I mentioned.

Page 134

1 Q   But you aren't sure that those involved
2 disability discrimination. They involved some
3 employment issue, correct?
4 A   They involved -- yes. They involved, both
5 of them involved employment issues where I believe
6 someone was terminated and I can't recall specifically
7 if it had to do with, again, what the posture legally
8 of it was so I don't know.
9     Those are the only two possibles.
10 Q   Okay. But they're, again, there is no case
11 in that list of your testimony that you know for sure
12 involved allegations of disability discrimination,
13 correct?
14 A   That's correct.
15     (Whereupon, a document was marked as Spodak
16 Deposition Exhibit Number 15.)
17 Q   You're being handed Exhibit 15 to your
18 deposition. It's your CV.
19     Take a minute to review it and let me know
20 if there are any additions that should be added or
21 whether there's anything that is incorrect or

Page 135

1 inaccurate on this document.
2 A   Let me just ask if I can, is this a copy?
3 Not that I'm aware of.
4 Q   If you can turn your attention, please, to
5 the education section which begins on page 3. Does
6 that accurately list all of your medical specialties?
7 A   It actually doesn't list any medical
8 specialties.
9 Q   Well, with regard to your residencies?
10 A   Yes.
11 Q   You've had no other residencies other than
12 the ones you've had in radiology or psychiatry,
13 correct?
14 A   Correct.
15 Q   Have you ever treated a patient for
16 epilepsy?
17 A   No.
18 Q   Turning back to your CV --
19 A   Let me amend that. It's possible I did
20 that during my residency because I did take a neurology
21 rotation as part of my psychiatry residency.

Page 136

1 Q   Okay.
2 A   So it is possible back in the 1970s I did,
3 but since I've been in private practice in psychiatry
4 I've not treated someone.
5     I've seen many patients with epilepsy.
6 I've not treated anyone for the epilepsy.
7 Q   Thank you. Does your CV contain a accurate
8 list of your publications since -- up to, I'm sorry,
9 2007?
10 A   Yes.
11 Q   Okay. The Federal Rules of Civil Procedure
12 require you to disclose your publications in the past
13 ten years, so we appear to be missing three years or
14 two years.
15     So I'm going to request that the
16 disclosures be supplemented in that regard. I'm
17 assuming that counsel will agree?
18     MR. ROTHSCHILD: Yes.
19     MS. MOROCCO: Have there been any
20 publications since '07?
21     THE WITNESS: No.

Page 137

1     MR. MONTEIRO: Well, that takes care of
2 that.
3     THE WITNESS: I was waiting for you to ask
4 that question.
5     MR. ROTHSCHILD: It was just supplemented.
6 Q   Okay. Can you turn your attention to your
7 expert report which is Exhibit 12?
8     Actually, I have an additional question
9 about your professional background.
10     Do you currently treat patients or are you
11 doing consulting and forensic psychiatry a hundred
12 percent of your time?
13 A   My current practice is approximately
14 30 percent treatment of patients and the other
15 70 percent forensic psychiatry.
16 Q   And do you have a specific specialization
17 with regard to the patients that you treat within
18 psychiatry?
19 A   I wouldn't say a specialization.
20 Q   What I'm trying --
21 A   Most of them tend to be the result of

Page 138

1 referrals through workers' compensation so they're
2 typically injured workers, although some have
3 depression, some have posttraumatic stress disorder,
4 some have bipolar disorder, some are schizophrenic.
5    But the most predominant ones are those who
6 are referred due to emotional problems related to some
7 work injury.
8 Q  Have you treated patients who suffer from
9 depression as a result of the loss of their employment?
10 A  Yes.
11 Q  So in your professional opinion the loss of
12 employment can result in the manifestation of
13 depression in an individual?
14 A  Yes.
15 Q  Turning now to your report, Exhibit 12,
16 please turn to the, the first page under identifying
17 information.
18    Is that an accurate description of the
19 process through which you and anyone who works for you
20 evaluated Christopher Fultz?
21 A  Yes, there is one addition.  There was one

Page 139

1 psychological test that's left off there by mistake.
2    It's call the Beck depression hopelessness
3 test and that should have been listed as one of the
4 psychological tests.
5 Q  Okay.  So, let me, tell me if I'm
6 summarizing this correctly.
7    With regard to your evaluation of
8 Christopher Fultz, an interview was conducted for his
9 background history, a psychiatric evaluation was
10 obtained, four tests were administered, the Minnesota
11 Multiphasic, the FCL, the MCI, MCMI-III, and as you
12 just told us, the Beck Depression Test, is that
13 correct?
14 A  Yes.
15 Q  And in addition you've reviewed, at the
16 time this report was written, you had reviewed the
17 information that is appended to the report on the table
18 of contents.
19    Is that also correct?
20 A  Yes.  I'd also add I made a request to
21 interview Mr. Fultz's wife.  After consultation with

Page 140

1 counsel, Mr. Fultz declined that request.
2 Q  Okay.  That request was made when
3 Mrs. Fultz came with him for his interview, correct?
4 A  Yes.
5 Q  And there was no prior notice given that
6 you had that request.  Is that also right?
7    The request was made at the time she showed
8 up to your office, isn't that correct?
9 A  Yes.
10 Q  And Mr. Fultz declined the request after
11 consulting with his attorney.  Is that also correct?
12 A  That's what I just said, yes.
13 Q  Mr. Fultz was in no way uncooperative
14 during any of the procedures that you undertook with
15 his evaluation, was he?
16 A  No.
17 Q  The process that was followed with regard
18 to evaluating Mr. Fultz, is that the general process
19 that you follow in administering an IME with regard to
20 a case that's in litigation?
21 A  Yes, with one exception.  Typically it's

Page 141

1 all done on one day.
2    I believe, if memory serves, I was
3 testifying on the 3rd and I think he came back a second
4 time.
5    I think he was given the option of doing
6 one day or splitting it up and by everyone's agreement
7 we agreed to have him seen on two days, but other than
8 that it's usually done on one day.
9 Q  What is the purpose of the first item
10 that's listed there or the interview for background
11 history?  Why is that done?
12 A  I have a number of staff I've trained to go
13 through a standardized interview to just obtain general
14 background history.
15    I think it makes my time, I use my time
16 more efficiently that way, and I guess that's the main
17 reason.
18    I found out it's just worked for me over
19 the years to just have someone take a background
20 history and then I get the notes when I see the
21 individual and I will go through and expand on areas I

U.S. EEOC, et al. vs
Rite Aid Corporation

Michael K. Spodak, M.D.
November 13, 2009

Page 142

1  want to, clarify things I want to, and ask my own
2  questions beyond that.
3  Q   The question that I had asked was why is
4  the interview conducted, not why is it conducted by
5  someone other than yourself.
6       So let's focus on the question as to what
7  is the purpose for the interview within the entire IME
8  process?
9  A   Oh.
10 Q   What purpose does it serve, in your
11 estimation?
12 A   Well, first of all, it's considered
13 standard practice, when you're doing a complete
14 psychiatric evaluation, to obtain background history.
15      Beyond that, it's for everything. I mean,
16 you want to see what early traumas the person may have
17 experienced.
18      You want to see what early factors went
19 into their personality development.
20      You want to understand, at least my view of
21 an evaluation is that it's not a snapshot of a point in

Page 143

1  time.
2       It's a moving picture of their entire life
3  and how any one event factors into it to better
4  understand what, if any, impact a particular event has.
5       Beyond that, I'd almost have to go fact by
6  fact to see how it might have some relevance.
7       You don't know until you see what turns out
8  or turns up and depending on what questions you may be
9  asked, certain factors may be more important than other
10 factors.
11      But it's just part of a standard, standard
12 operating procedure when you do a psychiatric
13 evaluation to take a detailed background history and
14 learn everything you can about someone's completed life
15 or as much as you can about their complete life.
16 Q   So the evaluation would be incomplete
17 without that component. Am I understanding that
18 correctly?
19 A   Depending on the evaluation. Certainly in
20 one of this nature I think it would be incomplete
21 without that component.

Page 144

1  Q   And the information contained as part of
2  the interview should be analyzed as part of the process
3  of rendering the opinions in the IME, correct?
4  A   Depending on the opinions. Certain
5  opinions it may have more relevance. Other opinions it
6  may not have any relevance, but you don't know until
7  you see what turns up.
8  Q   With regard to the opinions that you have
9  rendered in this case, the background history is
10 relevant, correct?
11 A   Yes.
12 Q   And therefore the background history needed
13 to be thoroughly analyzed in rendering the opinions.
14 Is that also correct?
15 A   Again, depending on which opinions, but
16 sure, I think that would be helpful to do.
17 Q   Well, take a minute to look at them and
18 tell me if there's any opinion in which the background
19 information is not, would not need to be analyzed as a
20 component of rendering the opinion.
21 A   Yes, I don't think for opinions 1 and 2 I'd

Page 145

1  have to have any background information.
2  Q   I'm sorry. I can't hear you.
3  A   For opinion 1, I don't believe any
4  background information is needed. For opinion 2, I do
5  not believe any background information is needed.
6       For opinion 3, I think background
7  information would be helpful. For opinion 4, I do not
8  think any background information is needed.
9       For opinion 5, I think background
10 information would be helpful. For opinion 6, I think
11 background information would be helpful.
12      For opinion 7, I do not believe background
13 information would be helpful.
14 Q   Why do you think background information is
15 not necessary for opinion 4?
16 A   Because in my opinion as a generic
17 statement, placing anyone, any general reasonable
18 employee on short-term disability does not cause a
19 mental illness.
20 Q   Okay.
21 A   I'm not aware of that being any recognized

U.S. EEOC, et al. vs
Rite Aid Corporation

Michael K. Spodak, M.D.
November 13, 2009

Page 146

1 cause of an illness. I've never seen that in any
2 publication or in any experience I've had.
3 Q  Does it make, so that's an assumption that
4 you're making, is that correct?
5 A  Which is the assumption?
6 Q  That being placed on disability does not
7 cause a mental illness.
8 A  That's not an assumption. It's an opinion.
9 Q  And what is the basis for that opinion?
10 A  Because the act of placing someone on
11 short-term disability is not the type of act that I've
12 ever seen written or had any experience that that type
13 of act results in the development of a diagnosable
14 mental illness or disorder.
15 Q  Does it matter whether the person is able
16 to actually collect compensation through the disability
17 carrier?
18 A  That's poss -- that's not the, that's not
19 the statement there.
20     The statement is whether being placed on
21 short-term disability is an act that would lead to, to

Page 147

1 development of a mental disorder.
2     If you're asking a different question,
3 whether someone who has no money, if the lack of money
4 can lead to the development of a mental disorder,
5 that's a different question.
6     That's not the question I was asked to
7 respond to here.
8 Q  And certainly the circumstances, whether or
9 not it was voluntary or involuntary would make a
10 difference with regard to opinion number 4, is that
11 right?
12 A  No, in my opinion, the act of placing
13 someone on short-term disability, voluntary or not, is
14 not the type of act that would lead to the development
15 of a diagnosable mental illness or disorder.
16 Q  What is the basis for your opinion, that
17 opinion?
18 A  Number one, that it has never been reported
19 or recognized as the cause of a mental illness.
20     Number two, my experience in treating and
21 evaluating lots and lots of people who have been placed

Page 148

1 on short-term disability for a variety of reasons.
2     Number three, I've never seen in any
3 textbook or literature that that type of act in and of
4 itself is the cause of a mental illness.
5 Q  But you have seen, you have treated
6 patients who have suffered from depression as a result
7 of being terminated from their employment, correct?
8 A  Yes.
9 Q  Are any facts in this case that support
10 your opinion with regard to number 4?
11 A  No, I don't believe so. That's not driven
12 by the facts of this case.
13     In my opinion, that's kind of a standalone
14 opinion I would offer that has application to this
15 case.
16 Q  Okay. So really this is sort of, make sure
17 I understand. This is sort of a -- this can be taken
18 in isolation?
19     I mean, this is an opinion that you would
20 render in any case involving somebody who was placed on
21 short-term disability, is that correct?

Page 149

1 A  I don't want to say any case. I could
2 probably sit here and conjure up a fact set in which
3 that might have relevance, but in the general terms and
4 in this case I don't believe it does.
5 Q  It's a general opinion?
6 A  General, but I wouldn't say it's totally
7 written in stone.
8 Q  Okay.
9 A  Like I say, I could picture, I could
10 envision a case where, depending on the facts and
11 circumstances that could result in it, but it would be
12 a very, very unusual set of circumstances.
13     (Whereupon, a document was marked as Spodak
14 Deposition Exhibit Number 16.)
15     MS. MOROCCO: You're being handed Exhibit
16 16 to your deposition. Take a minute to review this
17 article.
18     Are you on your Blackberry, sir?
19     THE WITNESS: No. I'm writing a note to
20 myself.
21     I have to reprint the original time line

U.S. EEOC, et al. vs
Rite Aid Corporation

Michael K. Spodak, M.D.
November 13, 2009

Page 150

1 because I said earlier that the copy of my report
2 didn't have it and I was asked to do a supplemental
3 report on IME versus personal physician, and I try not
4 to trust anything to memory.
5     MS. MOROCCO: That makes sense. I just
6 obviously want your full attention.
7     THE WITNESS: Okay.
8 Q  Review, please review the article entitled
9 The Psychiatrist a as Witness and verify for me,
10 please, whether you, in fact, wrote this article?
11 A  I did.
12 Q  Okay. Take a minute to review it and let
13 me know whether there's anything that is stated in this
14 article, and I realize it is from 1996, which you no
15 longer hold the opinion or is something that you would
16 now disavow for any reason?
17 A  You want me to go by it line by line?
18 Q  I want you to read it and tell me whether
19 there's anything that you think is no longer correct.
20     MR. ROTHSCHILD: I just object. I think
21 the question is much too general and I don't see where

Page 151

1 it's related to this case at all.
2     MS. MOROCCO: Well, it actually contains a
3 process for IMEs so I think it's totally relevant. Go
4 ahead and read it, Dr. Spodak.
5     MR. ROTHSCHILD: Why don't you point that
6 out and we can get to that.
7     MS. MOROCCO: I want him to read the whole
8 article and tell me if there's anything incorrect in
9 the article as he sits here now and reads it. Thank
10 you.
11     MR. ROTHSCHILD: I know what you want him
12 to do. I just think it's --
13     MS. MOROCCO: That's not a proper
14 objection, Jim.
15     MR. ROTHSCHILD: Would you let me talk?
16 You're not the only one that's allowed to talk at a
17 deposition.
18     I know you think you are but you really
19 aren't.
20     I think that giving him a seven-page
21 article and asking him if there's anything he disagrees

Page 152

1 with is a too general and open question.
2     If there's a specific thing, I would
3 request that you ask him that.
4     MS. MOROCCO: The question wasn't whether
5 he disagrees with anything. He wrote the article.
6     I want to know whether now, since it's been
7 some time since it was published, whether anything in
8 the article is, in his estimation, no longer correct.
9     THE WITNESS: Well, first I did say the
10 scope of civil forensic psychiatry is growing by leaps
11 and bounds.
12     I don't know if that's still accurate.
13 That was only in 1996.
14 Q  Okay.
15 A  So that would be one comment.
16 Q  When you reference something, please tell
17 me what page you're on.
18 A  Page 3.
19 Q  Thank you.
20 A  I also said on page 4, the types of
21 professionals participating in the legal process are

Page 153

1 diverse and growing.
2     I don't know if that's still applicable or
3 not.
4 Q  Thank you.
5     MR. ROTHSCHILD: They might be diverse but
6 they're not growing.
7     THE WITNESS: On page 5, the first full
8 paragraph on the left where I'm commenting on engaging
9 a therapist or psychiatrist in the litigation process,
10 I don't think back in '96 there was an ethical
11 consideration as to the dual agency of having a
12 treating physician also participate in the forensic
13 process.
14     I probably would add something about that
15 if I were to rewrite this now.
16 Q  Thank you.
17 A  Under evaluation, I'd probably add to that
18 list that I have there general knowledge of how the
19 alleged illness typically affects individuals and all
20 the things we would know about it.
21 Q  I'm sorry. I didn't hear you.

U.S. EEOC, et al. vs
Rite Aid Corporation

Michael K. Spodak, M.D.
November 13, 2009

---

Page 154

1 A   General knowledge about how a particular
2   illness ordinarily effects individuals would probably
3   be added to that list of things I've noted there.
4 Q   Thank you.
5 A   It looks like a misprint here in the middle
6   of page 5, the right-hand column.
7       It says, since many mental health
8   conditions have a genetic and it says familiar, it
9   should be familial component.
10 Q   So that's a typo?
11 A   Yes.  I never noticed that before.
12 Q   Okay.
13 A   There's part of it missing.
14       But up to the bottom of page 7 I don't
15   see -- other than those comments, I don't see anything
16   I would amend.
17 Q   Do you have page 8?
18 A   No, I don't have page 8.
19 Q   Can I see your copy?
20 A   Sure.
21 Q   I'm going to give you my page 8 and have

---

Page 155

1   you read it and then look at that exhibit.  It's just
2   one paragraph so you might as well finish.
3       MR. ROTHSCHILD: Do you have another copy
4   of page 8?
5       MS. MOROCCO: He can share that when he's
6   done.  Obviously you're just reading your article.
7   There's another article on that page.
8       THE WITNESS: Yes.  I would -- other than
9   the comments I made earlier, I don't see anything I
10   would want, I would amend.
11 Q   Nothing incorrect other than what you've
12   stated or nothing you would change, correct?
13 A   Correct.
14 Q   Thank you.
15       MR. ROTHSCHILD: Did you mark this as 16?
16       MS. MOROCCO: I'm sorry?
17       MR. ROTHSCHILD: This is 16?
18       MS. MOROCCO: Yes, it is.
19       (Whereupon, a document was marked as Spodak
20   Deposition Exhibit Number 17.)
21 Q   You're being handed Exhibit 17 to your

---

Page 156

1   deposition.  This is, this was produced a couple of
2   days ago.
3       It's counsel's representation that this
4   constitutes your file for the IME.
5       I'd like to go through this exhibit and
6   have you identify for me the various components of it
7   and the authors of the various components of it.
8       So let's start with the second page of the
9   exhibit which is a client intake form.
10       I'm assuming that's self-explanatory and
11   that was filled out by Christopher Fultz, is that
12   correct?
13 A   Yes.
14 Q   And then the next, the handwritten notes as
15   the next three pages.  Whose notes are those?
16 A   Those are mine.
17 Q   Okay.  When did you take these notes?
18 A   When I interviewed Mr. Fultz.
19 Q   Okay.  Was that on August the 17th?
20 A   Yes.
21 Q   Okay.  Do these notes comprise everything

---

Page 157

1   that Mr. Fultz told you or are they taken in a more
2   summary form?
3 A   Initially it's an attempt to take them
4   verbatim in response to a generic question of tell me
5   how you feel you're currently, what current emotional
6   problems you're experiencing or your understanding of
7   what this evaluation is about or questions along those
8   lines.
9       And I did make an attempt initially to take
10   it verbatim and I did put quotes as best I can tell
11   it's an attempt to be verbatim.
12 Q   How long did this interview last?
13 A   My interview with him was approximately
14   three hours.
15 Q   Okay.  Are there other notes of yours in
16   this exhibit?
17 A   Yes.
18 Q   Of the interview?
19 A   Yes.
20 Q   Okay.  This is Exhibit 17.  Then I see that
21   there are sort of page numbers with circles or

---

U.S. EEOC, et al. vs
Rite Aid Corporation

Michael K. Spodak, M.D.
November 13, 2009

Page 158

1  handwritten page numbers that are circled so I'm going
2  to try to refer to the documents by those numbers.
3     Do you see what I'm talking about, the top
4  of the pages?
5  A  Yes.
6  Q  Okay.  So, the set of typewritten notes
7  that appears to be 5 through 18 is it?  Focusing on the
8  typewritten parts of these notes, who generated these
9  notes?
10 A  Her name is Judith Harding, H-A-R-D-I-N-G.
11 Q  Who is she?
12 A  She is an assistant who works in my office
13 who I've trained to take a background history and who
14 is able to type basically at conversation speed.
15 Q  Okay.  Is she typing as she's conducting
16 the interview?
17 A  Yes.
18 Q  Okay.  Is she doing this on a computer?
19 A  No.
20 Q  What kind of machine is she using?
21 A  You mean the name of the typewriter?

Page 159

1  Q  No.  Is it a --
2  A  I think it's an Olivetti maybe.  I don't
3  know.  It's a regular old typewriter.
4  Q  It's a typewriter?
5  A  Yes, a typewriter, the real deal.
6  Q  Okay.  Is she a psychiatrist or a
7  psychologist?
8  A  No.
9  Q  Does she have a social work degree?
10 A  No.
11 Q  Does she have any educational training in
12 psychiatry or psychology or social work?
13 A  She has a master's in science and she has
14 specialized in being a therapist, however not in my
15 office.
16    She does that or has done that on her own
17 in other settings.  In my office her responsibility is
18 to do these background histories.
19 Q  What kind of a therapist is she?
20 A  Psychotherapist.
21 Q  And her degree is in what?

Page 160

1  A  She has a master's in science -- an MS.
2  Q  That's a basic science degree?
3  A  Well.  It's a Master of Science degree.
4  Q  Right.  But in basic science, general
5  science?
6  A  I don't know.
7  Q  The handwriting on, there's, the
8  typewritten notes also contain handwriting.  Whose
9  handwriting is that?
10 A  Well, if you're looking at page 12 that's
11 mind towards the bottom.  The ones on the top of the
12 page are Miss Harding's.
13 Q  Do you know when she made the written
14 notes, the handwritten notes?
15 A  Yes.  At the same time she interviewed
16 Mr. Fultz on I believe August 3rd.
17 Q  So she was typing and writing at the same
18 time?
19 A  No.
20 Q  Help me understand the process.
21 A  She takes a piece of paper and she writes

Page 161

1  on the top the heading and then she puts it in the
2  typewriter and then she types up what goes out under
3  that heading.
4  Q  I see.  And whose handwriting is it on page
5  6?
6  A  6 is Miss Harding's.
7  Q  So all of the handwriting except for on
8  page 12 is hers, is that right?
9  A  Yes.  Through 18, yes.  Except I wrote the
10 numbers on the top and put the circles around them.
11 Q  And did you, at what point did you review
12 Miss Harding's typed and handwritten notes of her
13 intake with Mr. Fultz?
14 A  When I saw him on August 17th, 2009.
15 Q  So she generated --
16 A  '9.  '8.  I'm sorry, 2008.
17 Q  '9?
18 A  '9.  I'm sorry.  Was that -- yeah, 2009.
19 Q  What instructions have you given her with
20 regard to conducting these intake interviews?  What are
21 your standing instructions to her, if you have any?

U.S. EEOC, et al. vs
Rite Aid Corporation

Michael K. Spodak, M.D.
November 13, 2009

Page 162

1 A   My standing instructions are to go back to
2 the earliest recollections the individual has, make
3 inquiries about all the aspects of their life.
4      For instance, if they're a child you're
5 looking at what family relationships were going on,
6 what early preschool traumas they may have experienced,
7 what stressors they may have been under between the
8 ages of around 5 to 18.
9      The inquiry is typically about your school
10 experience, ongoing family issues, information about
11 possible substance abuse and other stressors.
12      As you get older, there's an inquiry about
13 marital history, children, work history, emotional
14 stress, home life.
15      But at each different time period the
16 inquiry is about either school or work, your home life
17 and then your overall emotional health and any your
18 physical problems you might have which tries to give
19 you a more, kind of a total picture of the person, what
20 is ongoing with the person at any one point in time.
21 Q   Did you give any specific instructions to

Page 163

1 Miss Harding with regard to her interviewing Mr. Fultz?
2 A   I don't believe so, no.
3 Q   Did she have any background with regard --
4 did she have any information concerning the situation
5 before she interviewed him or did she go in cold, do
6 you know?
7 A   I don't know.  Sometimes she may look at
8 the file, sometimes not.
9      There's no real standing instruction about
10 it.  Most of the time she goes in cold.
11 Q   Okay.  So this is these notes that are of
12 her interview of Mr. Fultz on August 3rd and I believe
13 it's your testimony that you then reviewed these notes
14 when you met with Mr. Fultz on the 18th and sort of
15 conducted your own intake of him, is that correct?
16 A   Yes.
17 Q   Okay.  Did you read -- you reviewed her
18 notes thoroughly in the process of rendering your
19 opinions in this case, is that right?
20 A   Yes.
21 Q   Is there anything that you believe that

Page 164

1 she -- in her notes that are incorrect?
2 A   Excuse me a second.  I saw her on the 17th,
3 not the 18th.  I think I said the 18th, just to be
4 clear.
5 Q   Are you aware of anything in her notes
6 that's incorrect which is to say that Mr. Fultz did not
7 tell that to her or that she got it wrong?
8      Did she at any point come to you and say
9 there's a mistake in my notes?
10 A   Well, that's the way it's -- that's not the
11 way it would be conducted.
12      What would happen is I would typically take
13 Miss Harding's notes and basically review them with
14 Mr. Fultz and if there were any mistakes he could point
15 out to me if she got something inaccurate.
16 Q   And did you, in fact, do that with
17 Mr. Fultz?
18 A   Yes.
19 Q   Did he tell you whether she, anything was
20 inaccurate in her notes?
21 A   Typically if there was I would make a

Page 165

1 notation right there.
2      So I don't see any so I'm going to
3 assume -- well, for example, on page 15 it looks like
4 the motorcycle accident age 8 is inaccurate.  I put a
5 line through that.
6      It appears that on page 17 it looks like
7 something was inaccurate.  Thinks he had to go to court
8 and pay a fine.  I put a line through that.
9      That appears to be the only two things.
10 Q   Okay.  Turning your attention now to the
11 background information sheet that begins on page 19.
12 Who filled this form out?
13 A   Miss Harding.
14 Q   Okay.  This was as part of the intake?
15 A   Yes.
16 Q   Did you also review this information at the
17 time you interviewed Mr. Fultz on the 17th of August?
18 A   Yes.
19 Q   And then page number 25, 26, this is a
20 medical history that Mr. Fultz filled out?
21 A   Yes.

U.S. EEOC, et al. vs
Rite Aid Corporation

Michael K. Spodak, M.D.
November 13, 2009

Page 166

1  Q  And 27 and 28 is a work history that he
2  filled out, is that correct?
3  A  Yes.
4  Q  Through page 30?
5  A  No.
6  Q  29?
7  A  29 is a mental health treatment history.
8  Q  Oh, thank you.  Okay.  Page 31, what is,
9  starting on page 31 there's a set of notes that I
10  believe goes to page 50.
11     Are these your notes?
12  A  Yes.
13  Q  Are these your notes of your interview with
14  Mr. Fultz?
15  A  Yes.
16  Q  And then on page 51 there's some sort of a
17  chart.  It looks like it's something that you would
18  fill out to show how you spend your day, daily
19  activities sheet.
20     There are notes written on that.  Are those
21  Miss Harding's notes?

Page 167

1  A  Yes.
2  Q  Did she go through sort of a daily time
3  line with Mr. Fultz?
4  A  This would be specifically shortly before
5  he went -- he left Rite Aid in February of '08, so it
6  would be December, January, '08 time frame.
7  Q  Okay.  So she specifically was asking him
8  about the time frame when his employment ended, is that
9  correct?
10  A  Yes.
11  Q  And did you review this information in
12  rendering your opinions in this case?
13  A  Yes.
14  Q  You have no trouble reading her
15  handwriting, do you?
16  A  Mostly, no.
17  Q  Okay.  If you did you'd ask her what
18  something was that you didn't understand?  Is that also
19  right?
20  A  Yes.
21  Q  Okay.  Starting on page 53 and going to

Page 168

1  page 61, are these also Miss Harding's intake notes?
2  A  Yes.
3  Q  You reviewed these when you, at the time at
4  which you did your own intake of Mr. Fultz, is that
5  correct?
6  A  Yes.
7  Q  Your own interview of Mr. Fultz I should
8  say.  Are any of the notes on pages 53 through 61
9  yours?
10  A  Only the numbers.
11  Q  Okay.  Pages 64, 63 and 64, these are your
12  notes of your interview with Mr. Fultz, is that right?
13  A  Yes.
14  Q  And then 65 through 66, that's again
15  Miss Harding's intake, is that correct?
16  A  Actually through 68, yes.
17  Q  And other than the page numbers at the top,
18  is any of the handwriting yours?
19  A  No.
20  Q  You reviewed these notes at the time that
21  you did your own interview of Mr. Fultz, is that

Page 169

1  correct?
2  A  Yes.
3  Q  Are the next set of notes yours, 69 through
4  72?
5  A  Yes.
6  Q  Then we're back to Miss Harding on page 73,
7  is that correct?
8  A  Yes.
9  Q  Through 74?  No.  I'm sorry.
10  A  On 73 the notes on the top left are mine.
11  Q  Okay.  What about on page 74?
12  A  74, the two notations are mine.  One says
13  several per week at present and the other says 1400 QD.
14  Those are my notes.
15  Q  Then on page 75 are the notes yours?
16  A  Yes.  76 are mine also.
17  Q  Okay.  This form that's depression scale
18  patient version, is that Beck Depression Scale?
19  A  No.
20  Q  What is that?
21  A  It's just a standard depression scale

U.S. EEOC, et al. vs
Rite Aid Corporation

Michael K. Spodak, M.D.
November 13, 2009

Page 170

1 patient version I've used for years. I don't recall
2 its origin.
3 Q   Who gave this to Mr. Fultz to fill out?
4 A   One of my staff members would have done
5 that.
6 Q   Okay. And you've reviewed this in
7 rendering your opinions in this case?
8 A   Yes. He was given the same form on the
9 17th when I saw him. He filled out another one.
10 Q   Okay.
11 A   The notes on the back of the one dated
12 8/17/09 and the handwriting on the front is mine.
13 Q   Okay. I don't have backs. I just have --
14 starting with the 8/3/09 form, there's a, three pages
15 from that there's a piece of paper that has a small
16 amount of handwriting, wish this lawsuit would go away.
17      Whose handwriting is that? Is that yours?
18 A   That's the back of the form --
19 Q   Okay.
20 A   -- on 8/17/09 and yes, that's mine.
21 Q   Okay. And then this daily activities

Page 171

1 sheet, is that different from the one that we looked at
2 just a minute ago?
3 A   Yes. This is one done contemporaneous to
4 the interview.
5 Q   Okay. Thank you. And then the notes on
6 the next page, whose notes are those?
7 A   Miss Harding.
8 Q   Okay. And then the next form which is a
9 yes/no checklist, what is this?
10 A   That's something given to Mr. Fultz that he
11 filled out.
12 Q   What is it?
13 A   It's a list of questions. I don't recall
14 where -- I wrote down the origin of these but it's
15 typically focusing on things that tend to address
16 personality issues.
17      Some are emotional problems. I mean, the
18 questions, the questions speak for themselves I think.
19 Q   Is this a standard form that you use as
20 part of the IME process?
21 A   Yes. It's one I use. I don't know if

Page 172

1 anyone else does.
2 Q   Okay. And then the next form, abilities
3 assessment, is that also a standard form that's part of
4 the IME intake process?
5 A   It is for me. The questions come from two
6 sources.
7      One is the AMA Guide to the Evaluation of
8 Permanent Impairment and the other is Social Security
9 disability guidelines.
10      And from those I've produced these four
11 sheets that help identify a person's functional
12 limitations, if any.
13 Q   Can you go to the next document, not the
14 next page but the next document that appears to be a
15 yes/no test? Which test is this?
16 A   It's not a test. It's a questionnaire.
17      It comes from a standardized set of
18 questions that are designed to elicit information about
19 an individual's personality style, their personality
20 traits or personality disorder.
21 Q   Does this have a name, this questionnaire?

Page 173

1 A   I think if I recall correctly, it may be
2 called the SCID, S-C-I-D, but I don't recall what the
3 acronym stands for.
4 Q   Can you go forward to the various sheets
5 where it looks like Mr. Fultz is asked to draw lines?
6 What are these?
7 A   Well, the next five sheets starting with
8 mental status sheet and then Mini-Mental State
9 Examination, Digit Span, Trail Making Part A and Trail
10 Making Part B constitute the mental status examination
11 which is the psychiatric equivalent of a physical exam
12 where you try to make observations about an individual.
13      I try to make observations about the
14 individual as I interview them.
15      Under the cognitive assessment, those
16 latter four sheets are standardized questions or tasks
17 to help assess Mr. Fultz's cognitive functioning.
18 Q   Have you, are you making any diagnosis as
19 part of your opinion with regard to Mr. Fultz?
20 A   I hadn't been asked to, no.
21 Q   Okay. Do you expect to make any diagnosis

Page 178

1   answers into a computer and then it's, from that we get
2   a printout that you are currently looking at.
3   Q   Do you disagree with any component of the,
4   of the report that you recall?
5   A   I'd have to go through line by line. I
6   mean, I agree with some. I probably disagree with
7   some.
8        I mean, you want me to, I can, if you want
9   me to go line by line I'm happy to do that.
10  Q   Well, if there's anything that jumps out at
11  you as being something that you strongly disagree
12  with -- well, let me ask you this. Did you consider
13  the report in rendering your opinions in this case?
14  A   Yes.
15  Q   Is there any part of the report that you
16  discarded or that you rejected in rendering your
17  opinions?
18  A   I wouldn't call it rejected or discarded
19  but there's certainly ones that I thought were more
20  applicable than other things.
21  Q   Okay. And what things did you think were

Page 179

1   more applicable?
2   A   The ones that were most applicable I put in
3   my report.
4   Q   Okay.
5   A   The other things I'd have to go really line
6   by line again if you want me to do that.
7   Q   No, I don't need you to do that. If what
8   was most applicable is contained in your report, then I
9   think you've answered the question.
10  A   Well, just for example, there's a statement
11  on the bottom, toward the bottom of page 5. He appears
12  to be immobilized and withdrawn and has no energy for
13  life. I would dispute that.
14       I certainly felt that he was mobilized, not
15  withdrawn and seemed to have adequate energy for life
16  at the time I interviewed him so that would be one
17  example of something I don't think is applicable.
18       Again, beyond that I'd really have to go --
19  I don't believe he strongly -- well, he has -- well,
20  let me see.
21       At the time I saw him I didn't think that

Page 180

1   he was suicidal. I didn't think, although he may have
2   had a history of that, I didn't think a suicide
3   assessment was necessary at the time I evaluated him.
4        So again, beyond that I'd have to go line
5   by line.
6   Q   Why did you think it was not necessary if
7   it was indicated in the report?
8   A   Well, I asked him a few screening questions
9   about it. He denied -- and there were also questions
10  in the two depression inventories about suicidal
11  ideation that he'd answered on two different occasions.
12       I did ask, did do a little follow-up
13  inquiry because if you look at the form, on 8/3/09 he
14  said he had no intent to kill himself.
15       He had some thoughts of wishing he were
16  dead or suicide or not caring if I lived.
17       I saw him on 8/17/09. At that point he
18  said he had some thoughts of suicide, wishing I were
19  dead or not caring if I lived but no intent to kill
20  himself, no desire to want to hurt or punish himself.
21       I did inquire about that as far as whether

Page 181

1   he had any plan to kill himself and he said no, he had
2   no plan about that, was not -- what he did say in
3   response to 33, it was upsetting him that he wishes
4   that the lawsuit would go away.
5        That seemed to be the thing causing him to
6   not care if he lived or feeling down.
7   Q   Why was Mr. Fultz, how was this test
8   administered to Mr. Fultz, the Minnesota Multiphasic?
9   A   It's self-administered. The person is
10  given the instruction of read the questions and fill
11  out the bubble sheet.
12  Q   Why did you choose this test?
13  A   It's a fairly standardized personality
14  test. It has been well-validated.
15       It has a built-in validity scale to
16  determine if the person is being cooperative in the
17  evaluation process. It appeared that he was.
18       It provides information about longitudinal
19  personality issues and also about current emotional
20  distress if they're having it.
21       I think it's a way of, another source of

Page 182

1 information to put side by side with your clinical
2 interview and the mental status exam to see if they
3 kind of line up and are consistent or inconsistent.
4 Q  Did you, in fact, do that analysis with
5 regard to the testing and the clinical interview?  Did
6 you look for consistencies and inconsistencies?
7 A  Yes.
8 Q  The Minnesota Multiphasic has a built-in
9 validity scale to enable, for determination as to
10 whether the person is faking the results, correct?
11 A  True.
12 Q  Malingering?
13 A  Yes.
14 Q  And the results of Mr. Fultz's exam did not
15 show that he was malingering, is that correct?
16 A  That's correct.
17 Q  Okay.  Going on to the SCLR90.  Am I
18 correct that this is a test that's, it's a self report
19 of symptoms, is that right?
20 A  Yes.
21 Q  And why was this test administered to

Page 183

1 Mr. Fultz?
2 A  Because it's again a standardized test.
3    I'm familiar with using it and it's another
4 way of gaining information about how someone typically,
5 what type of symptoms or -- well, basically what kind
6 of symptoms they're experiencing at any one particular
7 time.
8    It's more of a cross-sectional type of
9 thing or a snapshot type of thing at the time that the
10 individual is seen.
11 Q  Okay.  And the next test is the Milan
12 Clinical Multiaxial Inventory, correct?
13 A  Yes.  It's Milan.
14 Q  Milan.  Thank you.  Is this primarily used
15 as a personality test?
16 A  Yes.
17 Q  And why was this test administered to
18 Mr. Fultz?
19 A  It has a -- couple reasons.  First it has
20 another, it's another test with a built-in validity
21 scale to see if he was providing a valid profile.

Page 184

1    It offers information about personality
2 patterns which are helpful to better understand
3 someone.
4    It also helps look for consistencies with
5 the MMPI and with the rest of the clinical interview.
6 Q  Validity scales also indicate whether there
7 is faking or malingering going on with regard to the
8 tests, correct?
9 A  Yes.
10 Q  And Mr. Fultz's results did not show that
11 he was faking or malingering, did it?
12 A  No.
13 Q  Okay.  And with regard to the report for
14 the Milan test, how was is that generated?
15 A  Computer generated.
16 Q  Okay.  So again, you did not write this?
17 It was -- the computer generated it based on
18 Mr. Fultz's answers to the test, correct?
19 A  Yes.
20 Q  And why was there no Axis III component to
21 this?

Page 185

1 A  To this?  You mean to the Milan?
2 Q  Yes, to the results.
3 A  I presume that's because how the software
4 is written.  They only do an Axis I and possible Axis
5 IV.
6 Q  Well, was there --
7 A  There is a II.
8 Q  Axis III would --
9 A  Well, Axis III is medical conditions and
10 that would basically really be by history.  That would
11 not be a psychological analysis.
12 Q  Why wasn't epilepsy controlled for?
13 A  I didn't say -- I don't know if it was or
14 was not controlled for.
15 Q  Well, when --
16 A  The point is that the information that goes
17 on Axis III is merely a recitation of medical
18 conditions a person may have had at some point during
19 their life.
20    That's done by history, not by interpretive
21 testing.

**Page 186**

1    It just simply asks someone or looks
2  through records and determine whether someone has
3  certain physical conditions, and if you do you
4  typically list them under Axis III.
5  Q   And so the test, there is some sort of
6  component of the test which would enable the tester to
7  provide Axis III information, is that right?
8  A   No. I'm not aware there is any component
9  because those 175 questions have nothing to do with
10  what your medical history is about.
11  Q   Okay. And then for Axis IV, psychosocial
12  and environmental problems, why does it say not
13  identified in the report?
14  A   That's the printout -- that's the way the
15  computer analyzed the data.
16  Q   Okay. Why, why was problems such as, you
17  know, the termination of Mr. Fultz's employment,
18  unemployment, et cetera, why wasn't that identified
19  under Axis IV?
20  A   I don't know. I mean, it's a computer
21  program.

**Page 187**

1  Q   Should it have been?
2  A   I don't know. It depends on the software.
3  I didn't write the software. That's why I don't rely
4  on these tests.
5    I use them as part of the evaluation. I
6  find things, some things are applicable, some are not.
7    It would strictly be governed by the nature
8  of his answers and if there's none identified it may
9  have been that when he went through the testing, based
10  on his answers, he didn't answer questions in such a
11  way that would have identified any psychosocial
12  stressors.
13    So he may not have perceived there were any
14  at the time he was taking this test.
15  Q   What is the Beck test which I believe is
16  the last component of this exhibit?
17  A   Well, there you have the actual questions
18  and his answers are transposed onto the question sheet.
19  Rather than scoring them, I find it more useful to just
20  look at the answers.
21    I mean, they basically speak for

**Page 188**

1  themselves.
2  Q   And this is a test that's used to determine
3  whether or not a person is experiencing depression?
4  A   I don't think it's determined. I think,
5  again, it goes along with the clinical interview and
6  other factors but it certainly is a different way of
7  doing it.
8    Some people are more expressive through
9  test taking. Some are more expressive through verbal
10  questions and answers.
11    In my estimation, for completeness, it's
12  just a different way of getting information and see if
13  it is consistent or inconsistent with what you come up
14  with in your clinical interview.
15  Q   In rendering your opinions in this case as
16  they're stated in your report, did you review all of
17  the information that's contained in Exhibit 17 --
18  A   Yes.
19  Q   -- which is all the information that we've
20  just reviewed with regard to the intake, your interview
21  and the testing?

**Page 189**

1    Was that all reviewed by you prior to you
2  completing your report and rendering your opinions in
3  this case?
4  A   Yes.
5  Q   All of this information in Exhibit 17 was
6  reviewed by you prior to you completing your report in
7  this case, correct?
8  A   Yes.
9  Q   Okay. Thank you.
10    (A short break was taken.)
11  Q   Can you turn to your report?
12    (A discussion was held off the record.)
13  Q   We were turning our attention, Dr. Spodak,
14  to your report and we are going to be looking at the
15  opinions that you've made in your report.
16    We talked about them some before and I'm
17  just going to complete that discussion now.
18    MR. ROTHSCHILD: Are we finished with --
19    MS. MOROCCO: We're done with Exhibit 17.
20    Now, I want to make sure I understand the
21  scope of your opinions and, as you can see, that they

U.S. EEOC, et al. vs
Rite Aid Corporation

Michael K. Spodak, M.D.
November 13, 2009

Page 190

1  all deal with the causation of whether various things
2  resulted in the development of a diagnosable mental
3  illness or disorder.
4      So I want to make sure I understand the
5  scope of each of your opinions in that regard.
6      It is you're opining whether or not a
7  diagnosable mental illness or disorder, causation with
8  regard to that, correct?
9      THE WITNESS: Not exclusively, no.
10 Q  Okay. Well how, with regard to each of
11 these, how is that not the case?
12 A  I don't believe number 7 addresses that.
13 Q  Okay. I'm sorry. But the ones that do,
14 which would be numbers 1 through 5, your opinions are
15 restricted to whether or not a diagnosable mental
16 illness or disorder resulted from various complaints of
17 Mr. Fultz, correct?
18 A  I would also include number 6 in that, yes.
19 Q  Okay. But you are not opining as to
20 whether he suffered other -- forms of mental distress
21 that do not rise to the level of a diagnosable mental

Page 191

1  illness or disorder, correct?
2      MR. ROTHSCHILD: Could you repeat that?
3      MS. MOROCCO: You are not opining as to
4  whether he suffered mental distress that does not rise
5  to the level of a diagnosable mental illness or
6  disorder?
7      That is not within the scope of what you're
8  opining on in this case, right?
9      THE WITNESS: I don't know if it's within
10 the scope. Those opinions are what they are.
11     I have my opinion about whether certain
12 things or the basis -- if he does say I'm distressed, I
13 certainly have an opinion about the types of things
14 that cause people distress in general and which ones
15 typically cause more distress than others and it seems
16 to me that is or may be inherent in some of the
17 opinions.
18 Q  Let's go opinion by opinion. Let's talk
19 about opinion number 3. Does opinion number 3 include
20 the termination of Mr. Fultz's employment?
21 A  No, it says work restrictions.

Page 192

1  Q  Okay.
2  A  I don't believe -- well, first of all, it's
3  not my understanding he was terminated until October of
4  2008 when he refused to go back to the job.
5  Q  Okay. Well, let's just talk about --
6  A  Is that what you're referring to when you
7  say termination?
8  Q  Does number 3 refer to him being put on
9  involuntary medical leave by Rite Aid, number 3?
10 A  No, that would be number 4.
11 Q  Okay. And does number 4 encompass, does
12 your opinion take into, with regard to number 4, take
13 into account the fact that Mr. Fultz did not, in fact,
14 collect short-term disability?
15 A  I think when you asked me that question
16 before --
17 Q  You said no.
18 A  -- the same answer I would give you now is
19 that it's about whether the act of placing him on
20 short-term disability resulted in a mental illness.
21     I did not review his bank statements to

Page 193

1  determine if he got money, if he didn't.
2      If he didn't have money, the cause of his
3  not having money, would it be because he is a
4  spendthrift or because he hasn't saved over the years?
5      Just because someone does not get money
6  from a specific job doesn't necessarily mean that that
7  should result in any mental illness because the
8  accumulation of your personal wealth is something that
9  goes on throughout your entire life.
10     That's not something that happens in a
11 snapshot.
12 Q  Okay.
13 A  So that's why I would say any time someone
14 misses a check here and there, and I see many, many
15 people all the time who complain about not, about
16 having their workers' comp benefits cut off, or this
17 different benefit cut off or that thing happening,
18 whatever.
19     Those acts in and of themselves do not
20 generally cause mental illness anyway, even if you were
21 to encompass failure to be given a check on a, for a

Page 194

1 certain number of weeks.
2 Q  As you've stated previously, number 4 is,
3 again, a general opinion that you're rendering in this
4 case with regard to whether the act of being placed on
5 short-term disability would result in the development
6 of a diagnosable mental illness or disorder.
7    That's a general opinion that you're
8 rendering in this case, correct?
9    MR. ROTHSCHILD: When you say general, you
10 mean as opposed to Mr. Fultz?
11    MS. MOROCCO: Right.
12    THE WITNESS: As stated, number 4, it's a
13 general opinion, however it's my further opinion that
14 his being placed on short-term disability did not
15 result in his developing a diagnosable mental illness
16 or disorder.
17 Q  Okay.  And what is the basis for that
18 opinion?  I need to know every leg of the stool with
19 regard to opinion number 4 as it was described in your
20 article.
21 A  The first is because short-term disability

Page 195

1 in virtually every case does not cause a mental
2 illness, period.
3 Q  Okay.  What is your basis for that opinion?
4 A  Well, you asked me that before as well and
5 what I explained was that there's no evidence that it
6 does.
7    I've never seen a peer reviewed article
8 saying that they've studied the impact of being placed
9 on short-term disability versus not being placed on
10 short-term disability, have two matched populations and
11 determine if one has a more frequent resultant mental
12 illness.
13    Would be very difficult to do because most
14 of the time when people are placed on short-term
15 disability they have some other problem going on that
16 leads to the disability.
17    So it would be very difficult to sort out
18 the underlying problems, such as Mr. Fultz's out of
19 control epilepsy, from the process of being placed on
20 short-term disability.
21    So it would be very difficult, first of

Page 196

1 all, to tease that out and say yes, that's the cause.
2 We can segregate off the fact that somebody has
3 bizarre, out of control seizures all the time and
4 somehow say yes, this is short-term disability.
5    So one is the difficulty with doing it.
6    Secondly, I've never seen any studies that
7 specifically show that short-term disability is a cause
8 of mental illness.
9    Third, I've never seen anything written in
10 any textbook that shows it.
11    Fourth, in my experience, I've never seen
12 any individuals who have developed a mental illness,
13 excuse me, a mental illness by the process of being
14 placed on short-term disability.
15 Q  Okay.  I'm handing you Exhibit Number 16.
16 I'm sorry, Number 18.
17    (Whereupon, a document was marked as Spodak
18 Deposition Exhibit Number 18.)
19 Q  These are medical records, two records of
20 Dr. Lesser which were provided to Rite Aid at the time
21 that Mr. Fultz was put on medical leave.

Page 197

1    I'd like you to, I'm going to direct your
2 attention -- I'm going to ask you if you took these
3 records into account in rendering opinion number 4.
4    MR. ROTHSCHILD: What's the date of those,
5 please?
6    MS. MOROCCO: The 16th of January and the
7 25th of January 2008.
8    MR. ROTHSCHILD: Do you have additional
9 copies?
10    MS. MOROCCO: Yes, I do.  Just give me a
11 second.
12    MR. ROTHSCHILD: I will.
13    MS. MOROCCO: Here you go.
14    MR. MONTEIRO: I'm sorry.  Did you mark
15 both of these?
16    MS. MOROCCO: They're the same exhibit.
17    MR. ROTHSCHILD: The same exhibit as --
18    MS. MOROCCO: I'm going to add this to that
19 exhibit as well which is the return to work notice from
20 Dr. Lesser.
21    MR. ROTHSCHILD: What are you marking

U.S. EEOC, et al. vs                                                        Michael K. Spodak, M.D.
Rite Aid Corporation                                                              November 13, 2009

Page 198

1  these?

2      MS. MOROCCO: They're a composite exhibit,

3  Exhibit Number 18, is that right?

4      So with regard to, did you take these

5  documents into account in rendering your opinion with

6  regard to number 4?

7      THE WITNESS: Yes.

8  Q   Okay. And with regard to the fact that in

9  these records Dr. Lesser is saying that Mr. Fultz is

10 indeed fit for duty, what weight did you give that in,

11 in making your opinion with regard to -- in rendering

12 your opinion with regard to number 4?

13 A   Well, I didn't give just the weight of this

14 fit for duty. You have to go back and start with the

15 beginning.

16     For instance, it says, he had a seizure

17 Christmas Eve characterized by prolonged twitching of

18 the right thumb and more typical symptoms and signs for

19 him.

20     He was unresponsive for a prolonged period

21 after this and had a cold the next day.

Page 199

1      The record I reviewed said that on December

2  24th, '07 he had a seizure on the floor. He was

3  convulsing for 40 minutes.

4      He had delirium, confusion and

5  disorientation which sounds a lot more than the way

6  that Dr. Lesser has described it.

7      So my first thing that came to mind to me

8  was well, did Dr. Lesser know the full extent of that

9  seizure.

10     My record review also indicated that

11 Mr. Fultz had another seizure, a complex partial

12 seizure on December 25th, '07. He had another one on

13 December 27th, '07.

14     He saw Dr. Rowekamp on January 4th, 2008

15 and Dr. Rowekamp felt that he was not fit for duty.

16 Q   Is it your testimony that Mr. Fultz --

17     MR. ROTHSCHILD: Will you let him finish

18 please?

19     MS. MOROCCO: Go ahead.

20     THE WITNESS: I don't see any of that

21 information contained in Dr. Lesser's report or that he

Page 200

1  knew or even considered any of that information.

2      I also note in the report that Dr. Lesser

3  prescribed Keppra and Tegretol and I think I commented

4  earlier that, to the extent that Mr. Fultz was taking

5  the Keppra, that has a number of troublesome side

6  effects.

7      In fact, Dr. Lesser even lists here that

8  they may include sleepiness, fatigue, weakness,

9  headache, pain, double vision, dizziness, coordination

10 difficulties, running nose or cough, increased

11 infection, memory difficulties, anxiety and behavior

12 problems including psychosis.

13     I also note from my time line that the day

14 after Mr. Fultz saw Dr. Lesser on January 16th he had

15 another seizure and lost a block of time.

16     Dr. Rowekamp again opined on January 23rd,

17 '08 that Mr. Fultz was not fit for duty. So, yes I put

18 Dr. Lesser's opinion in the context of the remainder of

19 that information.

20     Turning to the February 25th, '08 report,

21 leading up to that it's my understanding that on

Page 201

1  February 8th, '08, the day Mr. Fultz was placed on

2  short-term disability, he interpreted that as being

3  terminated or misinterpreted it as being terminated and

4  developed homicidal ideation which I think was noted in

5  Jodie French's notes.

6      On February 11th, '08 he had another

7  seizure, although that might have been the one from

8  January, and that's the, sort of the continuation of

9  that.

10     Now, Dr. Lesser's, I mean Dr. -- yeah,

11 Lesser is saying that he had no new -- no seizures on

12 his new medication regime.

13     If he was still taking the Keppra, then you

14 have to, which is the new medication regime, then you

15 have to again go back to the various side effect

16 profiles, including psychosis, that are possible to

17 develop with Keppra.

18     And I also note that Dr. Lesser limits him,

19 no driving forklifts, no climbing except stairs, and

20 doing well overall.

21     Given the information I have, it doesn't

U.S. EEOC, et al. vs
Rite Aid Corporation

Michael K. Spodak, M.D.
November 13, 2009

Page 202

1 sound like to me that that is the picture of someone
2 who is doing well overall.
3 Q   Okay.
4 A   So yes, I did consider it.
5 Q   Okay. And in formulating your opinion, did
6 you consider what effect it would have on Mr. Fultz to
7 be placed on medical leave when his doctor was finding
8 him fit for duty?
9      Did you analyze what kind of psychological
10 effect that had on Mr. Fultz?
11 A   I — well sure. First of all, Mr. Fultz
12 was, in my opinion, seriously understating to
13 Dr. Lesser the severity of his seizure disorder, the
14 frequency, the nature of his seizures, the full impact
15 they were having on him and in the workplace.
16      I see no mention that he discussed with
17 Dr. Lesser any concern about driving a car,
18 notwithstanding the fact that he is having a 40-minute
19 period where he's convulsing, delirium, confusion,
20 disorientation.
21      I mean, to any reasonably prudent

Page 203

1 individual who has a sense of concern about himself and
2 the general public, you don't drive when you're doing
3 that, when those things are happening to yourself,
4 because you can kill yourself and a bunch of innocent
5 people.
6      And it's not clear to me to what extent
7 Mr. Fultz cared about that. If he didn't care, that's
8 very troublesome.
9      If he did care about it, that's indication
10 of a serious stressor ongoing like the sort of Damocles
11 hanging over your neck.
12 Q   He was not asked about driving during any,
13 you did not ask him about that in your interview of
14 him, correct?
15 A   You don't have to. It's so self-evident.
16 Q   Did you ever, you never spoke with
17 Dr. Lesser, did you?
18 A   No, I didn't.
19 Q   You didn't obtain any -- you did not ask
20 for any kind of a release from Mr. Fultz to speak to
21 Dr. Lesser?

Page 204

1 A   The only person I asked to speak with was
2 Mr. Fultz's wife.
3 Q   Okay. So you never spoke with Dr. Lesser
4 about any concerns that you had that Mr. Fultz was not
5 accurately reporting his symptoms to Dr. Lesser,
6 correct?
7 A   Well, first of all, I saw Mr. Fultz in 2009
8 after he had already been terminated from Rite Aid,
9 after I guess he refused to go back, so I didn't see
10 what value that would be in discussing with Dr. Lesser
11 opinions he might have formulated a year and a half
12 earlier.
13      But no, I did not do that.
14 Q   Did you take into account, were you aware,
15 in formulating opinion number 4, that Mr. Fultz tried
16 on numerous occasions to have Rite Aid return him to
17 the work, to work when his doctor would not sign off on
18 his short-term disability?
19      MR. ROTHSCHILD: You said doctor. What
20 doctor are you referring to?
21      MS. MOROCCO: Dr. Lesser.

Page 205

1      THE WITNESS: I think you gave me a history
2 that he tried to go back.
3      The problem it sounded like that Mr. Fultz
4 was dealing with which, again, to me is an added source
5 of stress, is that as I understood it, Mr. Fultz, in
6 order to get short-term disability, needed his
7 physician to fill out the disability paper.
8      However, Dr. Lesser is the reason he didn't
9 get his disability checks, as I understand it, because
10 Dr. Lesser refused to fill out the paper.
11      So once again it seems like Mr. Fultz is
12 falsely blaming Rite Aid when the real fault lies with
13 Dr. Lesser who is the one who is the cause of his not
14 getting a check after he left work.
15      So that sort of misapplication of your
16 anger is another troublesome thing as far as his going
17 back to work.
18 Q   You did not ask, you did not speak with
19 Dr. Lesser, therefore you did not ask him why he would,
20 he did not certify Mr. Fultz for short-term disability,
21 correct?

U.S. EEOC, et al. vs
Rite Aid Corporation

Michael K. Spodak, M.D.
November 13, 2009

Page 206

1 A  I didn't, but given his report it seems
2 like he didn't because, in Dr. Lesser's opinion, he
3 could go back to work so it would be inconsistent for
4 him to then turn around and sign a disability form.
5      He's saying he's not disabled and then he's
6 coming in and saying would you please sign a disability
7 form so I can understand, while I didn't ask
8 Dr. Lesser, that it would suggest to me that that would
9 be --
10 Q  You have know --
11 A  -- require Dr. Lesser to change his opinion
12 by 180 degrees.
13 Q  You have no knowledge of any medical
14 reasons why Dr. Lesser would not certify Mr. Fultz for
15 disability, correct?
16      MR. ROTHSCHILD: Objection. He just
17 testified his knowledge is based on the report.
18      MS. MOROCCO: I'm sorry. You can answer
19 the question.
20      THE WITNESS: Well, yeah. The medical
21 knowledge I have is that what's contained in

Page 207

1 Dr. Lesser's two reports of January 16th, '08 and
2 February 25th, '08, that Dr. Lesser did not believe --
3 apparently did not believe Mr. Fultz was disabled so he
4 refused to sign the forms and that's why Mr. Fultz
5 didn't get paid.
6 Q  Did you ever read Dr. Lesser's deposition
7 in this case?
8 A  No, I was not provided that.
9 Q  In rendering opinion number 4, were you
10 aware that Rite Aid threatened Mr. Fultz with
11 termination if he did not attend the fitness for duty
12 with Dr. Rowekamp?
13 A  I didn't but it would not surprise me.
14      My experience is an IME evaluator for
15 various businesses is that if someone is told they have
16 to go see a doctor for a disability or a fitness for
17 duty evaluation and you refuse, it often ends up or can
18 be grounds for termination.
19 Q  And that --
20 A  So to me that's -- I didn't ask in this
21 case, but it would not surprise me if that were the

Page 208

1 case.
2 Q  Were you aware of the fact that Mr. Fultz
3 told the officials at Rite Aid that he would agree to
4 be seen by any neurologist but he objected to being
5 seen by Dr. Rowekamp because he thought he was
6 unqualified?
7 A  No, I did not.
8 Q  Would that change your opinions with regard
9 to whether or not Rite Aid's treatment of Mr. Fultz
10 caused him to experience any kind of a mental illness
11 or disorder?
12 A  You mean because Mr. Fultz wanted to decide
13 who he would not go see as a neurologist? No, I don't
14 think that changes my opinion.
15      In fact, I know it -- that doesn't change
16 my opinion. I probably shouldn't say this in
17 deposition but I've had a number of employees who've
18 said they'd see anybody but me.
19 Q  Turning your attention to number 6 of your
20 opinions. Have you arrived at an opinion as to what is
21 the cause of any depressive disorder that Mr. Fultz may

Page 209

1 have?
2 A  Yes.
3 Q  What is that?
4 A  Well, I tried to list on page 9 a number of
5 factors I considered particularly significant and
6 provided actually 16 separate things that could have
7 been a factor in Mr. Fultz's depression.
8      The one I didn't list, which I probably
9 should have because I think it's also extremely
10 significant, is this whole driving thing where he's
11 driving his car and engaging in this very unpredictable
12 behavior that could at any time cause him to have a
13 fatal accident for himself or anyone else.
14      And I think those things all in and of
15 themselves could be factors in Mr. Fultz developing a
16 depression.
17 Q  Have you arrived at an opinion with any
18 degree of medical certainty as to the cause of any
19 depression, the specific causes of any depression that
20 Mr. Fultz suffers?
21 A  I don't think one can list it as this is

U.S. EEOC, et al. vs
Rite Aid Corporation

Michael K. Spodak, M.D.
November 13, 2009

Page 210

1 the cause.
2     What I think you could do is say these are
3 the kind of things an individual was under in terms of
4 risk factors or things that would likely be kind of in
5 a priority list of the type of things that would lead
6 to depression.
7     I think first and foremost, as I've
8 indicated, would be someone who is leaving the house
9 every morning having these seizures which result, in
10 many times, in loss of consciousness and driving around
11 in the car every day.
12     To me that's an enormously significant
13 stressor.
14     The second you've got is a family history
15 of depression with his sister having a diagnosis of
16 bipolar disorder.
17     The third you've got an individual who's
18 had brain surgery.
19     The fourth you've got someone who has a
20 chronic medical condition of epilepsy which is not in a
21 very stable state, and that and chronic mental, I'm

Page 211

1 sorry, chronic medical conditions are frequently a
2 cause of depression.
3     Then you've got the various behaviors that
4 Mr. Fultz demonstrated during his seizures which I'm
5 sure had to be very embarrassing and many times
6 humiliating for him.
7     He's disrobing to his underwear on several
8 occasions, ending up in handcuffs when he's going for
9 jury duty, engaging in this rather unusual behavior.
10     And even if he didn't know what it was at
11 the time because he was in a semiconscious state,
12 certainly afterward you have to deal with the oh, my
13 God, I did that kind of thing and the embarrassment
14 that may go along with it.
15     And then you have these issues where he
16 feels -- he has a perception of feeling unappreciated,
17 of being retaliated against, of feeling harassed, the
18 stress of his lawsuit, all those things, in my opinion,
19 were far more likely contributors. And you've got his
20 mother committing suicide.
21     So, you've got -- all those factors, in my

Page 212

1 opinion, are far stronger contributors to any type of
2 depression Mr. Fultz might have developed separate and
3 apart from any and far in excess to anything that might
4 have been done by Rite Aid.
5 Q   Okay.  And what is the, again, the basis of
6 your opinion that there was -- with regard to the
7 causation of Mr. Fultz's depression, what is the basis
8 of your opinion that any one of those things or some
9 combination of those things was the cause of depression
10 and not his termination from Rite Aid?
11     MR. ROTHSCHILD: Objection to the
12 termination.
13     THE WITNESS: I thought that's what I just
14 said.  When you look at a continuum of stressors and
15 the type of things likely to cause --
16 Q   In what --
17 A   -- or be responsible for a depressive
18 disorder, I tried to list them in order of priority,
19 that in my opinion, from experience and from review of
20 the literature and other things that I've seen
21 published, are the type of things that likely go into

Page 213

1 the causing depression.
2     Add to that that the kind of things Rite
3 Aid did, and I tried to break them out one at a time in
4 the earlier opinions, are not the cause of mental or
5 emotional illness.
6     So you've got the fact that the things Rite
7 Aid did doesn't cause illness.  You've got all these
8 other things that does cause illness.
9     You've got the prioritization of what
10 causes it more likely than other things as far as risk
11 factors that all added together is the basis.
12 Q   Tell me every basis for your opinion that
13 what Rite Aid did to Mr. Fultz did not cause any kind
14 of a mental illness.
15     MR. ROTHSCHILD: Objection.  Asked and
16 answered.  He just answered the question.
17     MS. MOROCCO: Other than -- other than you
18 thinking that other things may have caused his mental
19 illness, tell me every reason why you think the
20 treatment by Rite Aid, including the ending of his
21 employment, did not cause any mental illness, every

U.S. EEOC, et al. vs
Rite Aid Corporation

Michael K. Spodak, M.D.
November 13, 2009

Page 214

1  basis, setting aside these other reasons that you think
2  may have caused his illness.
3      MR. ROTHSCHILD: Let me just object.
4      MS. MOROCCO: Every reason that Rite Aid's
5  treatment of him did not cause any mental illness,
6  every single leg of that stool, please tell me.
7      MR. ROTHSCHILD: Objection. You keep using
8  end his employment. The record is that —
9      MS. MOROCCO: It's a standing objection,
10  Jim.
11      MR. ROTHSCHILD: Well, it's just an unfair
12  question.
13      MS. MOROCCO: His employment ended and he
14  wasn't paid, okay? So I define it that way.
15      I want you to tell me every single reason,
16  every leg in your stool for your opinion that Rite
17  Aid's treatment of Mr. Fultz did not cause him to
18  suffer a mental illness.
19      THE WITNESS: As I've said —
20      MS. MOROCCO: Setting aside —
21      MR. ROTHSCHILD: Would you —

Page 215

1      MS. MOROCCO: — all of these things that
2  you are hypothesizing may have caused his illness, I
3  want you to answer the other side of that coin which is
4  to say every basis why the treatment of Rite Aid did
5  not cause his illness.
6      MR. ROTHSCHILD: I'm going to object to
7  your tone, the fact that you ask him a question, he
8  goes to answer it and you interrupt him, and you're
9  raising your voice with him at this point.
10      I'd like a little more professionalism at
11  this point in time.
12      I know it's late in the day but if you
13  would just ask him a question, let him answer it and
14  don't interrupt him in the middle of his answer.
15      THE WITNESS: Is this over and above the
16  other two times I answered this question?
17      MS. MOROCCO: Yes.
18      THE WITNESS: Because I made — it's the
19  same list that I answered when you asked me the last
20  time —
21  Q   No, I'm asking —

Page 216

1  A   — which is that there is an absence of any
2  medical literature which indicates that when you take
3  these things, forklift restriction, second floor
4  restriction, even a cage insistence that he be able to
5  go in the cage alone, all those things, when you break
6  them out, short-term disability, whatever these
7  individuals things as I understand them are, those
8  things have never been reported in the medical
9  literature as a cause of depression.
10      So the first is the absence of any medical
11  evidence whatsoever that they cause depression or
12  mental illness.
13      The second is that in my experience I've
14  never seen cases where — I've seen many, many cases
15  where people were — have restrictions at work,
16  restrictions on their duty and every other thing.
17      Those things simply do not cause people to
18  have mental illnesses.
19      Other than the absence of any literature
20  and any suggestion in anything psychiatric I've ever
21  seen and the absence of any experience in the area,

Page 217

1  those would probably be the factors that I would have
2  considered.
3      Plus, I mean, it's common sense. Telling
4  someone you can't climb to the second floor is not
5  something that causes an illness.
6      If it did, any time somebody got a bad knee
7  or a back pain or something and they couldn't climb to
8  the second floor is not the cause of a mental illness.
9      Telling someone you can't drive a forklift
10  after you nearly have an accident that injures someone
11  and have a seizure and go out of control, most people
12  would be relieved to have that kind of restriction.
13      Those things do not cause mental illness.
14      Placing someone on disability, if that were
15  the cause of an illness — millions of people every
16  year go out on short-term disability.
17      You would expect an, what's the word, I'm
18  blocking, epidemic of depression if going on disability
19  were the cause of a mental illness.
20      You don't have those things. They're just,
21  they don't do it.

U.S. EEOC, et al. vs
Rite Aid Corporation

Michael K. Spodak, M.D.
November 13, 2009

---

Page 218

1  The absence of any evidence or literature
2  indicating that they do is the most compelling evidence
3  that they don't.
4  Q  Have you ever seen any literature
5  indicating that being terminated from one's job can
6  cause someone to suffer from depression?
7  A  The answer, the short answer is yes but not
8  really because when you look at the literature it's not
9  the, it's not the, it's not the fact of the
10  termination.
11  It has to do with the individual's
12  perception of entitlement, the individual's perception
13  of what they may have put in the job or not, the
14  individual's self-confidence, self-esteem.
15  All those things are factors that, plus
16  their familial history, plus other things going on in
17  their lives.
18  So the mere act of termination, in my
19  opinion, is not the cause of a condition. It's what
20  that represents symbolically in people.
21  Some people are relieved, some people

---

Page 219

1  aren't.
2  A lot of the people I see want to stay off
3  of work. They're delighted when somebody puts them out
4  of work and they don't have to go back for a time.
5  So it's a very individualized thing.
6  But I've never seen anything that said that
7  the actual act itself -- even though I said earlier
8  that yeah, termination can cause depression in the sort
9  of process sense that if someone is dealing with
10  becoming terminated and a lot of the things that go
11  around that such as loss of income and maybe
12  self-esteem and other things, that can sure end up with
13  somebody becoming depressed.
14  But it's not like a light switch where
15  terminated, ah, depression. It just doesn't work that
16  way.
17  Q  Mr. Fultz was not delighted to be put out
18  of work, was he, as far as you know?
19  A  No. As far as I know, he believed that
20  there was nothing wrong with him and he could work
21  without any difficulty.

---

Page 220

1  Q  He didn't believe there was nothing wrong
2  with him.
3  A  Well --
4  Q  He knows that he has epilepsy, correct?
5  A  Well, yeah. The only thing is, from my
6  evaluation of him, the only thing he seemed to agree
7  with was that Rite Aid was justified in restricting his
8  driving a forklift.
9  But other than that -- now, to the extent,
10  how much of that was based on his really knowing that
11  he was misrepresenting the severity of his condition to
12  Dr. Lesser, how much of it was not is something
13  probably only Mr. Fultz really knows.
14  Q  What is your basis for your opinion that
15  Mr. Fultz was misrepresenting to Dr. Lesser?
16  A  Well, I have to go through each and every
17  one of the reports, but when you look at the things
18  that he was telling Dr. Lesser and you look at the
19  descriptions of what the co-workers were talking about
20  and the other information I've gotten from other
21  sources, it seemed very evident to me that he was not

---

Page 221

1  describing to Dr. Lesser the full extent of his, the
2  duration of the seizures, the frequency of the seizures
3  or the severity of the seizures.
4  Q  What other sources are you talking about?
5  MR. ROTHSCHILD: Objection. I think he
6  just answered that.
7  THE WITNESS: It's listed in my time line.
8  I mean, I've got seven pages of information and I have
9  to go back, I guess, and --
10  Q  As long as it's listed somewhere, that's
11  fine.
12  A  Okay.
13  Q  Are you opining, Dr. Spodak, on whether
14  Rite Aid's treatment of Mr. Fultz caused him to
15  experience any frustration?
16  You're not saying that it didn't, are you,
17  that he was not frustrated?
18  A  I wasn't specifically asked that but
19  certainly I would be, offer the opinion that yes, I
20  think he was probably frustrated, sure.
21  Q  And there were times where he also felt

---

U.S. EEOC, et al. vs
Rite Aid Corporation

Michael K. Spodak, M.D.
November 13, 2009

Page 222

1  humiliated.  Would you also agree with that --
2      MR. ROTHSCHILD: Objection.
3      MS. MOROCCO: -- as a result of his
4  treatment by Rite Aid?
5      THE WITNESS: No, I think he felt
6  humiliated by the behavior that he underwent during his
7  seizures.
8  Q  And you're not opining as to whether Rite
9  Aid's treatment of Mr. Fultz caused him to experience
10 anger, are you?
11 A  Am I opining?  I wasn't asked to
12 specifically but I would offer the opinion that sure I
13 think he angry about it very much.
14 Q  And you're not opining as to whether it
15 ever caused him to experience sadness, are you?
16 A  I didn't, I wasn't asked to but it probably
17 caused him, at some level, sadness.  But again, these
18 things are complicated because it's -- you can't take
19 the conduct in a vacuum.
20     If Mr. Fultz is trying to portray that he
21 is not very impaired by his epilepsy, which I think to

Page 223

1  his credit, most people would like not to feel impaired
2  by their condition, but someone like Dr. Rowekamp was
3  kind of seeing through that and recognizing the true
4  potential risks that he had, that would be very
5  frustrating for someone.
6      It would probably be a reason you wouldn't
7  want to go back and see that doctor again.
8  Q  Have you ever spoken to Dr. Rowekamp?
9  A  Yes.  Have I personally?
10 Q  Yes.
11 A  No.
12 Q  And have you reviewed any notes that
13 Dr. Rowekamp made of his intake of any interview he did
14 with Mr. Fultz?
15 A  I have the --
16 Q  You have his reports.
17 A  -- reports.
18 Q  I'm asking if you have the raw data.
19 A  I don't know, I don't even know if there is
20 raw data.  So the answer is I have what I've, what you
21 made copies of earlier today.

Page 224

1  Q  And you've read Dr. French's deposition,
2  correct?
3  A  Yes.
4  Q  And you saw in the -- and you read the
5  deposition prior to you rendering your report in this
6  case, completing your report, correct?
7  A  Yes.
8  Q  And you saw in the deposition where she
9  states that she believes that the treatment by Rite Aid
10 caused Mr. Fultz to experience various forms of
11 depression, correct?
12 A  I'd ask you if you could, tell me what page
13 reference so I can read it.
14 Q  Sure.  Yes, it's page, starting on page 46.
15     I'll direct you to page 46, line 23 where
16 she says, well, I think it's indicated throughout here
17 that the cause really was the feeling of being
18 discriminated against by his employer.
19     Do you see where it says that?
20 A  Yes.
21 Q  And she is talking about her diagnosis of a

Page 225

1  depressive disorder with regard to Mr. Fultz, correct?
2  A  Yes, that's what she is talking about.
3  Q  Okay.  And did you -- and your
4  understanding is that she was his treating psychologist
5  and that she arrived at the opinions that she had about
6  him with regard to her contemporaneous interaction with
7  Mr. Fultz, correct?
8  A  I think that was the extent of it.
9      My recollection is, I think from the
10 beginning, that she hadn't reviewed anything else and
11 when she was asked about a whole host of things that
12 were going on in Mr. Fultz's life she stated that she
13 was unaware of them and hadn't really considered them
14 when she rendered these opinions because she really
15 didn't know about all the other things going on.
16 Q  Okay.  What did she not know about?
17 A  Well, it was page after page.  I'd have to
18 go through the whole deposition.
19     But I think Mr. Rothschild asked her a
20 whole range of things about whether she knew about
21 this, that and the other thing and she said she didn't.

U.S. EEOC, et al. vs
Rite Aid Corporation

Michael K. Spodak, M.D.
November 13, 2009

Page 226

1    Beyond that, I'd have to go through page by
2  page to point them out.
3  Q  So, to what extent did you consider in
4  making your opinions in this, in this case,
5  Dr. French's opinion that treatment by Rite Aid was the
6  cause of Mr. Fultz's depression?
7  A  I think the problem I have with
8  Dr. French's assessment was first that she is a
9  treating therapist.
10    That's a totally different role.  You
11  generally try to be an advocate for the patient.  You
12  accept what they say at face value.
13    You don't make any effort to make a
14  critical assessment of whether it's accurate or not
15  because your focus is on trying to help the person with
16  the information they bring to the appointment.
17    That's an entirely different process than
18  trying to do an assessment and offer opinions in terms
19  of the totality of circumstances.
20    She basically had one wrung of the stool
21  and not a bunch of rungs of the stool when she tries to

Page 227

1  offer an opinion because her sole source, as I
2  understand it, was Mr. Fultz.
3  Q  So as you sit here getting $400 an hour for
4  your testimony, you believe that you can be more
5  objective than Dr. French with regard to rendering
6  opinions as to the causation of Mr. Fultz's depression.
7  Is that correct?
8  A  Absolutely.
9    MS. MOROCCO:  Okay.  I need to go off the
10  record and talk to Jeremy and I think we are wrapping
11  up, obviously.
12    THE WITNESS:  Okay.
13    (A discussion was held off the record.)
14  Q  Draw your attention to Exhibit 2.  We're
15  just going to do a review of these documents so I can
16  understand what they are and where you got them.
17  A  2.
18  Q  It's the biggest exhibit.  It should be
19  probably near the bottom.
20  A  Okay.
21  Q  Turn your attention to the first article

Page 228

1  which is published in Epilepsia.
2    Why don't we do it this way.  Go through
3  the exhibit, please, and tell me if there's any article
4  in this exhibit that was not given to you by Rite Aid's
5  attorneys.
6  A  No.
7  Q  So everything in this exhibit was given to
8  you by Rite Aid's attorneys?
9  A  Correct.
10  Q  And were all of these articles given to you
11  prior to you writing your report or did you get some
12  after to go through and --
13  A  To my best recollection, they were all
14  given to me in the original packet of records I was
15  sent.
16  Q  Okay.  And did you read, did you review
17  these articles prior to writing your report?
18  A  I probably gave them a cursory review since
19  I was not asked to comment on treatment of epilepsy and
20  various things like that.
21    I didn't review them in any great detail

Page 229

1  but I certainly I gave them a cursory review, yes.
2  Q  Okay.  Did you ask Rite Aid's attorney why
3  he was giving you articles about driving with epilepsy
4  and injuries with epilepsy?
5  A  No.
6  Q  Did he ever tell you why?
7  A  No.  Not that I recall, no.  They just
8  appeared.
9  Q  And if you didn't read all the articles,
10  I'm assuming that they did not play any sort of major
11  role in the opinions that you've rendered in this,
12  correct?  If any article did, if did form the basis of any
13  of your opinions, please identify it for me.
14  A  I wouldn't say it formed the basis, however
15  I did find --
16  Q  A leg in the stool.
17  A  -- of particular interest was the article
18  from the Epilepsy Foundation titled Advocate's Guidance
19  Reasonable Accommodation in Employment for Workers with
20  Epilepsy.
21    It goes on for about it looks like 20, wait

U.S. EEOC, et al. vs
Rite Aid Corporation

Michael K. Spodak, M.D.
November 13, 2009

Page 230

1  a minute, whatever number of pages. I mean, it's long.
2  It goes on for it looks like about 33 pages.
3  Q  Did that article form the basis of any of
4  your opinions in this case?
5  A  I don't think it formed the basis but it
6  was, I thought it was helpful background information.
7  Q  Okay. I just want you to quickly identify
8  two documents. Please verify that this is your fee
9  schedule in the case. This is Exhibit 19.
10 A  That is correct.
11     (Whereupon, a document was marked as Spodak
12 Deposition Exhibit Number 19.)
13 Q  Will you please confirm that Exhibit 20
14 describes the methodology for the IME?
15     (Whereupon, a document was marked as Spodak
16 Deposition Exhibit Number 20.)
17 A  It does, again, with the caveat in this
18 case that it was split up over two days, but yes, it
19 does.
20 Q  Okay.
21 A  Generally the typical methodology.

Page 231

1     MS. MOROCCO: Thank you. Those are all
2  questions I have, Dr. Spodak. Jeremy Monteiro is going
3  to ask you some questions now.
4     MR. ROTHSCHILD: You have two minutes.
5     EXAMINATION BY MR. MONTEIRO:
6  Q  Dr. Spodak, turning your attention to
7  Exhibit 12, which is your report that was produced on
8  October 5th of 2009, I'd like you to show me in the
9  report where you've rendered any opinion in writing
10 regarding the testimony you've provided today regarding
11 the driving as a cause of Mr. Fultz's depression.
12 A  I didn't, but it's subsumed under opinion
13 6.
14 Q  So it's not included -- there's nothing in
15 your report which says that driving caused Mr. Fultz's
16 depression is that correct?
17 A  That's correct.
18 Q  Can you tell me, earlier you testified that
19 Mr. Fultz had some concerns about working in the cage
20 alone.
21     Can you, can you explain your understanding

Page 232

1  of his complaints regarding that?
2  A  On page 47 of my notes he said -- and this
3  is not the sole basis but some of it.
4     I mean, there was also comments I believe
5  in his deposition of Mr. Fultz, but in any event, not
6  give him access to door of the cage where meds were
7  kept unless ask someone to let him out from where the
8  meds and the CDS were kept.
9     Again, to me, that's one of these examples
10 where he's taking something, which I understand is
11 basically federal law, is that when you have CVS you've
12 got to have two people monitoring it and he was feeling
13 somehow mistreated because I guess Rite Aid was
14 following federal requirements on how to handle CDS
15 medications.
16     So that was one of the areas I -- I don't
17 know if he made any other comments in the notes but
18 that was certainly one of the places.
19 Q  Okay. That's fine.
20 A  Okay, sure.
21 Q  I just wanted to get a clarification of

Page 233

1  that.
2  A  Sure.
3  Q  You also testified earlier about Mr. Fultz
4  taking Keppra I think in January of 2008, is that
5  correct?
6  A  Yes.
7  Q  And you're not rendering an opinion that
8  Mr. Fultz's emotional distress -- strike that.
9     You're not rendering an opinion that
10 Mr. Fultz's depression was caused by Keppra, are you?
11 A  No. I'm just mentioning that that is a
12 recognized side effect and a potential risk factor.
13 But no, I'm not opining that that was the cause.
14 Q  Okay. And just looking briefly at
15 Exhibit 18 which are Dr. Lesser's notes?
16 A  Are you referring to the two from
17 January --
18 Q  Right.
19 A  -- 16th and 25th?
20 Q  In January and February of 2008.
21     And you, in rendering your opinion

U.S. EEOC, et al. vs
Rite Aid Corporation

Michael K. Spodak, M.D.
November 13, 2009

Page 234

1  regarding Mr. Fultz, you saw that in January 16th
2  Dr. Lesser indicated that the patient was accompanied
3  by his wife to that meeting, is that correct?
4  A  Yes.
5  Q  And on February 25th, you considered the
6  fact that the patient was accompanied by his
7  mother-in-law to that meeting, is that right?
8  A  Yes.
9  Q  And you didn't -- are you aware -- are you
10  aware of whether Mr. Fultz drove to those appointments?
11  A  I do not know that.
12     MR. MONTEIRO: Okay. Nothing else.
13     MR. ROTHSCHILD: I have no questions.
14     THE WITNESS: I'd like to read and sign.
15     MS. MOROCCO: I actually need to go on the
16  record for one additional thing.
17     There's been an agreement by counsel --
18  well, counsel for the defense has requested that the
19  expert report be supplemented to include a written
20  statement of the opinion that's being rendered by this
21  expert with regard to fitness for duty examinations.

Page 235

1     I just want to state on the record that the
2  EEOC and the plaintiff are not in any way waiving any
3  objection that they have with regard to the timeliness
4  of that supplementation because it is well past the
5  deadline for providing an expert report in this case.
6     Second, there's been an agreement that this
7  deposition may be held open for the limited purpose of
8  the plaintiffs questioning Dr. Spodak regarding
9  supplementation of the report, and I just want to state
10  on the record that any agreement to hold this
11  deposition open and to continue the deposition is
12  strictly limited to that subject matter and to no other
13  component of Mr. Spodak' testimony. That's all.
14     MR. ROTHSCHILD: Okay.
15     (Deposition concluded at 4:40 p.m.)
16
17
18
19
20
21

Page 236

1     CERTIFICATE OF DEPONENT
2
3     I hereby certify that I have read and
4  examined the foregoing transcript, and the same is a
5  true and accurate record of the testimony given by me.
6
7     Any additions or corrections that I feel
8  are necessary, I will attach on a separate sheet of
9  paper to the original transcript.
10
11
12  _____
13     MICHAEL K. SPODAK, M.D.
14
15
16
17
18
19
20
21

Page 237

1  State of Maryland,
2  County of Baltimore, to wit:
3     I, Susan M. Wootton, a Notary Public of the
4  State of Maryland, County of Baltimore, do hereby
5  certify that the within-named witness personally
6  appeared before me at the time and place herein set
7  out, and after having been duly sworn by me, according
8  to law, was examined by counsel.
9     I further certify that the examination was
10  recorded stenographically by me and this transcript is
11  a true record of the proceedings.
12     I further certify that I am not of counsel
13  to any of the parties, nor in any way interested in the
14  outcome of this action.
15     As witness my hand and notarial seal this
16  27th day of November, 2009.
17
18  _____
19     Susan M. Wootton, RPR
20     Notary Public
21     My Commission Expires:
22     June 12, 2011

U.S. EEOC, et al. vs
Rite Aid Corporation

Michael K. Spodak, M.D.
November 13, 2009

**#**

**#2 (1)**
  5:4

**$**

**$400 (1)**
  227:3

**0**

**07 (5)**
  89:10;136:20;
  199:2,12,13
**08 (8)**
  167:5,6;200:17,20;
  201:1,6;207:1,2
**09 (4)**
  23:10;25:1;26:11;
  27:6

**1**

**1 (6)**
  8:13,18;106:4;
  144:21;145:3;190:14
**10 (8)**
  28:9,12,18;29:5;
  69:19;115:6,8;
  129:19
**10/05/09 (1)**
  26:14
**10/5 (1)**
  27:6
**10/5/09 (1)**
  16:8
**11 (7)**
  124:14,15;126:1;
  129:9,10,10,21
**11/11 (1)**
  98:8
**11/11/09 (1)**
  9:8
**11th (7)**
  9:6;10:18;99:8;
  107:7;108:21;
  109:13;201:6
**12 (11)**
  125:17,18;126:1;
  129:12,13;137:7;
  138:15;160:10;
  161:8;231:7;237:21
**129 (1)**
  5:4
**12th (1)**
  24:1
**13 (5)**
  5:4;129:12,15,16;
  130:2
**131 (1)**
  5:5

**134 (1)**
  5:6
**14 (5)**
  5:5;42:7,14;131:3,
  4
**1400 (1)**
  169:13
**149 (1)**
  5:7
**15 (4)**
  5:6;134:16,17;
  165:3
**155 (1)**
  5:8
**16 (8)**
  5:7;126:19;
  149:14,16;155:15,
  17;196:15;209:6
**16:12 (1)**
  62:12
**16th (6)**
  115:14;197:6;
  200:14;207:1;
  233:19;234:1
**17 (8)**
  5:8;155:20,21;
  157:20;165:6;
  188:17;189:5,19
**175 (1)**
  186:9
**17th (5)**
  156:19;161:14;
  164:2;165:17;170:9
**18 (10)**
  5:9;126:14;
  127:12;158:7;161:9;
  162:8;196:16,18;
  198:3;233:15
**180 (1)**
  206:12
**18th (3)**
  163:14;164:3,3
**19 (4)**
  5:10;165:11;
  230:9,12
**196 (1)**
  5:9
**1970s (1)**
  136:2
**1971 (1)**
  126:18
**1977 (1)**
  126:11
**1978 (1)**
  126:12
**1987 (2)**
  126:13,18
**1989 (3)**
  126:13;127:12,13
**1992 (2)**
  126:11;127:15
**1996 (2)**
  150:14;152:13

**2**

**2 (20)**
  23:18,19;24:16;
  99:5;101:15;102:2,4,
  18;105:10,12;106:4;
  110:11,14;130:3,19;
  144:21;145:4;175:8;
  227:14,17
**20 (6)**
  5:11;24:10;65:1;
  229:21;230:13,16
**2004 (1)**
  131:7
**2007 (2)**
  73:7;136:9
**2008 (13)**
  115:14,16;118:13;
  119:7;120:9,16;
  122:1;161:16;192:4;
  197:7;199:14;233:4,
  20
**2009 (20)**
  9:3,6;21:15;24:1;
  29:11;80:6;83:16;
  86:1;98:8;99:8;
  102:16;107:8;
  108:21;109:14;
  131:7;161:14,18;
  204:7;231:8;237:16
**2011 (1)**
  237:21
**20th (1)**
  73:7
**23 (1)**
  224:15
**230 (2)**
  5:10,11
**23rd (3)**
  102:16;111:12;
  200:16
**24th (1)**
  199:2
**25 (1)**
  165:19
**25th (6)**
  197:7;199:12;
  200:20;207:2;
  233:19;234:5
**26 (2)**
  91:12;165:19
**26a2 (1)**
  83:7
**26th (1)**
  23:10
**27 (1)**
  166:1
**27th (2)**
  199:13;237:16
**28 (1)**
  166:1
**29 (5)**

**112:20;113:4,5;**
  166:6,7
**296.33 (1)**
  104:8
**2nd (2)**
  119:17;122:7

**3**

**3 (13)**
  67:5,8;106:5,8,9,
  12;135:5;145:6;
  152:18;191:19,19;
  192:8,9
**30 (2)**
  137:14;166:4
**31 (2)**
  166:8,9
**33 (2)**
  181:3;230:2
**34 (2)**
  13:8;80:11
**3rd (2)**
  141:3;160:16;
  163:12

**4**

**4 (28)**
  68:16,17;70:12;
  72:2,3;106:5;110:14,
  14;113:1,2;122:15;
  123:5;145:7,15;
  147:10;148:10;
  152:20;192:10,11,
  12;194:2,12,19;
  197:3;198:6,12;
  204:15;207:9
**4:12 (3)**
  62:16,17;69:3
**4:40 (1)**
  235:15
**40 (1)**
  199:3
**40-minute (1)**
  202:18
**42 (1)**
  71:8
**43 (2)**
  71:21;72:3
**44 (5)**
  79:21;80:1;83:10,
  17;84:12
**45 (4)**
  13:9,11;80:3,12
**46 (3)**
  80:5;224:14,15
**47 (9)**
  86:9,21;87:2,4;
  98:20;99:4;100:19;
  102:9;232:2
**48 (5)**
  86:20;97:7;101:9;

**102:10;105:12**
**49 (3)**
  110:4,5;112:3
**4th (1)**
  199:14

**5**

**5 (20)**
  70:19;71:1;79:16;
  97:6;103:12,17;
  104:16,17,20;106:5,
  16;111:18;112:19;
  145:9;153:7;154:6;
  158:7;162:8;179:11;
  190:14
**50 (6)**
  72:3;84:21;
  112:18;113:6,8;
  166:10
**51 (2)**
  113:10;166:16
**52 (3)**
  114:2;115:1,9
**53 (2)**
  167:21;168:8
**56 (2)**
  96:2;97:3
**5th (2)**
  29:11;231:8

**6**

**6 (20)**
  85:19;86:1,6;
  101:2;103:12;
  104:16,18,19;106:5,
  6,7,12,16;145:10;
  161:5,6;174:21;
  190:18;208:19;
  231:13
**6/26 (2)**
  25:1,21
**6/26/09 (1)**
  24:17
**6/27 (1)**
  25:21
**61 (2)**
  168:1,8
**63 (3)**
  118:12;120:19;
  168:11
**64 (2)**
  168:11,11
**65 (1)**
  168:14
**66 (1)**
  168:14
**68 (1)**
  168:16
**69 (1)**
  169:3

**Gore Brothers Reporting & Videoconferencing**
**410 837 3027 - Nationwide - www.gorebrothers.com**

U.S. EEOC, et al. vs
Rite Aid Corporation

Michael K. Spodak, M.D.
November 13, 2009

172:2

## 7

7 (10)
100:15;101:1,12;
102:2;126:12;129:4,
5;145:12;154:14;
190:12
70 (1)
137:15
72 (1)
169:4
73 (2)
169:6,10
74 (3)
169:9,11,12
75 (1)
169:15
76 (1)
169:16

## 8

8 (10)
106:18,21;109:9;
129:5;154:17,18,21;
154:4;161:16;165:4
8/17/09 (4)
25:15;170:12,20;
180:17
8/3/09 (3)
25:12;170:14;
180:13
8th (14)
21:15;80:6;83:16;
85:1,6;86:1;115:16;
116:6;118:13;119:7,
16;122:7;123:7;
201:1

## 9

9 (6)
112:14,17;161:16,
17,18;209:4
9/14 (1)
27:6
9/14/09 (1)
26:13
9/9 (2)
26:1,11
9/9/09 (1)
24:17
96 (1)
153:10
96/'97 (1)
127:16
9th (2)
9:3,7

## A

abilities (1)

ability (4)
7:7,11;38:10;
39:18
able (6)
48:1;86:14;118:3;
146:15;158:14;216:4
above (1)
215:15
absence (5)
216:1,10,19,21;
218:1
Absolutely (1)
227:8
abuse (1)
162:11
Academy (1)
36:1
accept (1)
226:12
access (5)
78:11,16;108:19;
177:20;232:6
accessed (8)
87:5;98:9;107:8,8,
14;108:6,10;109:15
accident (3)
165:4;209:13;
217:10
accommodate (2)
74:1;78:15
accommodated (1)
37:3
accommodation (6)
36:13;37:10;38:9;
52:15;97:9;229:19
accommodations (4)
33:15;36:21;
57:10;60:13
accompanied (2)
234:2,6
accompany (1)
88:5
according (2)
117:18;237:7
account (4)
192:13;197:3;
198:5;204:14
accumulation (1)
193:8
accurate (6)
132:6;136:7;
138:18;152:12;
226:14;236:5
accurately (2)
135:6;204:5
acronym (1)
173:3
Act (15)
105:16;107:6;
132:11,11;146:10,
11,13,21;147:12,14;
148:3;192:19;194:4;

218:18;219:7
acted (1)
78:21
action (2)
79:14;237:14
actions (8)
15:6;22:7,8;36:14;
75:18;76:5,12;
104:10
actively (1)
10:11
activities (2)
166:19;170:21
activity (1)
53:19
acts (1)
193:19
actual (4)
18:19;175:5;
187:17;219:7
Actually (22)
23:6;25:6;30:11;
40:8;61:11;75:6;
95:20;99:9;105:8;
113:14;120:21;
122:13;123:18;
129:4,20;135:7;
137:8;146:16;151:2;
168:16;209:6;234:15
ADA (11)
36:13;37:4;97:8;
105:9;107:17,19;
108:4,14,21;109:2,
19
ADA's (1)
36:20
add (15)
62:17;84:9;
110:18;120:2;
126:20;128:7,9;
132:4,4;139:20;
153:14,17;175:16;
197:18;213:2
added (6)
130:17;131:20;
134:20;154:3;205:4;
213:11
addicting (1)
32:3
addition (3)
21:2;138:21;
139:15
additional (15)
7:14,21;25:19;
26:17;41:7;47:17;
67:11;71:20;85:13;
87:9;100:14;127:20;
137:8;197:8;234:16
additions (2)
134:20;236:7
address (1)
171:15
addressed (2)

28:8;79:2
addresses (1)
190:12
adequate (1)
179:15
adjustments (1)
57:10
administered (4)
139:10;181:8;
182:21;183:17
administering (1)
140:19
admitted (1)
94:5
adverse (1)
76:5
advisable (2)
37:16;53:3
advocacy (1)
55:3
advocate (2)
56:5;226:11
advocates (1)
34:14
Advocate's (1)
229:18
affected (1)
92:11
affects (2)
38:10;153:19
afternoon (2)
67:11;69:3
afterward (1)
211:12
afterwards (1)
14:18
again (36)
17:4;19:14;35:13;
42:4,19;44:21;47:7,
7;49:13,21;51:15;
53:12;60:10;66:17;
80:9;92:6;134:7,10;
144:15;168:14;
179:6,18;180:4;
183:2;184:16;188:5;
194:3;200:16;
201:15;205:4,11;
212:5;222:17;223:7;
230:17;232:9
against (3)
74:14;211:17;
224:18
age (6)
14:19;126:12,14;
127:12;152:17;165:4
agencies (1)
35:9
agency (2)
36:3;153:11
ages (1)
162:8
ago (7)
70:7;92:7;98:13,

14;128:11;156:2;
171:2
agree (13)
40:12;49:6,12;
50:10;51:6,12;55:9;
81:10;136:17;178:6;
208:3;220:6;222:1
agreed (1)
141:7
agreement (5)
12:9;141:6;
234:17;235:6,10
ah (1)
219:15
ahead (6)
82:21;83:3;94:19;
151:4;175:15;199:19
Aid (51)
15:10,16;22:7;
23:21;28:11;29:12;
41:13,16;60:2;61:3;
64:15;70:9,16;73:21;
75:19;77:5;78:12,21;
92:1;95:14;96:6;
104:10;119:2,9,15;
121:16;122:4,9,19;
123:6,11;167:5;
192:9;196:20;204:8,
16;205:12;207:10;
208:3;212:4,10;
213:3,7,13,20;215:4;
220:7;222:4;224:9;
226:5;232:13
Aid's (24)
10:1;21:7;26:12;
29:5,20;41:6,17;
60:1,20;76:11;77:9;
78:1,6;87:3;88:13;
99:13;208:9;214:4,
17;221:14;222:9;
228:4,8;229:2
air (1)
62:21
allegation (1)
133:3
allegations (3)
133:15,16;134:12
alleged (1)
153:19
allegedly (1)
22:7
allowed (3)
74:15;76:7;90:19;
151:16;176:16
almost (1)
143:5
alone (1)
216:5;231:20
along (4)
64:18;157:7;
188:5;211:14
although (6)
39:14;74:19;

U.S. EEOC, et al. vs
Rite Aid Corporation

Michael K. Spodak, M.D.
November 13, 2009

89:12;138:2;180:1;
201:7
**always (4)**
27:21;44:10;
47:16;55:20
**AMA (1)**
172:7
**amend (2)**
23:6;71:17;
135:19;154:16;
155:10
**amended (1)**
9:11
**American (1)**
35:21
**Americans (3)**
105:15;107:5;
132:10
**among (1)**
116:6
**amount (4)**
50:6;53:19;83:1;
170:16
**analysis (2)**
182:4;185:11
**analyze (1)**
202:9
**analyzed (4)**
144:2,13,19;
186:15
**Anderson (1)**
21:15
**anger (2)**
205:16;222:10
**angry (1)**
222:13
**answered (9)**
90:4;176:10;
179:9;180:11;
213:16,16;215:16,
19;221:6
**anticipation (1)**
71:5
**anxiety (1)**
200:11
**anymore (1)**
96:13
**apart (1)**
212:3
**apologize (1)**
98:5
**apology (1)**
130:1
**apparently (3)**
21:2;78:12;207:3
**appear (1)**
136:13
**appeared (5)**
60:15;115:13;
181:17;229:8;237:6
**appears (12)**
95:4,6,8;99:19;
106:12;109:9;131:5;

158:7;165:6,9;
172:14;179:11
**appended (2)**
130:12;139:17
**applicable (8)**
10:21;153:2;
178:20;179:1,2,8,17;
187:6
**application (1)**
148:14
**appointment (1)**
226:16
**appointments (1)**
234:10
**approached (1)**
109:3
**approaching (1)**
36:8
**appropriate (1)**
33:12
**approximately (7)**
27:4;30:7;31:15;
45:9;73:13;137:13;
157:13
**area (5)**
40:6,10,18;59:20;
216:21
**areas (4)**
27:13;77:17;
141:21;232:16
**argue (2)**
59:1;124:3
**around (8)**
56:7;87:19;92:19;
161:10;162:8;206:4;
210:10;219:11
**arrested (1)**
8:4
**arrived (3)**
208:20;209:17;
225:5
**Article (20)**
5:7;35:4;149:17;
150:8,10,14;151:8,9,
21;152:5,8;155:6,7;
194:20;195:7;
227:21;228:3;
229:12,17;230:3
**articles (8)**
35:15;54:18;55:2,
6;228:10,17;229:3,9
**aside (7)**
29:15,16;58:13;
105:4;129:4;214:1,
20
**asleep (1)**
127:16
**aspects (1)**
162:3
**assess (2)**
48:19;173:17
**assessment (7)**
33:13;172:3;

173:15;180:3;226:8,
14,18
**assessments (2)**
34:2;177:19
**assistant (5)**
17:5;25:10;29:14;
96:15;158:12
**assistants (1)**
177:21
**associate (2)**
17:6;121:3
**assume (6)**
7:5;16:14,17;
84:16;117:14;165:3
**assumed (1)**
76:14
**assumes (1)**
90:16
**assuming (9)**
76:20;93:10,13;
94:1,4;124:10;
136:17;156:10;
229:10
**assumption (3)**
146:3,5,8
**attach (2)**
85:16;236:8
**attached (4)**
23:8;81:15;85:20;
125:11
**attachment (1)**
10:10
**attempt (3)**
157:3,9,11
**attend (1)**
207:11
**attention (10)**
135:4;137:6;
150:6;165:10;
189:13;197:2;
208:19;227:14,21;
231:6
**attorney (7)**
16:5;66:20;90:15,
17;92:1;140:11;
229:2
**attorneys (8)**
10:1;77:9;78:1,6;
87:3;88:13;228:5,8
**August (6)**
73:7;156:19;
160:16;161:14;
163:12;165:17
**authors (1)**
156:7
**available (1)**
45:2
**avenue (1)**
177:3
**avoid (2)**
36:2,6
**aware (16)**
13:8;34:17;75:4,9;

76:10;79:14;122:21;
135:3;145:21;164:5;
186:8;204:14;
207:10;208:2;234:9,
10
**away (2)**
170:16;181:4
**Axis (5)**
184:20;185:4,4,8,
9,17;186:4,7,11,19

**B**

**back (32)**
17:18;18:5;23:4;
37:12;65:16;68:14;
70:3;79:16;83:19;
88:4;89:2,4;108:8;
135:18;136:2;141:3;
153:10;162:1;169:6;
170:11,18;192:4;
198:14;201:15;
204:9;205:2,17;
206:3;217:7;219:4;
221:9;223:7
**background (26)**
19:19;97:21;
137:9;139:9;141:10,
14,19;142:14;
143:13;144:9,12,18;
145:1,4,5,6,8,9,11,
12,14;158:13;
159:18;163:3;
165:11;230:6
**backs (1)**
170:13
**backwards (1)**
74:1
**bad (1)**
217:6
**balanced (1)**
34:12
**Baltimore (2)**
237:2,4
**bank (3)**
123:9,15;192:21
**banks (1)**
123:17
**based (13)**
34:21;58:4;74:11;
75:2;77:19;95:3;
103:7;117:17;
177:15;184:17;
187:9;206:17;220:10
**bases (2)**
31:1;60:11
**basic (3)**
6:12;160:2,4
**basically (6)**
30:17;31:4;65:20;
68:9;86:18;158:14;
164:13;183:5;
185:10;187:21;

226:20;232:11
**basis (30)**
33:16;35:2;54:6,7,
9;55:10;57:15;
75:21;86:17;89:6,15;
92:13;105:3;146:9;
147:16;191:12;
194:17;195:3;212:5,
7;213:11,12;214:1;
215:4;220:14;
229:12,14;230:3,5;
232:3
**Bates (6)**
63:12,21;68:5,10;
98:17,18
**became (3)**
114:4;116:6,12
**Beck (4)**
139:2,12;169:18;
187:15
**become (1)**
21:12
**becomes (2)**
36:10,15
**becoming (2)**
219:10,13
**began (1)**
127:13
**beginning (3)**
124:20;198:15;
225:10
**begins (2)**
135:5;165:11
**begun (1)**
128:14
**behavior (5)**
59:13;200:11;
209:12;211:9;222:6
**behaviors (3)**
53:20,21;211:3
**behind (2)**
94:10;102:9
**believes (3)**
74:13;78:21;224:9
**belongs (1)**
11:1
**benefit (1)**
193:17
**benefits (4)**
117:15;120:4,12;
193:16
**bent (1)**
74:1
**best (6)**
22:3;37:19;38:1;
45:18;157:10;228:13
**better (11)**
7:20;48:2;53:15;
57:8,13;59:5,14;
76:14;127:9;143:3;
184:2
**beyond (12)**
—11:17;35:10,11;

U.S. EEOC, et al. vs
Rite Aid Corporation

Michael K. Spodak, M.D.
November 13, 2009

53:7;66:8;84:13;
  142:2,15;143:5;
  179:18;180:4;226:1
biggest (1)
  227:15
bill (2)
  16:9;26:13
billing (4)
  23:8;24:2,5,12
Biondo (3)
  81:17;83:18;101:3
Biondo's (3)
  80:5;84:3;101:8
bipolar (2)
  138:4;210:16
bit (1)
  32:21
bizarre (1)
  196:3
Blackberry (1)
  149:18
blaming (1)
  205:12
block (1)
  200:15
blocking (1)
  217:18
board (1)
  40:11
books (1)
  35:15
born (1)
  126:18
both (5)
  88:8;128:5;133:2;
  134:4;197:15
bottom (6)
  25:6;154:14;
  160:11;179:11,11;
  227:19
bounds (1)
  152:11
brain (1)
  210:18
breadth (1)
  38:6
break (8)
  70:1,5;100:17;
  124:11,12;189:10;
  213:3;216:5
breakout (1)
  26:14
briefly (1)
  233:14
bring (3)
  62:9;176:6;226:16
bringing (1)
  75:5
broad (1)
  53:8
broader (2)
  49:3;133:9
brother (1)

62:21
brought (2)
  74:5;79:14
bubble (3)
  176:8;177:7;
  181:11
building (1)
  31:18
built-in (3)
  181:15;182:8;
  183:20
bunch (2)
  203:4;226:21
business (1)
  31:19
businesses (1)
  207:15

C

cage (5)
  95:15;216:4,5;
  231:19;232:6
call (9)
  16:1,11;18:18;
  29:14;30:16;45:14;
  66:19;139:2;178:18
called (6)
  6:4;21:18;27:8;
  30:11;36:2;173:2
came (6)
  25:19;84:16;
  140:3;141:3;174:11;
  199:7
can (94)
  12:17;13:3;14:17;
  21:21;24:18;25:7;
  32:16,21;35:7,14;
  36:6,8;42:5;43:5;
  46:4,7,19,21,21;50:6,
  7,8;51:18,21;52:11;
  54:15;55:17,17;56:8,
  11;62:17;68:19;
  69:21;71:2,6;74:7;
  79:21;80:7;81:4;
  83:5;85:19;88:4;
  89:2;93:2,2;97:4;
  101:14;105:11,20;
  107:1;112:15;120:5;
  124:18;125:6,10;
  130:3;132:1,9;
  133:18;135:2,4;
  137:6;138:12;
  143:14,15;147:4;
  148:17;151:6;
  154:19;155:5;
  157:10;172:13;
  173:4;176:18;177:4,
  8;178:8;189:11,21;
  196:2;203:4;206:7,
  18;207:17;209:21;
  218:5;219:8,12;
  224:13;227:4,15;

231:18,21,21
canceled (1)
  66:1
capable (1)
  6:17
capacity (1)
  17:14
captain (1)
  63:1
captured (1)
  11:20
car (6)
  89:14;94:11;
  100:11;202:17;
  209:11;210:11
Care (5)
  67:17;137:1;
  181:6;203:7,9
cared (1)
  203:7
caring (3)
  127:7;180:16,19
Carlson (26)
  16:9;21:14,16;
  22:1,18;23:10;24:17;
  26:20;27:5,17;28:4,
  10,15,16;61:8;66:15;
  71:9;77:14;82:17;
  84:7,15,20;85:6,21;
  101:8;102:13
Carol (1)
  99:17
carrier (1)
  146:17
case (101)
  13:4;16:4;19:7;
  21:5,13;22:2,18;
  23:1;27:8,20,21;
  29:6;33:10;37:17;
  41:8,13;42:17;43:2,
  17;45:1;48:5,9,13,
  14;52:20;53:4,9,17;
  60:3;66:13;69:9,13;
  73:19;74:5;75:14;
  76:11;77:3,10;78:3;
  85:13;89:17;91:12;
  92:12;95:6,8,13;
  100:2;104:13,16;
  107:11,12;108:5;
  109:1,7,16;110:2;
  114:11;115:10;
  119:1;121:12;
  122:13;123:20;
  124:9;127:5,21;
  133:18;134:10;
  140:20;144:9;148:9,
  12,15,20;149:1,4,10;
  151:1;163:19;
  167:12;170:7;174:1,
  18;176:5;178:13;
  188:15;189:3,7;
  190:11;191:8;194:4,
  8;195:1;207:7,21;

208:1;224:6;226:4;
  230:4,9,18;235:5
cases (20)
  9:11;16:2,2;54:11;
  84:17;85:3;107:11,
  15,17,19;108:4,10,
  14;131:7;132:10,18;
  133:2,11;216:14,14
category (2)
  16:4;133:9
causation (5)
  47:13;190:1,7;
  212:7;227:6
cause (48)
  103:4;109:5;
  110:1;115:9,11;
  130:20;145:18;
  146:1,7;147:19;
  148:4;191:14,15;
  193:2,20;195:1;
  196:1,7;205:13;
  208:21;209:12,18;
  210:1;211:2;212:9,
  15;213:4,7,8,13,21;
  214:5,17;215:5;
  216:9,11,17;217:8,
  13,15,19;218:6,19;
  219:8;224:17;226:6;
  231:11;233:13
caused (15)
  93:10;94:2,15;
  103:6;208:10;
  213:18;214:2;215:2;
  221:14;222:9,15,17;
  224:10;231:15;
  233:10
causes (3)
  209:19;213:10;
  217:5
causing (2)
  181:5;213:1
caveat (1)
  230:17
CDC (6)
  97:8;105:9,18,21;
  109:20;110:1
CDS (2)
  232:8,14
Center (1)
  42:8
Centers (2)
  109:10,11
certain (9)
  51:18;55:4;56:5;
  63:16;143:9;144:4;
  186:3;191:11;194:1
certainly (23)
  22:14;45:1,16;
  46:11;49:17;55:8;
  61:4;66:9;69:15;
  92:21;103:17;
  107:17;131:12;
  143:19;147:8;

178:19;179:14;
  188:6;191:13;
  211:12;221:19;
  229:1;232:18
certainty (2)
  133:19;209:18
CERTIFICATE (1)
  236:1
certified (1)
  40:11
certify (6)
  205:20;206:14;
  236:3;237:5,9,12
cetera (1)
  186:18
chair (1)
  37:12
change (15)
  47:20;69:18;85:8;
  103:4,6;109:6;110:1,
  1;115:9,11;130:20;
  155:12;206:11;
  208:8,15
changed (3)
  69:10;85:12;126:2
changes (9)
  18:5,6;71:7;79:18;
  115:18;116:1,10;
  125:6;208:14
characterization (1)
  83:13
characterize (1)
  15:5
characterized (1)
  198:17
charge (1)
  121:7
chart (1)
  166:17
check (5)
  66:1;68:7;193:14,
  21;205:14
checked (1)
  20:11
checking (1)
  68:11
checklist (1)
  171:9
checks (2)
  122:4;205:9
child (1)
  162:4
children (1)
  162:13
choose (1)
  181:12
Christmas (1)
  198:17
Christopher (5)
  117:5;124:17;
  138:20;139:8;156:11
chronic (3)
  210:20,21;211:1

U.S. EEOC, et al. vs
Rite Aid Corporation

Michael K. Spodak, M.D.
November 13, 2009

chronology (2)
72:20;120:15
circled (1)
158:1
circles (2)
157:21;161:10
circumstances (18)
37:10;38:5;43:16;
44:12,16;47:1;49:14,
20;51:8;52:18;
58:12;60:15;67:4;
118:15;147:8;
149:11,12;226:19
circumvent (2)
14:4,21
circumventing (1)
15:6
Civil (2)
136:11;152:10
claim (3)
75:15;76:2;79:10
claimed (2)
74:18;75:17
claims (11)
74:4;75:1,4,13;
76:3;77:9,19;78:2;
79:13;95:12,18
clarification (4)
78:1;111:19;
132:13;232:21
clarified (1)
118:9
clarify (5)
76:15,17;96:20;
115:12;142:1
clear (4)
66:10;83:8;164:4;
203:6
clearer (1)
7:19
clearly (2)
21:1;176:8
client (1)
156:9
climb (3)
51:18;217:4,7
climbing (1)
201:19
Clinic (2)
81:18;83:18
clinical (6)
182:1,5;183:12;
184:5;188:5,14
close (1)
48:1
closely (1)
174:17
Coe (1)
21:15
cognitive (2)
173:15,17
coin (1)
215:3

cold (3)
163:5,10;198:21
collateral (7)
44:14;47:15,21;
54:5;92:17,18;94:5
colleagues (1)
35:5
collect (2)
146:16;192:14
collecting (2)
121:15;123:5
College (1)
99:5
column (1)
154:6
combination (1)
212:9
coming (1)
206:6
comment (4)
39:3;43:9;152:15;
228:19
commented (1)
200:3
commenting (1)
153:8
comments (4)
154:15;155:9;
232:4,17
Commission (2)
34:7;237:20
committee (1)
33:21
committees (1)
35:6
committing (1)
211:20
common (7)
39:15;53:14;54:9;
57:17,18;176:10;
217:3
communicate (2)
26:4,7
communicated (1)
26:12
communication (1)
26:17
communications (5)
24:20;26:1;27:1;
80:16;84:19
community (1)
56:3
comp (1)
193:16
company (1)
127:16
compare (4)
125:21,21;129:5,
17
compelling (1)
218:2
Compensation (5)
34:7;122:3,19;

138:1;146:16
complain (1)
193:15
complaining (4)
76:6,6;78:7,8
complaint (8)
74:7,8,11;75:7;
77:1,3,6;133:15
complaints (3)
77:19;190:16;
232:1
complete (14)
7:18;11:4;42:16;
48:2;64:11,21;81:15;
131:8,11,12,21;
142:13;143:15;
189:17
completed (3)
71:4;80:2;143:14
completeness (1)
188:11
completing (3)
189:2,6;224:6
complex (2)
36:12;199:11
complicated (4)
37:15,18;53:4;
222:18
complied (1)
90:12
component (13)
32:17;52:16;
105:18;143:17,21;
144:20;154:9;178:3;
184:20;186:6,8;
187:16;235:13
components (4)
50:5;133:16;
156:6,7
composite (1)
198:2
comprehensive (1)
60:20
comprise (2)
105:12;156:21
computer (26)
10:3,12,16;11:10,
14;12:19;14:8;15:1;
17:2,11,12,14,17;
18:9,13;19:1,2;99:7;
158:18;175:14;
177:11;178:1;
184:15,17;186:15,20
computers (2)
13:17;17:7
concern (2)
202:17;203:1
concerning (10)
22:1;41:8;48:5;
58:3;65:13;89:8;
91:8;92:1,10;163:4
concerns (2)
204:4;231:19

concluded (1)
235:15
conclusion (1)
54:15
concussion (2)
126:14;127:12
condition (32)
7:11;37:17,21;
38:19,19,21;39:2,4,8,
9,11;44:4;47:2;
48:20;49:8;57:3;
58:4,6,10,16,18;59:2,
6;65:5;66:6;87:19;
88:21;92:21;210:20;
218:19;220:11;223:2
conditions (8)
54:11;56:5;100:6;
154:8;185:9,18;
186:3;211:1
conduct (6)
50:13;55:2,19,21;
91:16;222:19
conducted (7)
48:19;50:11;
139:8;142:4,4;
163:15;164:11
conducting (6)
55:11,15;57:1;
58:17;158:15;161:20
confer (1)
13:7
confirm (1)
230:13
confused (1)
65:10
confusion (2)
199:4;202:19
conjure (1)
149:2
consciousness (1)
210:10
consequence (7)
22:6;59:13;75:3,
18;103:20;104:9;
117:13
consider (5)
76:2;178:12;
202:4,6;226:3
consideration (1)
153:11
considered (10)
36:5;72:18;83:8;
84:5;142:12;200:1;
209:5;217:2;225:13;
234:5
considering (1)
69:15
consistencies (2)
182:6;184:4
consistent (5)
88:19;92:15;
132:1;182:3;188:13
constitute (1)

173:10
constitutes (1)
156:4
consultation (3)
25:7;36:11;139:21
consultations (2)
26:19;27:5
consulted (1)
130:7
consulting (2)
137:11;140:11
consumed (1)
96:15
contacted (2)
21:14;111:4
contain (5)
65:8;80:20;
125:19;136:7;160:8
contained (12)
24:3;70:12;84:12;
105:10;110:12,13;
113:11;144:1;179:8;
188:17;199:21;
206:21
containing (2)
100:14;101:8
contains (2)
83:17;151:2
contemporaneous (2)
171:3;225:6
contending (1)
81:13
contents (19)
9:11;32:9;42:6,9;
62:5,5;70:17;71:4;
72:4;79:17;82:3,4;
86:8;97:5;99:5;
105:6;111:17;115:9;
139:18
context (3)
96:5;115:20;
200:18
continuation (1)
201:8
continue (8)
15:2;79:21;86:7;
97:4;101:9;105:5;
110:4;235:11
continued (2)
5:1;120:12
continuum (1)
212:14
contradict (1)
118:19
contributors (2)
211:19;212:1
Control (5)
109:10,11;195:19;
196:3;217:11
controlled (2)
185:12,14
conversation (6)
22:1;23:9;28:4;

U.S. EEOC, et al. vs
Rite Aid Corporation

Michael K. Spodak, M.D.
November 13, 2009

29:20;77:14;158:14
**conversations (4)**
22:17,21;77:16;
92:4
**convicted (1)**
8:1
**convulsing (2)**
199:3;202:19
**cooperative (1)**
181:16
**coordination (1)**
200:9
**copied (2)**
10:6;30:19
**copies (3)**
84:2;197:9;223:21
**copy (22)**
15:15,21;16:9;
18:7;61:12;67:19;
71:17;72:13;77:2,5;
81:16;98:3;100:16;
111:11;125:11,19;
126:5;129:21;135:2;
150:1;154:19;155:3
**copyright (1)**
175:17
**copyrighted (1)**
176:16
**corrections (1)**
236:7
**correctly (4)**
11:5;139:6;
143:18;173:1
**correspondence (16)**
9:21;10:2,16;11:7;
12:3;16:7;72:15,18;
81:9;110:8,13,17;
112:4,13;113:19,21
**cough (1)**
200:10
**counsel (26)**
6:9;14:17;15:10,
16;16:18;21:7;
24:20;26:1,4,7,12,
17;29:6,12,20;41:7;
60:1;90:9;99:13;
136:17;140:1;
175:13;234:17,18;
237:8,12
**counsel's (1)**
156:3
**County (2)**
237:2,4
**couple (3)**
72:11;156:1;
183:19
**course (3)**
11:13;73:1;81:5
**court (5)**
7:19;12:21;14:13;
131:18;165:7
**cover (9)**
72:17;80:10,20,21;

81:19;82:11;83:5,11;
85:21
**covered (1)**
63:1
**covers (2)**
11:19;13:11
**co-workers (1)**
220:19
**CR (1)**
25:9
**create (2)**
93:20;130:6
**created (2)**
124:18;130:3
**creates (1)**
72:20
**creating (1)**
130:9
**credit (1)**
223:1
**crime (1)**
8:2
**critical (1)**
226:14
**cross-sectional (1)**
183:8
**curious (5)**
74:2;86:11;109:2,
19;114:4
**current (3)**
137:13;157:5;
181:19
**currently (3)**
137:10;157:5;
178:2
**cursory (2)**
228:18;229:1
**cut (2)**
193:16,17
**CV (4)**
5:6;134:18;
135:18;136:7
**CVS (1)**
232:11

---

**D**

**daily (3)**
166:18;167:2;
170:21
**damages (1)**
75:17
**Damocles (1)**
203:10
**danger (1)**
95:1
**data (3)**
186:15;223:18,20
**date (4)**
21:19;127:2,4;
197:4
**dated (8)**
16:8;73:7;83:16;

86:1;98:8,9;99:7;
109:13;170:11
**dates (2)**
24:17;111:6
**day (18)**
11:14;14:19;
25:11,11;61:14;
96:10;98:12;127:14;
141:1,6,8;166:18;
198:21;200:13;
201:1;210:11;
215:12;237:16
**days (9)**
11:19;72:11;88:7,
8;98:13,14;141:7;
156:2;230:18
**day-to-day (1)**
38:13
**dead (2)**
180:16,19
**deadline (1)**
235:5
**deal (4)**
85:17;159:5;
190:1;211:12
**dealing (3)**
53:15;205:4;219:9
**December (4)**
167:6;199:1,12,13
**decide (2)**
73:17;208:12
**deciding (1)**
44:3
**declined (3)**
119:9;140:1,10
**defense (1)**
234:18
**define (1)**
214:14
**defining (1)**
49:19
**definitely (2)**
36:16;56:19
**degree (9)**
50:7;53:20;59:3;
133:19;159:9,21;
160:2,3;209:18
**degrees (1)**
206:12
**delighted (2)**
219:3,17
**delirium (2)**
199:4;202:19
**demonstrated (1)**
211:4
**denial (2)**
76:8;79:9
**denied (6)**
74:21;78:11,16,17,
18;180:9
**Department (2)**
34:5;96:12
**Depending (10)**

51:8;52:18;54:12;
57:5;67:3;143:8,19;
144:4,15;149:10
**depends (11)**
37:9;43:15,21;
49:13;51:15;52:4;
56:19;58:20;59:2,3;
187:2
**DEPONENT (1)**
236:1
**deposition (85)**
6:11,13;8:1,7,8,10,
14,18,23:18,19;
29:15,16,18;30:12,
20;31:6;60:6,9;
66:16;67:6,8;68:16,
18;70:20;71:1,5,11,
15;80:14;83:6;86:2,
6;88:2;89:9,14;97:6;
101:1;102:14;103:8,
18;105:1;106:19,21;
110:10,17;111:5,11,
13;112:8,14,17,19;
115:4,6;124:14,16;
125:17;128:15,20;
129:15;130:10;
131:3,5,8;134:16,18;
149:14,16;151:17;
155:20;156:1;
196:18;207:6;
208:17;224:1,5,8;
225:18;230:12,16;
232:5;235:7,11,11,
15
**depositions (1)**
67:1
**depressed (1)**
219:13
**depression (34)**
138:3,9,13;139:2,
12;148:6;169:17,18,
21;180:10;188:3;
209:7,16,19,19;
210:6,15;211:2;
212:2,7,9;213:1;
216:9,11;217:18;
218:6;219:8,15;
224:11;226:6;227:6;
231:11,16;233:10
**depressive (6)**
104:6,8;174:20;
208:21;212:17;225:1
**describe (2)**
21:21;46:18
**described (2)**
194:19;199:6
**describes (1)**
230:14
**describing (1)**
45:17;117:9;221:1
**description (8)**
44:6;46:16;51:11,
19;52:2;64:11;

132:6;138:18
**descriptions (3)**
52:8;53:18;220:19
**designed (1)**
172:18
**desire (1)**
180:20
**despite (1)**
120:12
**destroy (1)**
19:14
**detail (1)**
228:21
**detailed (3)**
49:10,10;143:13
**determination (6)**
71:21;72:2,5,10;
79:19;182:9
**determinations (1)**
73:4
**determine (7)**
12:2;123:10;
181:16;186:2;188:2;
193:1;195:11
**determined (1)**
188:4
**develop (1)**
201:17
**developed (5)**
75:17;103:19;
196:12;201:4;212:2
**developing (2)**
194:15;209:15
**development (8)**
104:4;142:19;
146:13;147:1,4,14;
190:2;194:5
**diagnosable (9)**
146:13;147:15;
190:2,7,15,21;191:5;
194:6,15
**diagnosis (10)**
104:6;173:18,21;
174:5,13,14,18,21;
210:15;224:21
**dictated (2)**
20:6,9
**difference (1)**
147:10
**differences (1)**
43:10
**different (15)**
23:3;72:6;114:5;
118:7;129:3;147:2,5;
162:15;171:1;
180:11;188:6,12;
193:17;226:10,17
**difficult (3)**
195:13,17,21
**difficulties (3)**
92:16;200:10,11
**difficulty (2)**
196:5;219:21

U.S. EEOC, et al. vs
Rite Aid Corporation

Michael K. Spodak, M.D.
November 13, 2009

**Digit (1)**
173:9
**Dillen (2)**
41:21;64:17
**Dillen's (2)**
61:15;67:18
**direct (2)**
197:1;224:15
**direction (1)**
41:17
**Disabilities (3)**
105:16;107:6;
132:11
**disability (60)**
37:3;115:15;
117:6,13,14,20;
118:4,18;119:3,19;
120:11,12;121:6,15;
122:5,18;132:12,15,
16;133:8,12,20;
134:2,12;145:18;
146:6,11,16,21;
147:13;148:1,21;
172:9;192:14,20;
194:5,14,21;195:9,
10,15,16,20;196:4,7,
14;201:2;204:18;
205:6,7,9,20;206:4,6,
15;207:16;216:6;
217:14,16,18
**disabled (2)**
206:5;207:3
**disagree (3)**
178:3,6,11
**disagrees (2)**
151:21;152:5
**disavow (1)**
150:16
**discarded (2)**
178:16,18
**disclose (1)**
136:12
**disclosures (1)**
136:16
**discovery (3)**
67:2;84:18;123:20
**discriminated (2)**
74:14;224:18
**discrimination (12)**
75:1;96:6;132:15,
16,21;133:3,8,10,12,
20;134:2,12
**discriminatorily (1)**
79:1
**discriminatory (1)**
95:17
**discuss (3)**
31:3;41:6;52:16
**discussed (6)**
30:10,17;31:5,21;
35:6;202:16
**discussing (2)**
50:20;204:10

**discussion (7)**
27:17;59:19;92:1;
111:10;189:12,17;
227:13
**discussions (2)**
77:8;88:12
**Disease (2)**
109:10,11
**disorder (37)**
29:3;75:3;78:15;
79:2;86:13;87:11;
88:18;89:11;95:2;
103:20;104:2,5,7,7,
8;107:21;138:3,4;
146:14;147:1,4,15;
172:20;174:20;
190:3,7,16;191:1,6;
194:6,16;202:13;
208:11,21;210:16;
212:18;225:1
**disorders (2)**
89:18;97:9
**disorientation (2)**
199:5;202:20
**dispute (1)**
179:13
**disrobing (1)**
211:7
**disseminate (1)**
175:18
**distress (7)**
47:12;181:20;
190:20;191:4,14,15;
233:8
**distressed (1)**
191:12
**District (4)**
12:21;13:20;
14:13,13
**diverse (2)**
153:1,5
**dizziness (1)**
200:9
**DMV (7)**
86:12,16;87:9,12;
88:17;89:8,11
**doctor (20)**
37:16,20;38:2;
39:16;44:8;46:1;
49:9;55:20;57:1,2;
58:17;74:16;78:13;
121:5;202:7;204:17,
19,20;207:16;223:7
**doctors (2)**
55:18;60:12
**doctor's (1)**
58:15
**document (43)**
8:14,17;9:2;14:2,
3;15:1;23:17;67:7;
68:15;70:21;71:2,20;
73:18;76:19,21;86:5;
100:21;106:20;

112:16;115:5;
124:13,15,19;
125:16;129:14;
130:4,6,10,14,16;
131:2;132:7,9;
134:15;135:1;
149:13;155:19;
172:13,14;176:13;
196:17;230:11,15
**documentation (6)**
22:10;37:6;42:20;
64:14;67:11,13
**documents (44)**
9:4,9;10:4;19:7;
23:20;24:4;63:6,8,
11,11,21;64:3,6,10;
65:13,14;66:12;
68:20;69:5,9,12,17;
70:8,11,15;72:21;
81:20;83:10;85:5,8,
14,16;105:12;126:1;
127:20,21;128:6,8;
129:2;130:19;158:2;
198:5;227:15;230:8
**done (28)**
27:21;33:19,19;
38:15,18;39:7;40:7;
41:3;43:19;45:8;
52:9;56:15;60:19,21;
107:11;108:4,14;
120:21;141:1,8,11;
155:6;159:16;170:4;
171:3;185:20;
189:19;212:4
**Donuts (4)**
31:17;32:1,3;
41:10
**door (2)**
96:12;232:6
**doses (1)**
39:15
**double (1)**
200:9
**down (4)**
29:3;96:4;171:14;
181:6
**download (1)**
11:15
**downloaded (2)**
10:20;114:8
**dozen (1)**
45:16
**Dr (113)**
5:6,9;6:8;13:4,16;
14:8;15:4,9;21:7,13;
24:13,16,18;41:20,
20,21,21;42:2,6;
59:20;60:14,15,16,
20;61:6,14,15,20;
63:6,7,14;64:5,16,
17;67:16,18;68:17;
71:14;73:5;80:5;
83:15;84:3;85:21;

86:8;101:3,8,8;
103:18;104:14;
105:1;111:11;
112:14,18;117:10,
18;124:5,16;151:4;
189:13;196:20;
197:20;198:9;199:6,
8,14,15,21;200:2,7,
14,16,18;201:10,10,
18;202:13,17;
203:17,21;204:3,5,
10,21;205:8,10,13,
19;206:2,8,11,14;
207:1,2,6,12;208:5;
220:12,15,18;221:1,
13;223:2,8,13;224:1;
226:5,8;227:5;231:2,
6;233:15;234:2;
235:8
**draft (6)**
16:6,11,11,14;
18:16;19:3
**drafts (10)**
15:9,20;17:2,6,15,
20;18:7,15;19:3;21:1
**draw (2)**
173:5;227:14
**drinking (2)**
127:7,17
**drive (8)**
22:15;23:15;
86:14;87:9;90:20;
96:10;203:2;217:9
**driven (1)**
148:11
**driver (3)**
86:12;91:3;100:5
**Drivers (1)**
99:11
**driving (45)**
29:1;86:19;87:5,
14,17,19,21;88:2,3,
14,17;89:17;90:10;
91:8;92:2,11,19;
93:4,19,20;94:8,15,
21;95:21;96:6,9,14,
16;97:11,11;98:1;
99:6,15,21;100:14;
201:19;202:17;
203:12;209:10,11;
210:10;220:8;229:3;
231:11,15
**drove (2)**
89:14;234:10
**Drs (1)**
60:21
**drunk (2)**
126:13,16
**DSM-IV (1)**
104:9
**dual (2)**
36:2;153:11
**due (1)**

138:6
**duly (2)**
6:4;237:7
**dump (1)**
127:17
**Dunkin' (3)**
31:17;32:1;41:10
**duplicates (1)**
84:10
**duration (1)**
221:2
**during (12)**
26:8;27:2;54:1;
72:8;80:2,4;135:20;
140:14;185:18;
203:12;211:4;222:6
**duties (11)**
11:14;50:8,9;
51:14;52:1,2,9,12,13,
20;54:3
**duty (31)**
46:15,17;47:9;
48:5,6,10,11,14,16,
19,21;49:7,9,16,19;
50:11;52:14;61:20;
65:15;117:11,18;
198:10,14;199:15;
200:17;202:8;
207:11,17;211:9;
216:16;234:21
**dying (1)**
103:20
**dysthymic (1)**
104:7

**E**

**earlier (18)**
23:13;66:13;72:7;
73:15;89:12;95:11;
111:2,15;118:17;
150:1;155:9;200:4;
204:12;213:4;219:7;
223:21;231:18;233:3
**earliest (1)**
162:2
**early (4)**
42:3;142:16,18;
162:6
**earning (1)**
123:6
**easier (1)**
68:4
**education (2)**
56:3;135:5
**educational (1)**
159:11
**EEOC (13)**
6:9;30:21;71:21;
73:4,20;76:6;78:8,
20;79:19;106:11;
121:7;132:19;235:2
**EEOC's (3)**

**U.S. EEOC, et al. vs**
**Rite Aid Corporation**

Michael K. Spodak, M.D.
November 13, 2009

72:9;80:11;107:4
**effect (4)**
   201:15;202:6,10;
   233:12
**effects (10)**
   39:17;47:5,5;
   114:5,8,21;115:17;
   116:10;154:2;200:6
**efficiently (1)**
   141:16
**effort (1)**
   226:13
**efforts (2)**
   10:15;88:20
**either (8)**
   50:3,4;121:3;
   122:4;123:16;127:7;
   130:18;162:16
**electronic (2)**
   12:2;13:11
**electronically (7)**
   11:19;12:12,13,18;
   13:1,2,12
**elephant (1)**
   96:21
**elicit (1)**
   172:18
**else (16)**
   9:12;31:3;47:17;
   56:15;59:12;71:18;
   75:8,9;76:10;94:14;
   95:15;113:7;172:1;
   209:13;225:10;
   234:12
**E-Mail (13)**
   10:20;12:2;63:9,
   12;64:1;67:10;
   71:16;72:14,17;
   99:19;100:14;101:4;
   119:8
**E-Mailed (1)**
   72:11
**E-Mails (6)**
   10:2,12;11:11,15;
   15:5;100:13
**embarrassing (1)**
   211:5
**embarrassment (1)**
   211:13
**embellish (1)**
   54:12
**emergency (1)**
   103:21
**emotional (16)**
   22:6;23:16;36:14;
   39:3;47:12;78:20;
   79:5;92:16;138:6;
   157:5;162:13,17;
   171:17;181:19;
   213:5;233:8
**employee (10)**
   29:1;37:3;38:5;
   44:3,5,15;51:11;

52:1;58:12;145:18
**employees (2)**
   54:10;208:17
**employee's (5)**
   32:13,19;33:14;
   40:20;44:12
**employer (7)**
   32:15;36:15;37:4;
   44:2,7;53:3;224:18
**employers (1)**
   33:20
**employer's (1)**
   32:12
**employment (25)**
   36:8;70:9;76:5;
   104:10;119:2,12,15;
   121:14,19;122:1;
   132:21;133:3,9;
   134:3,5;138:9,12;
   148:7;167:8;186:17;
   191:20;213:21;
   214:8,13;229:19
**Employment-based (1)**
   132:16
**enable (2)**
   182:9;186:6
**enclosed (1)**
   72:19
**encompass (2)**
   192:11;193:21
**encompassed (4)**
   112:3;113:7;
   114:21;115:8
**end (5)**
   101:17;119:12;
   122:1;214:8;219:12
**endeavor (1)**
   7:16
**ended (3)**
   121:19;167:8;
   214:13
**ending (2)**
   211:8;213:20
**ends (1)**
   207:17
**energy (2)**
   179:12,15
**engaging (3)**
   153:8;209:11;
   211:9
**enormously (1)**
   210:12
**entire (3)**
   142:7;143:2;193:9
**entirely (1)**
   226:17
**entirety (2)**
   52:20;110:13
**entitled (7)**
   109:11;117:13,20;
   131:7;150:8;175:21;
   176:4
**entitlement (1)**

218:12
**entries (2)**
   25:5;127:19
**entry (2)**
   126:12,16
**environment (6)**
   36:14;38:3,3;
   74:19;76:8;79:11
**environmental (1)**
   186:12
**envision (1)**
   149:10
**epidemic (1)**
   217:18
**Epilepsia (1)**
   228:1
**epilepsy (34)**
   91:8;93:5;94:15;
   99:6,15,21;105:15;
   106:11;107:5,15,16,
   19,20;108:3,6,7,17,
   20;109:3,12,20;
   135:16;136:5,6;
   185:12;195:19;
   210:20;220:4;
   222:21;228:19;
   229:3,4,18,20
**episodes (1)**
   54:1
**equivalent (1)**
   173:11
**ergonomic (1)**
   37:12
**errors (1)**
   18:4
**ESI (6)**
   13:7,19,21;14:12;
   15:5;16:19
**especially (2)**
   14:2;59:9
**essential (1)**
   55:12
**essentially (1)**
   19:18
**establish (1)**
   6:12
**established (1)**
   14:12
**estimation (3)**
   142:11;152:8;
   188:11
**et (1)**
   186:18
**ethical (3)**
   35:21;43:3;153:10
**evaluate (3)**
   23:15;41:1;50:1
**evaluated (6)**
   40:19;71:10,12;
   88:3;138:20;180:3
**evaluating (3)**
   76:1;140:18;
   147:21

**evaluation (31)**
   21:18;22:5;23:12;
   25:16;26:9;27:19;
   28:2,5;37:16;46:15;
   48:14;52:5;66:7;
   80:2,4;88:6;139:7,9;
   140:15;142:14,21;
   143:13,16,19;
   153:17;157:7;172:7;
   181:17;187:5;
   207:17;220:6
**evaluations (6)**
   33:19;35:9;41:20;
   43:10,11;60:18
**evaluator (5)**
   34:4,5,6;56:6;
   207:14
**evaluators (2)**
   34:10,13
**Eve (1)**
   198:17
**even (9)**
   39:16;104:3;
   193:20;200:1,7;
   211:10;216:4;219:7;
   223:19
**evening (2)**
   63:3;99:11
**event (4)**
   104:3;143:3,4;
   232:5
**everyone's (1)**
   141:6
**evidence (5)**
   104:1;195:5;
   216:11;218:1,2
**evident (1)**
   220:21
**exact (1)**
   133:1
**exactly (5)**
   33:8;64:5;105:11
**exaggerate (1)**
   54:12
**exam (4)**
   55:5;173:11;
   182:2,14
**EXAMINATION (8)**
   6:7;37:5;49:7;
   65:15;173:9,10;
   231:5;237:9
**examinations (10)**
   48:5,7,11,16,19,
   21;50:11;51:14;
   56:15;234:21
**examine (1)**
   22:4
**examined (3)**
   6:6;236:4;237:8
**examiner (1)**
   53:5
**example (6)**
   28:20;39:15;

46:15;165:3;179:10,
17
**examples (1)**
   232:9
**exams (1)**
   57:20
**Except (4)**
   56:1;161:7,9;
   201:19
**exception (2)**
   71:11;140:21
**excess (1)**
   212:3
**exclusively (2)**
   58:15;190:9
**excuse (8)**
   29:11;31:8;
   101:20;102:12;
   113:2;164:2;175:15;
   196:13
**EXHIBIT (98)**
   5:3;8:13,18;23:18,
   19;24:16;67:5,8;
   68:2,14,16,17;70:12,
   19;71:1;72:1,2,3;
   79:16;85:17,19;86:1,
   6;97:6;99:5;100:15;
   101:1,12,15,18,21;
   102:18;105:10,12;
   106:18,21;109:9;
   110:9,11,14,14,14;
   112:14,17,19;113:1,
   2;115:6,8;124:14;
   125:17,18;129:4,5,5,
   8,15,16,19,21;130:2;
   131:3,4;134:16,17;
   137:7;138:15;
   149:14,15;155:1,20,
   21;156:5,9;157:16,
   20;187:16;188:17;
   189:5,19;196:15,18;
   197:16,17,19;198:2,
   3;227:14,18;228:3,4,
   7;230:9,12,13,16;
   231:7;233:15
**exhibits (1)**
   111:13
**exist (2)**
   10:4;80:17
**expand (4)**
   103:7,9;107:20;
   141:21
**expect (2)**
   173:21;217:17
**expected (1)**
   60:19
**experience (27)**
   33:3,18;35:1;
   49:21;54:10;56:9,9;
   60:17;62:18;93:8;
   114:13,16,17;146:2,
   12;147:20;162:10;
   196:11;207:14;

U.S. EEOC, et al. vs
Rite Aid Corporation

Michael K. Spodak, M.D.
November 13, 2009

208:10;212:19;
216:13,21;221:15;
222:9,15;224:10
**experienced (2)**
142:17;162:6
**experiences (1)**
56:13
**experiencing (4)**
47:12;157:6;
183:6;188:3
**expert (20)**
21:5;36:4;38:11,
12;72:21;80:17;
81:21;84:5;89:16,21;
90:3,9,11;93:14,16,
18;137:7;234:19,21;
235:5
**expertise (4)**
40:18;91:1,5,9
**Expires (1)**
237:20
**explain (7)**
17:19;74:3;
105:20;115:18;
116:11;177:8;231:21
**explained (1)**
195:5
**explaining (2)**
79:19;84:20
**expressed (4)**
27:16;29:9;31:2;
32:5
**expressive (2)**
188:8,9
**extensive (2)**
50:13,15
**extent (9)**
81:10;174:10;
199:8;200:4;203:6;
220:9;221:1;225:8;
226:3
**extremely (2)**
54:4;209:9
**eyes (1)**
47:19

**F**

**face (2)**
35:12;226:12
**fact (24)**
20:12;33:10;68:7;
117:19;122:21;
133:5;143:5,6;149:2;
150:10;164:16;
182:4;192:13,13;
196:2;198:8;200:7;
202:18;208:2,15;
213:6;215:7;218:9;
234:6
**factor (3)**
55:17;209:7;
233:12

**factoring (1)**
69:15
**factors (12)**
142:18;143:3,9,10;
188:6;209:5,15;
210:4;211:21;
213:11;217:1;218:15
**facts (4)**
49:13;148:9,12;
149:10
**factual (3)**
118:5;119:18;
127:3
**factually (1)**
122:11
**failure (1)**
193:21
**fair (3)**
34:12;40:3;107:12
**fairly (1)**
181:13
**faking (3)**
182:10;184:7,11
**falls (2)**
40:4;53:8
**falsely (1)**
205:12
**familial (2)**
154:9;218:16
**familiar (14)**
6:13;35:4;36:20;
38:2,4,4;4:8,11;57:2,
7;58:18;60:14;
114:14;154:8;183:3
**familiarity (4)**
56:16;58:1,14,16
**family (3)**
162:5,10;210:14
**far (15)**
36:16;53:11;54:9;
60:14;110:10;176:2;
177:4;180:21;
205:16;211:19;
212:1,3;213:10;
219:18,19
**fatal (1)**
209:13
**father (1)**
126:12
**fatigue (1)**
200:8
**fault (2)**
73:21;205:12
**fax (21)**
9:8;16:8;62:11,12;
64:20;67:20;69:2;
71:16;72:6;80:6,10,
20;81:19;82:11;83:5,
11,15;85:21;101:7;
102:13;112:20
**faxed (3)**
62:11;67:14;
111:12

**FCL (1)**
139:11
**FE (1)**
25:15
**fear (1)**
95:1
**February (13)**
115:16;116:6;
118:13;119:16;
122:7;123:7;167:5;
200:20;201:1,6;
207:2;233:20;234:5
**Federal (4)**
132:1;136:11;
232:11,14
**Fee (2)**
5:10;230:8
**feel (3)**
157:5;223:1;236:7
**feeling (5)**
181:6;211:16,17;
224:17;232:12
**feels (1)**
211:16
**fell (1)**
127:16
**felt (7)**
76:14;78:10;
95:16;179:14;
199:15;221:21;222:5
**few (3)**
45:16;70:7;180:8
**fewer (1)**
56:15
**fiancee (2)**
99:18,20
**figure (1)**
112:1
**file (29)**
5:8;10:21;11:6;
30:18;44:19;61:13,
17;62:9;63:8,15;
64:8;65:2,9,11,18;
66:3;97:13;110:8,13,
17,20;112:4,11,13;
113:19,21;156:4;
163:8;175:4
**filed (1)**
10:21
**files (3)**
11:16;12:2;84:11
**filing (1)**
121:7
**fill (6)**
121:5;166:18;
170:3;181:10;205:7,
10
**filled (7)**
156:11;165:12,20;
166:2;170:9;171:11;
175:11
**final (6)**
15:13,21;16:2,6;

18:7;59:20
**finalized (1)**
102:21
**find (7)**
10:12;47:14;
73:20;100:4;187:6,
19;229:15
**finding (2)**
100:3;202:7
**fine (3)**
165:8;221:11;
232:19
**finish (6)**
81:2;7;120:5;
129:1;155:2;199:17
**finished (3)**
86:21;105:8;
189:18
**fired (6)**
118:17,18;121:4;
126:13,16;127:16
**first (42)**
6:4;15:3;21:12,21;
23:8;24:21;25:11;
31:17;32:7;33:5,18;
36:19;41:6;42:11;
61:5;71:8;72:9;
91:21;92:5;107:8,10,
10;115:13;118:8;
126:10;138:16;
141:9;142:12;152:9;
153:7;175:8;183:19;
192:2;194:21;
195:21;199:7;
202:11;204:7;210:7;
216:10;226:8;227:21
**Fisher (1)**
99:17
**Fisher's (1)**
100:9
**fit (8)**
50:2;117:11,18;
198:10,14;199:15;
200:17;202:8
**fitness (24)**
46:14;47:9;48:5,6,
10,10,14,16,18,21;
49:7,9,16,19;50:11;
51:13;52:9,20;54:3;
61:20;65:15;207:11,
16;234:21
**five (2)**
89:12;173:7
**flesh (1)**
32:21
**floor (13)**
22:13;23:15;
31:18;74:15;75:3;
76:8;78:11,17;79:9;
199:2;216:3;217:4,8
**flushed (1)**
79:12
**focus (3)**

133:6;142:6;
226:15
**focusing (3)**
58:15;158:7;
171:15
**follow (3)**
16:9;33:2;140:19
**followed (4)**
12:15;43:13;
128:4;140:17
**following (4)**
13:5,5;14:12;
232:14
**follows (1)**
6:6
**follow-up (1)**
180:12
**force (1)**
62:21
**foregoing (1)**
236:4
**foremost (1)**
210:7
**forensic (9)**
25:7,16;36:4,11,
16;137:11,15;
152:10;153:12
**forklift (6)**
22:15;23:15;29:1;
216:3;217:9;220:8
**forklifts (1)**
201:19
**form (19)**
92:13;133:3;
156:9;157:2;165:12;
169:17;170:8,14,18;
171:8,19;172:2,3;
177:7;180:13;206:4,
7;229:12;230:3
**formed (2)**
229:14;230:5
**forms (4)**
174:8;190:20;
207:4;224:10
**formulated (1)**
204:11
**formulating (2)**
202:5;204:15
**forth (1)**
111:5
**forward (2)**
30:21;173:4
**forwarded (3)**
9:8;10:8,9
**found (8)**
24:12;87:4;100:7;
104:1;120:9,11,15;
141:18
**Foundation (1)**
229:18
**four (7)**
23:2;26:16;41:4;
139:10;172:10;

U.S. EEOC, et al. vs
Rite Aid Corporation

Michael K. Spodak, M.D.
November 13, 2009

173:16;175:6
**four-page (1)**
  113:15
**Fourth (2)**
  196:11;210:19
**frame (2)**
  167:6,8
**frankly (2)**
  80:19;82:1
**free (1)**
  87:8
**French (3)**
  71:11;103:7;227:5
**French's (11)**
  71:14;102:14;
  103:17,18;104:14;
  105:1;111:11;201:5;
  224:1;226:5,8
**frequency (2)**
  202:14;221:2
**frequent (1)**
  195:11
**frequently (2)**
  34:8;211:1
**Friday (1)**
  131:18
**front (2)**
  132:19;170:12
**frustrated (2)**
  221:17,20
**frustrating (1)**
  223:5
**frustration (1)**
  221:15
**full (9)**
  38:6;45:4;53:19;
  88:18;150:6;153:7;
  199:8;202:14;221:1
**full-time (1)**
  50:3
**fully (1)**
  6:16
**Fultz (152)**
  19:20;22:4;25:10,
  13,15;26:8;27:9,19;
  28:21;41:16,17;54:5;
  64:15;65:20;71:10,
  13;74:1,13,20;75:16;
  76:5,12;77:19;78:7,
  10;79:1;80:2;86:15;
  87:19;88:10;90:12;
  92:10;93:3,11;94:2,
  8,12,13;95:14;96:5;
  103:19;114:5;
  115:13;117:5,9,19;
  118:3,12;119:19,20;
  121:2,13,15;122:9,
  13,18;123:5,13,14;
  124:17;126:17;
  138:20;139:8;140:1,
  3,10,13,18;156:11,
  18;157:1;160:16;
  161:13;163:1,12,14;

164:6,14,17;165:17,
  20;166:14;167:3;
  168:4,7,12,21;170:3;
  171:10;173:5,19;
  174:1,5;175:11;
  177:16;181:7,8;
  183:1,18;190:17;
  192:13;194:10;
  196:21;198:9;
  199:11,16;200:4,14,
  17;201:1;202:6,10,
  11;203:7,20;204:4,7,
  15;205:3,5,11,20;
  206:14;207:3,4,10;
  208:2,9,12,21;
  209:15,20;211:4;
  212:2;213:13;
  214:17;219:17;
  220:13,15;221:14;
  222:9,20;223:14;
  224:10;225:1,7;
  227:2;231:19;232:5;
  233:3;234:1,10
**Fultz's (37)**
  53:18;60:12;
  61:13,16;64:7,12;
  65:5;66:5;70:9;87:5;
  88:14,19;89:7;91:15;
  92:2,11;119:2,15;
  121:13;139:21;
  173:17;182:14;
  184:10,18;186:17;
  191:20;195:18;
  204:2;209:7;212:7;
  225:12;226:6;227:6;
  231:11,15;233:8,10
**function (3)**
  39:19,19;47:20
**functional (1)**
  172:11
**functioning (2)**
  47:18;173:17
**further (6)**
  14:6;25:14;79:12;
  194:13;237:9,12

## G

**gain (1)**
  54:13
**gaining (1)**
  183:4
**gave (5)**
  70:7;170:3;205:1;
  228:18;229:1
**General (25)**
  34:4;43:12,18;
  45:18;53:2;59:5;
  60:17;93:7;140:18;
  141:13;145:17;
  149:3,5,6;150:21;
  152:1;153:18;154:1;
  160:4;191:14;194:3,

7,9,13;203:2
**generally (11)**
  36:5;43:12;46:5,6;
  49:1;104:3,20;
  114:12;193:20;
  226:11;230:21
**generated (8)**
  158:8;161:15;
  177:10,11,15;
  184:14,15,17
**generic (3)**
  87:7;145:16;157:4
**genetic (1)**
  154:8
**given (21)**
  8:15;23:12;32:4;
  47:1;52:21;77:5;
  130:15;140:5;141:5;
  161:19;170:8;
  171:10;181:10;
  193:21;201:21;
  206:1;228:4,7,10,14;
  236:5
**giving (3)**
  70:4;151:20;229:3
**glad (1)**
  73:2
**God (1)**
  211:13
**goes (11)**
  47:8;99:10;161:2;
  163:10;166:10;
  185:16;188:5;193:9;
  215:8;229:21;230:2
**Good (7)**
  6:8;49:8,11;50:12;
  51:7,13;59:2
**governed (1)**
  187:7
**government (1)**
  35:9
**great (4)**
  56:16;70:5;100:2;
  228:21
**ground (2)**
  6:12;7:14
**grounds (1)**
  207:18
**growing (3)**
  152:10;153:1,6
**guarantee (1)**
  131:11
**guess (17)**
  17:13;18:17;27:7;
  39:21;43:21;54:17;
  62:11;66:14;75:17;
  82:6;84:7;110:19;
  141:16;174:9;204:9;
  221:9;232:13
**guessing (2)**
  45:15;76:19
**Guidance (1)**
  229:18

**Guide (1)**
  172:7
**guideline (1)**
  37:9
**guidelines (9)**
  34:2;35:21;43:4,
  19;45:18,19;57:19;
  58:2;172:9

## H

**half (1)**
  204:11
**halfway (1)**
  96:4
**hand (4)**
  18:5;83:19;
  105:13;237:15
**Handbook (1)**
  99:11
**handcuffs (1)**
  211:8
**handed (9)**
  70:19;112:4;
  124:15;129:16,20;
  131:4;134:17;
  149:15;155:21
**handing (4)**
  8:13;67:5;68:17;
  196:15
**handle (1)**
  232:14
**handwriting (11)**
  111:21;160:7,8,9;
  161:4,7;167:15;
  168:18;170:12,16,17
**handwritten (5)**
  21:3;156:14;
  158:1;160:14;161:12
**hanging (1)**
  203:11
**happen (1)**
  164:12
**happened (4)**
  19:9;44:17;111:7;
  117:9
**happening (2)**
  193:17;203:3
**happens (3)**
  39:1;66:19;193:10
**happy (2)**
  6:21;178:9
**harassed (1)**
  211:17
**harassment (1)**
  132:14
**hard (1)**
  16:9
**Harding (5)**
  158:10;163:1;
  165:13;169:6;171:7
**H-A-R-D-I-N-G (1)**
  158:10

**Harding's (7)**
  160:12;161:6,12;
  164:13;166:21;
  168:1,15
**harm (4)**
  22:6;23:16;78:20;
  79:6
**head (5)**
  35:19;54:21;55:7;
  73:20;128:3
**headache (1)**
  200:9
**heading (3)**
  53:8;161:1,3
**health (6)**
  16:3;33:21;154:7;
  162:17;166:7;177:9
**hear (5)**
  7:1;29:17;95:7;
  145:2;153:21
**height (1)**
  51:18
**held (6)**
  31:6;59:19;
  111:10;189:12;
  227:13;235:7
**help (12)**
  48:2;74:3;76:19,
  21;111:6,20;115:12;
  121:10;160:20;
  172:11;173:17;
  226:15
**helped (1)**
  76:15
**helpful (11)**
  45:2,3;64:13;
  65:19;144:16;145:7,
  10,11,13;184:2;
  230:6
**helps (5)**
  75:12;76:16;
  96:20;111:2;184:4
**hereby (2)**
  236:3;237:4
**herein (1)**
  237:6
**high (1)**
  39:15
**highest (1)**
  37:20
**highway (1)**
  94:10
**himself (6)**
  180:14,20,20;
  181:1;203:1;209:13
**histories (1)**
  159:18
**history (26)**
  46:10,12,13;50:17;
  127:6;139:9;141:11,
  14,20;142:14;
  143:13;144:9,12;
  158:13;162:13,13;

U.S. EEOC, et al. vs
Rite Aid Corporation

Michael K. Spodak, M.D.
November 13, 2009

165:20;166:1,7;
180:2;185:10,20;
186:10;205:1;
210:14;218:16
**hold (2)**
150:15;235:10
**holding (1)**
105:13
**home (2)**
162:14,16
**homicidal (4)**
116:6,12,15;201:4
**honestly (1)**
6:18
**hopelessness (1)**
139:2
**Hopkins (1)**
84:11
**host (1)**
225:11
**hostile (4)**
36:13;74:19;76:8;
79:10
**hour (3)**
30:7;31:15;227:3
**hours (3)**
26:15,16;157:14
**house (1)**
210:8
**How's (1)**
86:4
**huge (3)**
92:21;93:9;94:11
**humiliated (2)**
222:1,6
**humiliating (1)**
211:6
**hundred (2)**
131:11;137:11
**hurt (1)**
180:20
**hypothesizing (1)**
215:2

**I**

**IBM (1)**
18:20
**ideal (1)**
57:6
**ideation (3)**
116:15;180:11;
201:4
**identified (5)**
83:11;186:13,18;
187:8,11
**identify (11)**
24:18;71:2;
101:14;105:11;
107:1;110:6;133:18;
156:6;172:11;
229:13;230:7
**identifying (1)**

138:16
**II (1)**
185:7
**III (6)**
184:20;185:8,9,17;
186:4,7
**illegal (1)**
88:16
**illness (50)**
29:2;38:9,10,12,
12;57:8;75:18;
145:19;146:1,7,14;
147:15,19;148:4;
153:19;154:2;
174:10;190:3,7,16;
191:1,5;192:20;
193:7,20;194:6,15;
195:2,12;196:8,12,
13;208:10;213:5,7,8,
14,19,21;214:2,5,18;
215:2,5;216:12;
217:5,8,13,15,19
**illnesses (1)**
216:18
**IME (41)**
5:8,11;33:12;
34:13;37:16,19;
38:18;39:7,8;40:9,
20;42:2,6;43:10,14,
20,21;44:2,7,18;
46:1;47:8;49:14,
55:11,15,19,21;57:1;
58:3,17;74:16;78:13;
140:19;142:7;144:3;
150:3;156:4;171:20;
172:4;207:14;230:14
**IMEs (16)**
32:12,18;38:16;
39:12;40:5;41:8,13,
15;42:17;45:6,20;
55:2;59:21;60:18;
61:6;151:3
**immobilized (1)**
179:12
**impact (6)**
36:14;39:3,17;
143:4;195:8;202:14
**impacts (1)**
38:13
**impair (2)**
7:7,11
**impaired (2)**
222:21;223:1
**Impairment (1)**
172:8
**impartial (1)**
34:3,4,6;56:6
**impartiality (2)**
55:5,11
**important (9)**
38:8;49:17;53:17;
54:4;57:1;59:3;
92:18;94:4;143:9

**improperly (1)**
78:10
**inability (1)**
75:2
**inaccurate (6)**
15:7;135:1;
164:15,20;165:4,7
**incapable (1)**
86:19
**include (8)**
111:13;115:3;
128:7;132:13;
190:18;191:19;
200:8;234:19
**included (4)**
41:20;61:14;72:5;
231:14
**including (5)**
26:16;94:7;
200:12;201:16;
213:20
**income (3)**
122:8;123:6;
219:11
**incomplete (2)**
143:16,20
**inconsistencies (1)**
182:6
**inconsistent (3)**
182:3;188:13;
206:3
**incorrect (5)**
134:21;151:8;
155:11;164:1,6
**increased (1)**
200:10
**Indeed (1)**
62:20;198:10
**independent (8)**
33:13;34:10;35:8;
37:5;53:5;55:3,5;
57:20
**INDEX (1)**
5:1
**indicate (4)**
58:3;123:15;
125:6;184:6
**indicated (7)**
64:10;131:9;
180:7;199:10;210:8;
224:16;234:2
**indicates (3)**
107:7;121:2;216:2
**indicating (4)**
82:12;106:17;
218:2,5
**indication (1)**
203:9
**individual (23)**
23:14;26:15;38:7;
46:11;47:4,12,14;
48:3;56:7,13;57:11;
86:13;87:10;94:2;

138:13;141:21;
162:2;173:12,14;
183:10;203:1;210:3,
17
**individualized (1)**
219:5
**individuals (5)**
50:2;153:19;
154:2;196:12;216:7
**individual's (5)**
39:18;172:19;
218:11,12,14
**infection (1)**
200:11
**inferring (1)**
132:3
**inform (1)**
21:7
**information (90)**
11:20;12:12,14,18;
13:1,3,11,12,15;
14:8;19:19;32:13,19;
34:15;38:6;44:15;
45:14;47:18;53:1;
62:2;63:15,16;66:10;
72:21;74:2;81:10;
83:8,21;84:11,17;
92:10;95:13;97:8,12;
98:9;99:13,21;
100:15;105:9;
106:15;107:9,14;
108:11,20;109:5,15,
21;114:8,11,20;
115:7;123:12;127:9;
138:17;139:17;
144:1,19;145:1,4,5,7,
8,10,11,13,14;
162:10;163:4;
165:11,16;167:11;
172:18;181:18;
182:1;183:4;184:1;
185:16;186:7;
188:12,17,19;189:5;
199:21;200:1,19;
201:21;220:20;
221:8;226:16;230:6
**informed (5)**
21:6;60:1;81:19;
103:16;121:3
**inherent (1)**
191:16
**Initially (2)**
157:3,9
**injured (2)**
59:12;138:2
**injures (1)**
217:10
**injuries (1)**
229:4
**injury (2)**
39:4;138:7
**innocent (1)**
203:4

**inordinate (1)**
83:1
**inquire (1)**
180:21
**inquiries (1)**
162:3
**inquiry (4)**
162:9,12,16;
180:13
**insistence (1)**
216:4
**instance (6)**
43:20;44:20;
51:17;53:9;162:4;
198:16
**instead (2)**
78:13
**instruction (2)**
163:9;181:10
**instructions (4)**
161:19,21;162:1,
21
**insurance (1)**
100:11
**intact (1)**
112:12,12
**intake (13)**
93:3;113:19;
156:9;161:13,20;
163:15;165:14;
168:1,4,15;172:4;
188:20;223:13
**intent (2)**
180:14,19
**interaction (1)**
225:6
**interest (1)**
229:17
**interested (4)**
65:21;66:1,2;
237:13
**internet (1)**
98:10;100:3
**interpret (1)**
45:19
**interpretation (2)**
90:1,10
**interpreted (1)**
201:2
**interpretive (2)**
177:9;185:20
**interrupt (3)**
33:6;215:8,14
**interview (39)**
25:15;45:20,21;
46:3;47:14;49:10,18;
50:1,13,16;80:3;
95:19;139:8,21;
140:3;141:10,13;
142:4,7;144:2;
157:12,13,18;
158:16;163:12;
166:13;168:7,12,21;

171:4;173:14;182:2,
5;184:5;188:5,14,20;
203:13;223:13
**interviewed (7)**
74:19;94:14;
156:18;160:15;
163:5;165:17;179:16
**interviewing (3)**
25:10;47:17;163:1
**interviews (2)**
93:3;161:20
**into (16)**
10:21;14:6;21:18;
37:14;69:15;111:21;
114:10;142:19;
143:3;178:1;192:12,
13;197:3;198:5;
204:14;212:21
**inventories (1)**
180:10
**Inventory (1)**
183:12
**invoice (1)**
24:16
**involuntary (2)**
147:9;192:9
**involve (7)**
50:20;51:3;56:8;
107:20;132:19;
133:2,11
**involved (14)**
21:12;36:12;85:3;
107:17;108:17;
132:10,20;133:19;
134:1,2,4,4,5,12
**involves (3)**
67:1,2,3
**involving (1)**
148:20
**irresponsible (3)**
87:18;88:16;127:7
**isolation (1)**
148:18
**issue (23)**
16:19;20:18;40:1;
52:15;57:4,21;58:6,
13,18;75:13;76:11;
77:9;78:2;83:13;
84:5;88:13;91:12;
92:2;93:10,21;109:3;
134:3;176:18
**issued (2)**
13:10;81:17
**issues (15)**
33:15;36:17;
39:13;48:11;51:4;
56:9,16;79:3;91:7;
108:5;134:5;162:10;
171:16;181:19;
211:15
**item (8)**
52:8,8;71:21;72:3,
3;111:18;112:18;

141:9
**items (3)**
24:19;71:8;130:17
**IV (3)**
185:5;186:11,19

**J**

**January (13)**
115:14;167:6;
197:6,7;199:14;
200:14,16;201:8;
207:1;233:4,17,20;
234:1
**Jeremy (2)**
227:10;231:2
**Jerry (1)**
6:10
**Jim (2)**
151:14;214:10
**job (26)**
7:19;38:4,5,13;
44:6;46:16;50:2;
51:11,19;52:2,7,12,
13,16;59:10;117:3;
119:9;120:9,12,15;
123:1,8;192:4;193:6;
218:5,13
**jobs (1)**
56:14
**Jodi (2)**
71:11;102:14
**Jodie (1)**
201:5
**Johns (1)**
84:11
**Judith (1)**
158:10
**July (1)**
21:15
**jumps (1)**
178:10
**June (6)**
23:10;120:9,16;
123:1,8;237:21
**jury (1)**
211:9
**justified (1)**
220:7

**K**

**keep (5)**
112:11;124:4;
131:21;132:2;214:7
**keeps (1)**
96:20
**Keppra (11)**
114:9,14;115:13,
18;116:9;200:3,5;
201:13,17;233:4,10
**kept (4)**
18:7;95:16;232:7,

8
**kill (4)**
180:14,19;181:1;
203:4
**kind (21)**
18:9;66:10;73:21;
93:8;127:10;148:13;
158:20;159:19;
162:19;182:3;183:5;
202:9;203:20;
208:10;210:3,4;
211:13;213:2,13;
217:12;223:3
**kinds (4)**
36:17;55:6;56:11;
60:18
**King (1)**
21:15
**knee (1)**
217:6
**knew (3)**
114:12;200:1;
225:20
**knowing (4)**
60:18;94:8;176:9;
220:10
**knowledge (7)**
88:9;93:7;153:18;
154:1;206:13,17,21
**knowledgeable (4)**
57:3;58:5,10,11
**knows (4)**
47:19;118:3;
220:4,13
**Krumholz (5)**
41:20;60:16;61:1,
2,3
**Krumholz's (2)**
42:2,6

**L**

**Labor (1)**
34:5
**lack (1)**
147:3
**ladder (1)**
51:18
**last (20)**
30:6;31:14;32:7,
17;62:13;63:2;71:4;
89:3;99:10;100:1;
105:19;109:9;114:3;
126:3;130:5;132:18;
157:12;175:11;
187:16;215:19
**late (1)**
215:12
**later (1)**
61:13
**latter (1)**
173:16
**law (4)**

36:1;91:15;
232:11;237:8
**laws (4)**
87:14,17;90:12;
99:6
**lawsuit (5)**
78:8,9;170:16;
181:4;211:18
**lead (6)**
29:2;74:21;
146:21;147:4,14;
210:5
**leading (1)**
200:21
**leads (1)**
195:16
**leaps (1)**
152:10
**learn (1)**
143:14
**learning (2)**
83:12;117:2
**least (6)**
22:20;23:2;45:16;
88:7;95:18;142:20
**leave (6)**
119:4,5;123:7;
192:9;196:21;202:7
**leaving (1)**
210:8
**left (5)**
139:1;153:8;
167:5;169:10;205:14
**leg (4)**
194:18;214:6,16;
229:16
**legal (5)**
74:6;78:2;117:21;
118:5;152:21
**legally (2)**
134:7;177:3
**less (3)**
55:18;59:6,15
**Lesser (38)**
5:9;41:20;60:15;
61:1,2,4;63:6;
196:20;197:20;
198:9;199:6,8;200:2,
7,14;201:11,18;
202:13,17;203:17,
21;204:3,5,10,21;
205:8,10,13,19;
206:8,11,14;207:2;
220:12,15,18;221:1;
234:2
**Lesser's (8)**
124:5;199:21;
200:18;201:10;
206:2;207:1,6;
233:15
**letter (3)**
21:3;71:21;79:20
**letters (1)**

36:8
**letting (1)**
81:6
**level (4)**
37:20;190:21;
191:5;222:17
**Lewis (1)**
41:21
**license (4)**
86:17;89:10;
92:20;95:2
**lies (1)**
205:12
**life (16)**
47:15;62:19;93:1;
94:9,10;143:2,14,15;
162:3,14,16;179:13,
15;185:19;193:9;
225:12
**light (1)**
219:14
**likely (8)**
28:3;32:14;34:12;
210:4;211:19;
212:15,21;213:10
**limitations (2)**
46:19;172:12
**limited (7)**
34:15;39:12;48:6,
10,18;235:7,12
**limits (1)**
201:18
**line (54)**
9:16;19:11,13,15;
20:2,4;25:10;32:7;
36:9;72:4;97:7;
114:7;119:5;124:17;
125:4,7,15,19;126:1,
3,21;127:2,15;128:4,
7,9,11,18;129:6,7,18;
130:2,12,18,18,19;
149:21;150:17,17;
165:5,8;167:3;178:5,
5,9,9;179:5,6;180:4,
5;182:3;200:13;
221:7;224:15
**lines (4)**
64:19;113:11;
157:8;173:5
**List (23)**
5:5;9:11;29:3;
30:13;131:6,8;132:5;
133:17,19;134:11;
135:6,7;136:8;
153:18;154:3;
171:13;186:4;209:4,
8,21;210:5;212:18;
215:19
**listed (14)**
42:6;62:4;63:8,11,
21;70:16;76:7;79:4;
81:20;82:2;139:3;
141:10;221:7,10

U.S. EEOC, et al. vs
Rite Aid Corporation

Michael K. Spodak, M.D.
November 13, 2009

listen (1)
  66:20
listened (1)
  78:13
listing (1)
  67:11
lists (1)
  200:7
literature (15)
  34:17;35:3,14;
  43:5,7,9;54:14;
  148:3;212:20;216:2,
  9,19;218:1,4,8
litigation (3)
  36:13;140:20;
  153:9
little (5)
  19:12;32:21;
  37:15;180:12;215:10
lived (3)
  180:16,19;181:6
lives (1)
  218:17
living (1)
  96:21
LOC (2)
  126:14;127:12
local (2)
  12:21;13:20
locate (2)
  10:15;11:6
Logistics (3)
  31:7,9,10
long (7)
  30:6;31:14;87:8;
  127:6;157:12;
  221:10;230:1
longer (3)
  150:15,19;152:8
longitudinal (1)
  181:18
look (37)
  10:3,11;11:10,14;
  12:1,19;14:5,8;17:2;
  35:20,21;47:3,7;
  53:16;56:6;64:13;
  68:9;72:16;75:11;
  87:16;88:4;94:17;
  99:13;105:9;108:9;
  115:17;144:17;
  155:1;163:7;180:13;
  182:6;184:4;187:20;
  212:14;218:8;
  220:17,18
looked (19)
  11:2,3,6;16:7;
  23:7;30:18;40:21;
  56:12;73:21;81:12;
  86:9;87:14;97:8,12;
  108:18;114:10,14;
  115:21;171:1
looking (16)
  34:11;47:13;

54:13;60:11;67:20;
  75:6,7;83:10;106:1,
  10;127:21;160:10;
  162:5;178:2;189:14;
  233:14
looks (15)
  9:7;23:8;25:17;
  64:16;95:11;98:2;
  110:16;154:5;165:3,
  6;166:17;173:5;
  186:1;229:21;230:2
lose (1)
  92:20
losing (3)
  59:10;95:1;117:3
loss (5)
  126:14;138:9,11;
  210:10;219:11
lost (1)
  200:15
lot (6)
  7:19;31:19;66:2;
  199:5;219:2,10
lots (8)
  54:16,16;55:8,8;
  108:14,14;147:21,21

**M**

machine (1)
  158:20
main (4)
  32:5;35:20;75:21;
  141:16
maintained (1)
  132:7
major (2)
  104:8;229:10
makes (4)
  53:14;83:8;
  141:15;150:5
making (5)
  53:10;85:12;
  109:6;146:4;173:9,
  10,18;198:11;226:4
Malingering (4)
  182:12,15;184:7,
  11
manifestation (1)
  138:12
manifests (1)
  39:11
many (20)
  22:17,21;27:4;
  34:1,14;38:16;41:3;
  45:15;54:11;55:1;
  84:16;106:4;136:5;
  154:7;193:14,14;
  210:10;211:5;
  216:14,14
March (1)
  119:16
Maria (1)

6:8
marital (1)
  162:13
mark (7)
  69:21;86:3;99:1;
  100:13;101:2;
  155:15;197:14
MARKED (23)
  5:3;8:17;23:17;
  67:7;68:15;70:21;
  86:5;100:21;106:20;
  112:16;115:5,8;
  124:13;125:16;
  129:11,14;131:2;
  134:15;149:13;
  155:19;196:17;
  230:11,15
marking (4)
  106:18;112:6,13;
  197:21
Maryland (10)
  34:7;42:7;86:12;
  87:9;89:17;90:10,17;
  99:11;237:1,4
Master (1)
  160:3
master's (2)
  159:13;160:1
matched (1)
  195:10
matter (8)
  15:10;59:5;73:5;
  93:16;133:5;146:15;
  176:10;235:12
matters (2)
  33:14;55:15
may (39)
  23:12;36:15,15;
  51:4;56:4,14;59:9;
  66:2;74:6;108:17;
  110:20,20;115:3;
  131:19;132:20;
  133:13;142:16;
  143:8,9;144:5,6;
  162:6,7;163:7;173:1;
  174:19;180:1;
  185:18;187:8,13;
  191:16;200:8;
  208:21;211:14;
  213:18;214:2;215:2;
  218:13;235:7
maybe (3)
  128:6;159:2;
  219:11
MCI (1)
  139:11
MCMI-III (1)
  139:11
MD (4)
  5:2;6:3;81:17;
  236:13
mean (38)
  10:2;18:1;25:7;

28:20;33:5;42:18;
  50:16;53:9,12;55:6;
  57:19;65:20;68:9;
  72:4;102:2;114:16;
  117:8;133:14;
  142:15;148:19;
  158:21;171:17;
  176:17,18;178:6,8;
  185:1;186:20;
  187:21;193:6;
  194:10;201:10;
  202:21;208:12;
  217:3;221:8;230:1;
  232:4
MedChi (1)
  34:1
Medical (52)
  5:9;7:11;34:3,17;
  35:14;37:5,6,17;
  42:8;44:4;46:12,13;
  49:8,10;50:13,15,17,
  21;54:6,7,14;57:3;
  58:4,6;64:14;67:16;
  81:16,18;83:18;
  84:21;92:20;100:5;
  123:7;124:6;135:6,7;
  165:20;185:9,17;
  186:10;192:9;
  196:19,21;202:7;
  206:13,20;209:18;
  210:20;211:1;216:2,
  8,10
medication (8)
  7:7;39:16,18;47:6;
  114:21;117:1;
  201:12,14
medications (5)
  47:3;95:16;114:5,
  18;232:15
medicine (1)
  40:10
meds (2)
  232:6,8
meet (4)
  13:7;30:1;31:5,11
meeting (8)
  30:6,8;31:14,16;
  32:1;72:8;234:3,7
members (1)
  170:4
memory (3)
  141:2;150:4;
  200:11
mental (49)
  16:3;29:2;75:18;
  78:20;145:19;146:7,
  14;147:1,4,15,19;
  148:4;154:7;166:7;
  173:8,10;174:10;
  177:9;182:2;190:2,7,
  15,20,21;191:4,5;
  192:20;193:7,20;
  194:6,15;195:1,11,

196:8,12,13;208:10;
  210:21;213:4,14,18,
  21;24:5,18;216:12,
  18;217:8,13,19
mention (1)
  202:16
mentioned (3)
  23:13;88:15;
  133:21
mentioning (1)
  233:11
mere (1)
  218:18
merely (3)
  15:1;60:5;185:17
messages (2)
  111:3,6
met (3)
  60:8;61:11;163:14
Methodology (3)
  5:11;230:14,21
MICHAEL (9)
  5:2;6:3;21:14;
  24:16;26:20;82:17;
  85:21;101:7;236:13
middle (2)
  154:5;215:14
might (19)
  23:11;44:17;
  46:20,20;48:2;71:17;
  74:3;76:21;92:19;
  115:18;143:6;149:3;
  153:5;155:2;162:18;
  201:7;204:11;212:2,
  3
Mike (1)
  22:18
Milan (5)
  183:11,13,14;
  184:14;185:1
military (2)
  62:14,19
millions (1)
  217:15
mind (4)
  70:4;127:6;
  160:11;199:7
mine (7)
  68:4;156:16;
  169:10,12,16;
  170:12,20
Mini-Mental (1)
  173:8
minimize (2)
  54:10;88:20
Minnesota (5)
  139:10;175:4;
  177:5;181:8;182:8
minute (14)
  24:9;59:18;68:19;
  97:10;108:9;126:15;
  127:18;131:13;
  134:19;144:17;

U.S. EEOC, et al. vs
Rite Aid Corporation

Michael K. Spodak, M.D.
November 13, 2009

149:16;150:12;
171:2;230:1
**minutes (3)**
70:7;199:3;231:4
**misapplication (1)**
205:15
**Miscellaneous (1)**
25:9
**misinterpreted (1)**
201:3
**misprint (1)**
154:5
**misrepresenting (2)**
220:11,15
**Miss (16)**
84:2;100:9;103:7,
17;104:21;160:12;
161:6,12;163:1;
164:13;165:13;
166:21;168:1,15;
169:6;171:7
**missed (1)**
62:18
**misses (1)**
193:14
**missing (6)**
96:20;131:14,15,
17;136:13;154:13
**mistake (2)**
139:1;164:9
**mistakes (1)**
164:14
**mistreated (1)**
232:13
**Mm-hmm (1)**
81:8
**MMPI (2)**
175:8;184:5
**mobilized (1)**
179:14
**moment (2)**
58:13;105:4
**Monday (2)**
73:15;131:19
**money (7)**
122:11;147:3,3;
193:1,2,3,5
**monies (1)**
123:19
**monitoring (1)**
232:12
**Monteiro (25)**
6:10;21:2;24:10;
69:21;82:11,14;89:2,
5;97:19;98:18;101:3,
6;102:5;106:3,8;
113:1;126:5,7,9;
137:1;176:1;197:14;
231:2,5;234:12
**more (46)**
25:17;32:14;
33:12;34:11;36:16;
38:8;39:14;53:3,4;

54:9;55:19,20;56:21;
57:7,12;59:5,14;
60:14,20,21;61:2;
64:11;80:20,21;81:3;
99:9;104:21;141:16;
143:9;144:5;157:1;
162:19;178:19;
179:1;183:8;187:19;
188:8,9;191:15;
195:11;198:18;
199:5;211:19;
213:10;215:10;227:4
**morning (14)**
6:8,11;9:10;29:21;
30:2,18;31:12;41:9,
10;60:9;61:12;64:9;
82:5;210:9
**MOROCCO (102)**
6:7,9;10:11;12:9;
13:7;14:7,14,17;
15:8;16:17;17:1,5;
20:21;31:21;59:17;
62:21;63:4,17,20;
68:13;70:4;72:20;
80:9;81:1,3,5,8,14;
82:4,13,17;83:7;
84:2,4;89:6;90:6,21;
93:15;97:4,18,20;
98:2,5,7,19;99:2;
100:20;101:7;102:4,
8;106:2,6,9,14,18;
107:3;111:8;113:2,5,
20;118:2,9;120:7;
121:19;124:5;126:6,
8;136:19;149:15;
150:5;151:2,7,13;
152:4;155:5,16,18;
176:8,20;189:19;
191:3;194:11;197:6,
10,13,16,18;198:2;
199:19;204:21;
206:18;213:17;
214:4,9,13,20;215:1,
17;222:3;227:9;
231:1;234:15
**most (11)**
45:10;131:10;
137:21;138:5;
163:10;179:2,8;
195:13;217:11;
218:2;223:1
**mostly (2)**
61:2;167:16
**mother (1)**
211:20
**mother-in-law (1)**
234:7
**motion (1)**
176:21
**motorcycle (1)**
165:4
**Motors (1)**
34:4

**moving (1)**
143:2
**Mrs (1)**
140:3
**much (6)**
33:12;143:15;
150:21;220:10,12;
222:13
**Multiaxial (1)**
183:12
**Multiphasic (5)**
139:11;175:4;
177:6;181:8;182:8
**multitude (1)**
46:4
**MVA (2)**
126:14;127:12
**myself (2)**
62:13;87:4;149:20

## N

**name (3)**
158:10,21;172:21
**nature (12)**
37:9,10;38:4;
53:21;56:19;64:12;
66:6;88:17,18;
143:20;187:7;202:14
**near (1)**
227:19
**nearly (2)**
84:21;217:10
**necessarily (4)**
36:11;44:21;56:2;
193:6
**necessary (5)**
50:17;145:15;
180:3,6;236:8
**neck (1)**
203:11
**need (21)**
6:16,18;7:6,10;
12:20;38:11,12;
51:19;52:2;59:17;
66:9;80:18;89:21;
106:14;113:18;
124:3;144:19;179:7;
194:18;227:9;234:15
**needed (5)**
144:12;145:4,5,8;
205:6
**needs (1)**
83:9
**negate (1)**
74:20
**neither (1)**
81:15
**neurologist (2)**
208:4,13
**neurology (1)**
135:20
**new (7)**

82:4;123:1,8;
128:8;201:11,12,14
**next (20)**
6:10;26:11;29:12,
14,19;127:3;156:14,
15;169:3;171:6,8;
172:2,13,14,14;
173:7;174:8;175:3;
183:11;198:21
**night (6)**
32:7;62:13;71:5;
100:1;114:3;130:5
**nobody (1)**
90:19
**noise (1)**
7:2
**none (1)**
187:8
**nor (1)**
237:13
**normal (3)**
11:13;15:19;16:1
**northern (1)**
14:13
**nose (1)**
200:10
**notarial (1)**
237:15
**Notary (2)**
237:3,19
**notation (1)**
165:1
**notations (2)**
25:4;169:12
**note (6)**
85:19;149:19;
175:13;200:2,13;
201:18
**noted (3)**
25:6;154:3;201:4
**notes (63)**
19:6,9,17,18,18;
20:3;21:3;30:8;80:3;
88:4;93:3,6;94:17,
20;95:4,10,13,21;
111:14;118:11;
120:19;141:20;
156:14,15,17,21;
157:15;158:6,8,9;
160:8,14,14;161:12;
163:11,13,18;164:1,
5,9,13,20;166:9,11,
13,20,21;168:1,8,12,
20;169:3,10,14,15;
170:11;171:5,6;
201:5;223:12;232:2,
17;233:15
**notice (9)**
8:10;30:12,20;
110:16;112:7;
131:14,15;140:5;
197:19
**noticed (1)**

154:11
**notwithstanding (1)**
202:18
**novel (1)**
16:3
**November (10)**
9:3,6,7;10:18;
24:1;99:8;107:7;
108:21;109:13;
237:16
**NUMBER (83)**
5:3;8:18;23:18;
33:3;42:14;64:1;
67:8;68:10,16;71:1;
79:21;84:9;86:6;
98:17,18,20;99:4;
101:1,9;102:10;
105:12;106:21;
108:16;111:18;
112:3,17,18,19;
113:3,7,10;114:2;
115:1,6,9;122:15;
123:5;124:14,15;
125:17;129:12,15;
130:3;131:3;134:16;
141:12;147:10,18,
20;148:2,10;149:14;
155:20;165:19;
190:12,18;191:19,
19;192:8,9,10,11,12;
194:1,2,12,19;
196:15,16,18;197:3;
198:3,6,12;200:5;
204:15;207:9;
208:17,19;209:4;
230:1,12,16
**numbers (8)**
63:12;157:21;
158:1,2;161:10;
168:10,17;190:14
**numerous (1)**
204:16

## O

**oath (1)**
6:17
**object (5)**
12:8;15:3;150:20;
214:3;215:6
**objected (1)**
208:4
**Objection (17)**
12:11;16:18;90:4,
16;93:12;121:17;
124:1;151:14;176:1;
206:16;212:11;
213:15;214:7,9;
221:5;222:2;235:3
**objective (1)**
227:5
**observations (2)**
173:12,13

U.S. EEOC, et al. vs
Rite Aid Corporation

Michael K. Spodak, M.D.
November 13, 2009

obtain (7)
  46:10;49:9;50:17;
  118:3;141:13;
  142:14;203:19
obtained (3)
  80:3;123:1;139:10
obtaining (1)
  32:13
obviously (5)
  6:18;128:2;150:6;
  155:6;227:11
occasions (3)
  180:11;204:16;
  211:8
occupational (2)
  33:21;67:15
occurred (3)
  23:5;60:10;104:4
October (12)
  29:11;80:6;83:16;
  84:21;85:6;86:1;
  119:7,16;122:1,7;
  192:3;231:8
off (18)
  35:19;54:21;55:7;
  59:17,19;68:7;111:8,
  10;120:11;139:1;
  189:12;193:16,17;
  196:2;204:17;219:2;
  227:9,13
off-duty (1)
  117:12
offer (8)
  91:19;119:10;
  148:14;174:7;
  221:19;222:12;
  226:18;227:1
offered (4)
  53:1;60:12;119:6,
  9
offers (1)
  184:1
office (14)
  10:19;21:14,18;
  25:11;26:9;30:5;
  82:14;88:10;98:1;
  131:19;140:8;
  158:12;159:15,17
officials (1)
  208:3
often (8)
  16:5;34:14;36:1;
  39:2;17;45:8;66:19;
  207:17
old (1)
  159:3
older (1)
  162:12
Olivetti (1)
  159:2
OMS (1)
  67:15
once (1)

205:11
one (95)
  15:18;16:8,15,15;
  20:19;22:14,16;23:5;
  24:21;27:7;33:3;
  35:20;47:10;50:5;
  54:2;55:18,19;59:20;
  60:13;61:4;68:6,7,
  12;71:19;73:5,7;
  75:16,16;81:1,3,12;
  82:15;88:7;92:3,18;
  95:18;104:7;108:2;
  110:15;113:12,14;
  114:15;115:12;
  116:9;123:10,15;
  125:8,11;126:10,11;
  127:5;131:11;
  133:15;138:21,21;
  139:3;140:21;141:1,
  6,8;143:3,20;147:18;
  151:16;152:15;
  155:2;162:20;
  169:12;170:4,9,11;
  171:1,3,21;172:7;
  174:6;175:2;177:21;
  179:16;183:6;
  195:11;196:5;
  199:12;201:7;
  205:13;209:8,21;
  212:8;213:3;220:17;
  226:20;232:9,16,18;
  234:16
ones (14)
  28:8;48:8;60:19,
  21;68:10;105:13;
  132:20;135:12;
  138:5;160:11;
  178:19;179:2;
  190:13;191:14
one's (1)
  218:5
ongoing (4)
  86:17;162:10,20;
  203:10
online (2)
  87:4;99:11
only (19)
  15:12;16:8;34:15;
  48:8;53:1;56:6;
  115:20;132:20;
  134:9;151:16;
  152:13;165:9;
  168:10;175:2;185:4;
  204:1;220:5,6,13
onto (4)
  19:11,15;20:9;
  187:18
open (3)
  152:1;235:7,11
operating (1)
  143:12
opine (5)
  27:14;39:8,17;

54:2;77:18
opined (3)
  104:9;117:11;
  200:16
opining (11)
  59:7,9;190:6,19;
  191:3,8;221:13;
  222:8,11,14;233:13
opinion (131)
  28:20,21;32:11,18;
  33:9,11,17;34:3,10,
  18;35:2,2,15,16;
  36:19;37:2,8,18;
  38:14;39:6;41:7;
  42:16,21;48:4,9,15;
  49:3;52:19;53:13;
  55:10;56:21;57:15;
  58:8;61:15;88:21;
  90:3,7,9,11;91:13,14,
  17,20;92:16;93:13,
  16,19;94:7,11;
  103:18;104:12;
  121:12;122:12,15,
  17;123:5;138:11;
  144:18,20;145:3,4,6,
  7,9,10,12,15,16;
  146:8,9;147:10,12,
  16,17;148:10,13,14,
  19;149:5;150:15;
  173:19;174:7,21;
  191:11,13,18,18,19,
  19;192:12;194:3,7,
  13,13,18,19;195:3;
  197:3;198:5,11,12;
  200:18;202:5,12;
  204:15;206:2,11;
  207:9;208:14,16,20;
  209:17;211:18;
  212:1,6,8,19;213:12;
  214:16;218:19;
  220:14;221:19;
  222:12;226:5;227:1;
  231:9,12;233:7,9,21;
  234:20
opinions (85)
  16:16;27:10,16,18;
  28:5,8,11,12,15,16,
  17;29:4,5,9;31:2;
  45:12;53:7;55:16;
  59:21;60:2,6,11,12;
  61:14;69:9,13,16,18;
  83:2;85:9,13;89:16;
  91:11;92:11,14;
  103:4,7,10,12,12,14;
  104:16,16;105:3;
  109:6;110:2;115:10;
  118:21;121:11;
  124:8;130:21;144:3,
  4,5,5,8,13,15,21;
  163:19;167:12;
  170:7;174:15;
  178:13,17;188:15;
  189:2,15,21;190:5,

14;191:10,17;
  204:11;208:8,20;
  213:4;225:5,14;
  226:4,18;227:6;
  229:11,13;230:4
opposed (7)
  37:5;194:10
option (1)
  141:5
order (4)
  68:5;87:8;205:6;
  212:18
ordinarily (1)
  154:2
origin (2)
  170:2;171:14
original (12)
  62:5;69:9,13,18;
  70:2,16;77:14;125:8;
  129:13;149:21;
  228:14;236:9
originally (1)
  71:9
others (3)
  35:9;94:12;191:15
Otherwise (1)
  58:7
ought (4)
  44:5,6,7,8
out (51)
  12:17;14:17;15:5;
  32:21;47:14;55:8;
  56:6;68:13;79:12;
  97:11,15;99:10;
  100:4,8;106:12;
  112:1,7;114:20;
  117:16;121:5;
  141:18;143:7;151:6;
  156:11;161:2;
  164:15;165:12,20;
  166:2,18;170:3,9;
  171:11;175:11;
  178:10;181:11;
  195:17,18;196:1,3;
  205:7,10;213:3;
  216:6;217:11,16;
  219:3,17;226:2;
  232:7;237:7
outcome (1)
  237:14
outline (1)
  45:11
outlined (2)
  23:11,11
outpatient (1)
  177:9
outside (1)
  7:2
outstanding (1)
  13:14
over (26)
  7:16;15:16;17:4;
  18:6,15,16,19:3;  —

20:10,13,16;21:4;
  33:3;41:4;43:1,9;
  45:15;55:1;74:1;
  108:14;125:2;
  127:21;141:18;
  193:4;203:11;
  215:15;230:18
overall (3)
  162:17;201:20;
  202:2
overwritten (1)
  125:14
own (8)
  77:21;78:13;
  142:1;159:16;
  163:15;168:4,7,21

_____

P

PA (2)
  42:1;64:17
packet (1)
  228:14
packs (1)
  127:13
page (62)
  28:8,12,17;29:5;
  42:11;69:19;96:2;
  97:1;105:19;118:11,
  17;120:19;126:3;
  132:18;135:5;
  138:16;152:18,20;
  153:7;154:6,14,17,
  18,21;155:4,7;156:8;
  157:21;158:1;
  160:10,12;161:4,8;
  165:3,6,11,19;166:4,
  8,9,10,16;167:21;
  168:1,17;169:6,11,
  15;171:6;172:14;
  175:11;179:11;
  209:4;224:12,14,14,
  15;225:17,17;226:1,
  2;232:2
pages (20)
  24:10;83:10,17;
  84:12,21;106:4,6,9;
  110:17;112:20;
  113:4,5;156:15;
  158:4;168:8,11;
  170:14;221:8;230:1,
  2
paid (5)
  120:3;121:4;
  122:3;207:5;214:14
pain (5)
  37:12;39:15,16;
  200:9;217:7
paper (7)
  11:6;19:12;
  160:21;170:15;
  205:7,10;236:9
paperwork (1)

121:5
**paragraph (2)**
153:8;155:2
**part (30)**
25:18,19;40:20;
41:12;93:13;97:13;
102:2,2;108:9;109:9;
110:11;113:20;
114:11;115:3;
128:18;131:10;
135:21;143:11;
144:1,2;154:13;
165:14;171:20;
172:3;173:9,10,19;
175:3;178:15;187:5
**partial (2)**
174:20;199:11
**participate (1)**
153:12
**participating (1)**
152:21
**particular (9)**
43:16;57:11,11;
95:5;114:15;143:4;
154:1;183:6;229:17
**particularly (4)**
17:11;84:11;
86:16;209:5
**parties (1)**
237:13
**partner (3)**
82:18,18,18
**parts (1)**
158:8
**part-time (1)**
50:3
**passed (1)**
13:21
**past (5)**
100:12;108:3,17;
136:12;235:4
**patient (17)**
34:9,13,14,16;
36:3,7;37:19;49:11;
50:14,18;57:6;
135:15;169:18;
170:1;226:11;234:2,
6
**patients (7)**
33:19;136:5;
137:10,14,17;138:8;
148:6
**patient's (3)**
35:11;50:21;55:4
**pattern (1)**
127:10
**patterns (1)**
184:2
**pay (2)**
122:4;165:8
**paying (1)**
123:12
**payments (1)**

121:15
**Pearson (1)**
177:19
**peer (1)**
195:7
**people (23)**
15:20;56:5,11;
64:15;76:18;107:15;
120:11;147:21;
188:8;191:14;
193:15;195:14;
203:5;216:15,17;
217:11,15;218:20,
21,21;219:2;223:1;
232:12
**people's (1)**
94:9
**per (3)**
43:7;127:13;
169:13
**perceived (1)**
187:13
**percent (4)**
131:11;137:12,14,
15
**perception (3)**
211:16;218:12,12
**perform (3)**
43:14;45:6;52:11
**performed (3)**
37:19;41:16;45:21
**performing (1)**
49:9
**perhaps (1)**
73:16
**period (7)**
27:2,6;131:9;
162:15;195:2;
198:20;202:19
**Permanent (1)**
172:8
**permitted (1)**
14:11
**person (20)**
38:1;46:18;47:18;
51:18,21;53:15;57:7,
12;82:15;142:16;
146:15;162:19,20;
181:9,16;182:10;
185:18;188:3;204:1;
226:15
**personal (11)**
32:13;34:21;36:6;
43:10;49:21;53:5;
88:9;114:13,16;
150:3;193:8
**personality (10)**
116:10;142:19;
171:16;172:19,19,
20;181:13,19;
183:15;184:1
**personally (3)**
11:12;223:9;237:5

**personnel (13)**
44:19;61:13,16;
62:9;63:8,15;64:8;
65:2,9,11,18;66:3;
67:3
**persons (2)**
52:8;89:18
**person's (1)**
172:11
**phone (2)**
111:3,5
**photocopying (1)**
85:18
**photograph (1)**
53:11
**phrased (1)**
6:20
**physical (5)**
39:4,10;162:18;
173:11;186:3
**physically (1)**
40:21
**physician (20)**
32:14,20;33:13,14;
35:11;36:7,18;43:11,
14;45:6;50:13;51:4;
53:6;55:11,14;74:16;
78:14;150:3;153:12;
205:7
**physicians (5)**
34:9,13;45:11;
51:13;55:4
**Picking (1)**
105:7
**picture (6)**
48:2;53:16;143:2;
149:9;162:19;202:1
**pictures (1)**
41:1
**piece (2)**
160:21;170:15
**place (1)**
237:6
**placed (19)**
78:19;15:15;
117:6,11;118:17;
119:5;146:6,20;
147:21;148:20;
194:4,14;195:8,9,14,
19;196:14;201:1;
202:7
**places (1)**
232:18
**placing (5)**
145:17;146:10;
147:12;192:19;
217:14
**plaintiff (1)**
235:2
**plaintiffs (3)**
74:5;75:5;235:8
**plan (3)**
91:19;181:1,2

**play (1)**
229:10
**please (36)**
6:20;8:14;16:11;
24:5,18;71:3;79:21;
80:7;82:16;86:8;
95:7;100:2,4;107:2;
110:4,6,20;112:15;
120:6,19;129:17;
130:3;132:9;135:4;
138:16;150:8,10;
152:16;197:5;
199:18;206:6;214:6;
228:3;229:13;230:8,
13
**Plus (3)**
217:3;218:15,16
**pm (1)**
235:15
**point (24)**
8:16;35:14,18;
54:15,18;66:13;93:2;
104:7;120:10;
128:10,14;130:16;
142:21;151:5;
161:11;162:20;
164:8,14;180:17;
185:16,18;215:9,11;
226:2
**poorly (1)**
6:20
**populations (1)**
195:10
**portray (1)**
222:20
**position (1)**
56:3
**poss (1)**
146:18
**possible (8)**
47:1;116:10;
133:2;135:19;136:2;
162:11;185:4;201:16
**possibles (1)**
134:9
**possibly (2)**
16:3;73:20
**postal (2)**
132:19;133:11
**posttraumatic (4)**
103:19;104:2,5;
138:3
**posture (2)**
133:1;134:7
**potential (7)**
32:2;39:17;44:16;
47:5,15;223:4;
233:12
**practice (17)**
10:19;16:10;
18:14;19:5,14;41:5;
49:8,11;50:12;51:7,
13;67:16,18;94:14;

136:3;137:13;142:13
**practices (1)**
45:18
**practitioner (1)**
37:7
**precipitate (1)**
44:17
**predominant (1)**
138:5
**predominantly (1)**
46:7
**preliminary (1)**
127:9
**preparation (2)**
25:18;26:18
**prepare (1)**
130:10
**prepared (2)**
60:9;128:19
**preparing (1)**
128:15
**preschool (1)**
162:6
**prescribe (1)**
114:18
**prescribed (3)**
114:6;115:13;
200:3
**present (3)**
51:4;95:15;169:13
**preservation (1)**
21:6
**preserved (1)**
21:3
**presumably (1)**
77:19
**presume (4)**
35:10;84:14,14;
185:3
**presuming (1)**
23:11
**presumption (1)**
27:14
**pretty (2)**
11:2;37:11
**Prevention (1)**
109:11
**previous (1)**
127:21;131:7
**previously (5)**
61:19;70:15;84:2;
114:10;194:2
**primarily (1)**
183:14
**print (3)**
11:15;97:11;
114:20
**printed (5)**
10:20;15:5;97:15;
99:10;100:8
**printout (10)**
98:8;99:7;101:10;
107:3,7;109:10,13;

U.S. EEOC, et al. vs
Rite Aid Corporation

Michael K. Spodak, M.D.
November 13, 2009

175:14;178:2;186:14
**prior (13)**
    15:21;25:14;
    27:18;61:20;80:14;
    103:13;104:14;
    140:5;189:1,6;224:5;
    228:11,17
**prioritization (1)**
    213:9
**priority (2)**
    210:5;212:18
**private (1)**
    136:3
**probably (31)**
    21:19;22:20;23:9;
    27:7;29:21;41:4;
    52:2;57:8;60:21;
    71:16;88:16;92:3,7;
    104:17,19;108:6;
    149:2;153:14,17;
    154:2;174:12;178:6;
    208:16;209:8;217:1;
    220:13;221:20;
    222:16;223:6;
    227:19;228:18
**problem (3)**
    195:15;205:3;
    226:7
**problems (9)**
    46:20;138:6;
    157:6;162:18;
    171:17;186:12,16;
    195:18;200:12
**procedure (12)**
    12:13,15,21;13:2,
    6;15:4,19;16:1;18:1;
    43:13;136:11;143:12
**procedures (1)**
    140:14
**proceed (2)**
    7:15;83:14
**proceedings (1)**
    237:11
**process (22)**
    17:9;128:3,14,19;
    138:19;140:17,18;
    142:8;144:2;151:3;
    152:21;153:9,13;
    160:20;163:18;
    171:20;172:4;
    181:17;195:19;
    196:13;219:9;226:17
**produce (4)**
    20:20;82:10;
    176:7,16
**produced (15)**
    10:13;12:4;13:13;
    19:10,18;20:1;23:20;
    80:18;81:13,14;82:5,
    7;156:1;172:10;
    231:7
**product (2)**
    117:1,2

**production (7)**
    13:15;14:2,3,21;
    15:6;83:4;176:13
**profession (1)**
    100:9
**professional (5)**
    35:1;91:1;114:17;
    137:9;138:11
**professionalism (1)**
    215:10
**professionals (1)**
    152:21
**profile (1)**
    183:21
**profiles (1)**
    201:16
**program (2)**
    122:5;186:21
**prolonged (2)**
    198:17,20
**promotion (4)**
    74:21;78:17,18;
    79:9
**promotions (1)**
    76:9
**prompted (2)**
    87:16;103:12
**proper (2)**
    11:16;151:13
**protected (1)**
    175:17
**protocol (1)**
    14:12
**provide (27)**
    12:5,6;15:9;27:18;
    28:11,17,19;29:6,8;
    30:14,15;32:11;40:5,
    9;58:7;60:2,6;70:8;
    71:19,20;73:2;90:9;
    123:11,15;174:4,14;
    186:7
**provided (58)**
    9:10,17,20;10:7,
    17,21;11:3;15:12;
    17:7;20:16,17;22:10;
    26:5;32:8,9,19;34:9,
    15;37:6;39:6,16;
    41:19;42:3;44:6;
    61:13;62:3;70:11,15;
    71:9;72:14,21;73:6,
    8;77:1,2;80:14,17;
    84:17;85:4;87:2;
    97:17,20;101:11;
    102:7,13;110:5;
    111:15;112:2;
    113:12;123:9;131:5;
    174:12,18;177:16;
    196:20;207:8;209:6;
    231:10
**provides (1)**
    181:18
**providing (12)**
    9:12;15:17,20;

41:7;44:16;89:16;
    90:2,11;93:16,18;
    183:21;235:5
**prudent (1)**
    202:21
**psychiatric (13)**
    38:19;39:9,12;
    46:13;48:6,11,19;
    53:13;139:9;142:14;
    143:12;173:11;
    216:20
**Psychiatrist (7)**
    5:7;91:5,9;93:8;
    150:9;153:9;159:6
**Psychiatry (15)**
    36:1;39:11;40:6;
    43:4;46:5,8;49:4;
    135:12,21;136:3;
    137:11,15,18;
    152:10;159:12
**psychological (7)**
    25:12;80:1;139:1,
    4;175:7;185:11;
    202:9
**psychologist (2)**
    159:7;225:4
**psychology (1)**
    159:12
**psycho-pharmaceutical (1)**
    40:1
**psychosis (2)**
    200:12;201:16
**psychosocial (2)**
    186:11;187:11
**Psychotherapist (1)**
    159:20
**PSYT (1)**
    25:12
**public (3)**
    203:2;237:3,19
**publication (2)**
    106:11;146:2
**publications (3)**
    136:8,12,20
**published (3)**
    152:7;212:21;
    228:1
**punish (1)**
    180:20
**purpose (10)**
    44:1,2;46:3,10;
    77:21;130:9;141:9;
    142:7,10;235:7
**purposes (1)**
    32:15
**pursuant (1)**
    13:10
**pursued (1)**
    177:3
**put (19)**
    11:16;16:3;
    113:18;119:3,4;
    123:7;127:1;157:10;

161:10;165:4,8;
    177:21;179:2;182:1;
    192:8;196:21;
    200:17;218:13;
    219:17
**puts (2)**
    161:1;219:3

**Q**

**QD (1)**
    169:13
**qualifications (3)**
    55:14;56:18,20
**qualified (12)**
    40:16;55:19,19,20;
    56:2,2,4,14;57:8,12,
    13;121:6
**quash (1)**
    176:21
**questionnaire (2)**
    172:16,21
**quickly (2)**
    105:9;230:7
**quite (1)**
    32:16
**quote (1)**
    63:14
**quotes (1)**
    157:10

**R**

**radiology (1)**
    135:12
**raises (1)**
    36:17
**raising (1)**
    215:9
**range (1)**
    225:20
**Rather (2)**
    187:19;211:9
**raw (2)**
    223:18,20
**read (25)**
    15:15;16:16;
    54:19;55:1;89:2,4;
    103:2;109:21;
    111:20,20;117:15;
    150:18;151:4,7;
    155:1;163:17;
    181:10;207:6;224:1,
    4,13;228:16;229:9;
    234:14;236:3
**reading (7)**
    42:9;103:13,15;
    104:14;107:18;
    155:6;167:14
**reads (1)**
    151:9
**ready (1)**
    66:16

**real (3)**
    159:5;163:9;
    205:12
**realize (2)**
    66:18;150:14
**really (18)**
    17:15;37:9;46:7;
    52:4;56:12;76:3;
    112:1;148:16;
    151:18;179:5,18;
    185:10;218:8;
    220:10,13;224:17;
    225:13,14
**reason (16)**
    6:20;7:1,8,12;
    35:10;44:4;49:14;
    109:19;127:1;
    141:17;150:16;
    205:8;213:19;214:4,
    15;223:6
**reasonable (5)**
    36:21;50:19;57:9;
    145:17;229:19
**reasonably (1)**
    202:21
**reasons (6)**
    22:5;50:12;148:1;
    183:19;206:14;214:1
**recall (22)**
    15:18;21:17;22:9,
    12;29:10;65:3;82:8;
    85:2;97:19;107:16;
    108:2,5,13;133:14;
    134:6;170:1;171:13;
    173:1,2;174:16;
    178:4;229:7
**receipt (1)**
    16:12
**receive (4)**
    62:8;72:6,7;
    117:20
**received (14)**
    10:4;30:12;62:12;
    69:6;80:5;81:16;
    83:16;84:14;102:14,
    20;122:9,11;123:1,8
**receiving (4)**
    83:20;122:3,18;
    123:19
**recitation (1)**
    185:17
**recognize (1)**
    67:13
**recognized (3)**
    145:21;147:19;
    233:12
**recognizing (1)**
    223:3
**recollection (5)**
    22:3;75:13;88:1;
    225:9;228:13
**recollections (1)**
    162:2

U.S. EEOC, et al. vs
Rite Aid Corporation

Michael K. Spodak, M.D.
November 13, 2009

**recommended (1)**
36:2
**record (31)**
6:15;24:15;25:9,
14,17;59:18,19;64:3;
80:10;87:6;98:1,16,
20;99:3;110:6;111:9,
10,21;115:3;124:1;
189:12;199:1,10;
214:8;227:10,13;
234:16;235:1,10;
236:5;237:11
**recorded (1)**
237:10
**records (28)**
5:9;25:19;26:5,17;
32:7;50:21;51:1,5;
64:7;67:3;80:5;
81:16;83:18;84:3,21;
85:20;87:9;101:8;
118:19;123:15,17;
124:6;186:2;196:19,
19;197:3;198:9;
228:14
**recurrent (1)**
104:8
**refer (3)**
125:10;158:2;
192:8
**reference (6)**
94:20;95:20;
96:14;105:21;
152:16;224:13
**referrals (1)**
138:1
**referred (2)**
24:3;138:6
**referring (7)**
19:21;63:6,7;
116:1;192:6;204:20;
233:16
**refers (2)**
13:8;113:13
**reflected (3)**
19:17;27:15;28:7
**refresh (1)**
75:12
**refuse (1)**
207:17
**refused (4)**
192:4;204:9;
205:10;207:4
**refusing (1)**
14:7
**regard (77)**
15:19;16:19;18:8;
19:19;21:5;24:19;
25:4;36:21;42:17;
43:20;48:10;49:7;
52:15,19,21;55:15;
57:16;59:20,21;
63:16,16;69:13;
70:12;76:3,4,11;

78:2,7;79:3,5,8;
89:18;94:1;99:15;
110:1;119:1;122:8,
13;123:12;126:15;
128:4;135:9;136:16;
137:17;139:7;
140:17,19;144:8;
147:10;148:10;
161:20;163:1,3;
173:19;174:1;182:5;
184:7,13;188:20;
190:5,8,10;192:12;
194:4,19;198:4,6,8,
11,12;208:8;212:6;
225:1,6;227:5;
234:21;235:3
**Regarding (6)**
99:6;231:10,10;
232:1;234:1;235:8
**regime (2)**
201:12,14
**regular (2)**
122:4;159:3
**regulations (3)**
89:17;90:10,18
**Rehabilitation (1)**
132:11
**rejected (2)**
178:16,18
**relate (1)**
83:2
**related (7)**
48:11;56:16;
65:14;66:5;70:8;
138:6;151:1
**relating (2)**
36:13;107:15
**relationships (1)**
162:5
**release (1)**
203:20
**relevance (4)**
143:6;144:5,6;
149:3
**relevant (4)**
65:4;66:15;
144:10;151:3
**reliable (4)**
32:14;33:12;53:4;
60:21
**relied (1)**
66:14
**relief (1)**
76:2
**relieved (2)**
217:12;218:21
**rely (5)**
33:12;53:3,4,5;
187:3
**relying (5)**
37:5;43:5,7;69:12,
14
**remain (1)**

55:3
**remainder (1)**
200:18
**remedies (1)**
75:16
**remember (3)**
16:15;108:13;
133:1
**remembered (2)**
71:18;131:19
**remind (1)**
73:13
**removed (1)**
116:19
**render (3)**
28:6;104:15;
148:20
**rendered (14)**
34:19;35:17;
55:16;85:9;92:12;
121:11,12;123:4;
124:8;144:9;225:14;
229:11;231:9;234:20
**rendering (31)**
33:9,11;35:1;
42:20;48:4,15;86:18;
91:11;118:21;
122:17;144:3,13,20;
163:18;167:12;
170:7;178:13,16;
188:15;189:2;194:3,
8;197:3;198:5,11;
207:9;224:5;227:5;
233:7,9,21
**renewed (2)**
86:16;89:10
**repeat (2)**
7:2;191:2
**rephrase (2)**
39:5;174:9
**report (89)**
15:10,13,15;16:2,
6,11;17:2;20:6,12,
12;21:5;25:18;
26:18;27:9,12,15;
28:7,9,13,18;29:5,9;
31:2;42:5;62:6;
69:19;70:17;75:12;
76:14,15;81:20;83:9;
85:9;86:12,16;87:10,
12;100:6;102:21;
113:11;117:7;
122:14;125:4,10,12,
18;126:4;129:13;
130:13,21;137:7;
138:15;139:16,17;
150:1,3;174:15;
177:9,13;178:4,13,
15;179:3,8;180:7;
182:18;184:13;
186:13;188:16;
189:2,6,11,14,15;
199:21;200:2,20;

206:1,17;224:5,6;
228:11,17;231:7,9,
15;234:19;235:5,9
**reported (4)**
89:7;116:15;
147:18;216:8
**reporter (1)**
89:4
**reporter's (1)**
7:19
**reporting (2)**
88:17;204:5
**reports (10)**
12:1;15:20;34:8;
45:11;61:20;66:7;
207:1;220:17;
223:16,17
**represent (4)**
23:20;24:20;67:9,
15
**representation (1)**
156:3
**represents (1)**
218:20
**reprint (1)**
149:21
**request (30)**
11:21;12:5,12;
13:1,14;14:14;16:14;
17:1;21:7;22:4;
32:12,19;33:19,20;
34:9;44:18;47:17;
60:20;70:12;71:20;
76:2;80:11;136:15;
139:20;140:1,2,6,7,
10;152:3
**requested (10)**
21:18;23:12;
30:20;35:8;49:15;
73:14;77:18;89:4;
176:12;234:18
**requests (2)**
37:3;84:18
**require (4)**
12:18;13:3;
136:12;206:11
**required (1)**
45:1
**requirement (1)**
95:14
**requirements (3)**
36:20;38:4;232:14
**requires (1)**
47:16
**re-reviewed (1)**
128:5
**residencies (2)**
135:9,11
**residency (3)**
40:11;135:20,21
**resides (1)**
15:1
**residing (1)**

17:7
**respect (1)**
81:6
**respond (1)**
147:7
**responded (1)**
77:13
**response (9)**
9:12,21;23:21;
81:16;84:18;95:11;
104:21;157:4;181:3
**responsibilities (1)**
38:13
**responsibility (6)**
50:7;86:11;87:10,
12;100:5;159:17
**responsible (2)**
91:3;212:17
**responsive (11)**
10:17;11:7,11;
12:3;13:13,16;14:9,
21;21:1;80:10,12
**rest (3)**
25:4;106:14;184:5
**restate (1)**
6:21
**restricted (4)**
14:1;29:1;44:3;
190:15
**restricting (1)**
220:7
**restriction (7)**
52:15;54:3;79:8;
97:12;216:3,4;
217:12
**restrictions (9)**
50:4;58:4;78:14,
19;96:16;104:11;
191:21;216:15,16
**result (17)**
59:10;69:8;75:1;
78:16;85:13;104:4;
127:20;137:21;
138:9,12;148:6;
149:11;193:7;194:5,
15;210:9;222:3
**resultant (1)**
195:11
**resulted (5)**
69:18;103:14;
190:2,16;192:20
**results (6)**
146:13;176:6;
182:10,14;184:10;
185:2
**retained (6)**
15:21;20:9,10;
39:7;91:4;174:4
**retaining (2)**
28:11;60:2
**retaliated (1)**
211:17
**return (7)**

U.S. EEOC, et al. vs
Rite Aid Corporation

Michael K. Spodak, M.D.
November 13, 2009

68:2;86:4;100:16;
112:12;119:9;
197:19;204:16
reused (1)
20:10
revealed (2)
83:9;123:21
review (42)
8:14;18:4;25:9,14,
17;26:17;45:2;
62:13;63:2;64:20;
68:19;69:5,17;73:18;
74:7,11;76:13;81:15;
85:5,14;95:3;128:8;
131:13;134:19;
149:16;150:8,8,12;
161:11;164:13;
165:16;167:11;
174:17;188:16;
192:21;199:10;
212:19;227:15;
228:16,18,21;229:1
reviewed (37)
34:8;41:13,15,18,
19;42:3,20;43:1,8;
44:5;60:10;61:16;
67:12;73:19;74:8;
81:21;82:8;83:12;
84:10;118:19;
123:17;124:5;
133:17;139:15,16;
163:13,17;168:3,20;
170:6;188:20;189:1,
6;195:7;199:1;
223:12;225:10
reviewing (7)
19:7;69:8;100:1;
109:5;114:3;115:7;
127:20
Revised (17)
5:4;9:16;32:7,8;
79:17;113:12;
124:17,17;125:14;
128:11,18;129:6,7,
18;130:2,18,18
revising (1)
128:4
revision (3)
113:15,16;125:3
revisions (2)
113:14;127:19
rewrite (1)
153:15
ridiculous (1)
14:20
right (40)
15:2;35:20;49:4;
52:17;59:15,17;
63:11;68:14;69:3;
70:13;79:7;82:12;
83:14;98:2;100:10;
101:6;105:13;
108:12;122:16;

129:19;140:6;
147:11;160:4;161:8;
163:19;165:1;
167:19;168:12;
175:12;176:19;
177:15,18;182:19;
186:7;191:8;194:11;
198:3,18;233:18;
234:7
right-hand (1)
154:6
rise (2)
190:21;191:4
risk (3)
210:4;213:10;
233:12
risking (1)
94:9
risks (1)
223:4
risky (1)
86:19
Rite (75)
10:1;15:10,16;
21:7;22:7;23:21;
26:12;28:11;29:5,12,
20;41:6,13,15,17;
60:1,2,19;61:3;
64:15;70:9,16;73:21;
75:19;76:11;77:5,8;
78:1,6,12,21;87:2;
88:13;92:1;95:14;
96:6;99:12;104:10;
119:2,9,15;121:16;
122:4,9,19;123:6,11;
167:5;192:9;196:20;
204:8,16;205:12;
207:10;208:3,9;
212:4,10;213:2,6,13,
20;214:4,16;215:4;
220:7;221:14;222:4,
8;224:9;226:5;228:4,
8;229:2;232:13
road (1)
95:1
role (3)
55:3;226:10;
229:11
room (2)
96:21;103:21
rotation (1)
135:21
Rothschild (117)
8:15,19;9:1,5,10;
10:7,9,17;11:3;12:6,
8,11;13:18;14:10,16;
15:3;16:21;20:17,18;
23:1;27:2;30:1;
31:11,20;32:1;53:2;
60:8;61:9,11;62:9,
18;63:4,10,19;64:2,
6,10;66:4;67:10;
68:21;70:8;71:19;

72:8,16;73:2;77:16;
80:19;81:2,4,6,9;
82:1,6,15,19;84:1;
88:15;90:4,7,16;
92:3;93:12,17;97:1,
17;98:3,6,21;101:2,
5;107:1;112:15;
113:18;114:1;
117:21;118:7,10;
120:5;121:17;124:1;
130:7;136:18;137:5;
150:20;151:5,11,15;
153:5;155:3,15,17;
176:3,15;189:18;
191:2;194:9;197:4,8,
12,17,21;199:17;
204:19;206:16;
212:11;213:15;
214:3,7,11,21;215:6;
221:5;222:2;225:19;
231:4;234:13;235:14
Rothschild's (1)
29:14
route (2)
177:1,1
routine (4)
16:2;19:14;37:11;
45:13
routinely (3)
40:5;85:3;89:14
Rowekamp (14)
41:21;60:14,20;
64:16;117:10,18;
199:14,15;200:16;
207:12;208:5;223:2,
8,13
Rowekamp's (4)
61:6,14,20;67:16
RPR (1)
237:18
Rule (8)
13:8,9,10;14:4;
80:11,12;83:7;91:12
rules (8)
6:13;7:14;12:13;
13:19,20;127:8;
132:1;136:11
rungs (1)
226:21
running (1)
200:10
RX (1)
96:12

**S**

sadness (2)
222:15,17
safety (1)
33:15
same (19)
24:9;36:4,18;
42:11;58:2;68:9;

69:20;106:1;109:19;
112:18,21;160:15,
17;170:8;192:18;
197:16,17;215:19;
236:4
sanitized (1)
34:15
satisfied (1)
14:11
save (4)
18:13,14,18;19:3
saved (3)
18:7;19:16;193:4
saves (2)
18:16;19:3
saw (14)
61:5;72:9;119:8;
161:14;164:2;170:9;
179:21;180:17;
199:14;200:14;
204:7;224:4,8;234:1
saying (9)
20:3;22:12;132:3;
195:8;198:9;201:11;
206:5,6;221:16
scale (6)
169:17,18,21;
181:15;182:9;183:21
scales (1)
184:6
schedule (2)
5:10;220:9
schizophrenic (1)
138:4
school (2)
162:9,16
SCID (1)
173:2
S-C-I-D (1)
173:2
science (6)
159:13;160:1,2,3,
4,5
SCLR90 (1)
182:17
scope (13)
23:12;45:4;47:8;
52:5;90:21;91:2,8;
104:20;152:10;
189:21;190:5;191:7,
10
scoring (1)
187:19
scraps (1)
19:12
scratching (1)
73:20
screening (1)
180:8
se (1)
43:7
seal (1)
237:15

search (2)
54:20;97:21
seated (1)
6:10
second (23)
22:13;23:14;50:7;
74:15;75:2;76:8;
78:11,17;79:9;
102:12;113:15;
126:11;129:6;141:3;
156:8;164:2;197:11;
210:14;216:3,13;
217:4,8;235:6
secondary (1)
54:13
Secondly (1)
196:6
secretary (2)
11:13;18:2
section (2)
100:19;135:5
Security (1)
172:8
seeing (5)
53:10,11;97:19;
125:8;223:3
seeking (2)
66:11;75:16
seemed (5)
88:19;179:15;
181:5;220:6,21
seems (3)
191:15;205:11;
206:1
segregate (1)
196:2
seizure (22)
53:18;75:3;78:15;
79:2;86:13;87:8,11;
88:18;89:11,18;95:2;
97:9;107:21;198:16;
199:2,9,11,12;
200:15;201:7;
202:13;217:11
seizures (14)
64:12;65:13;66:6;
86:18;89:8;196:3;
201:11;202:14;
210:9;211:4;221:2,2,
3;222:7
select (1)
31:20
Selectric (1)
18:20
self (1)
182:18
self-administered (1)
181:9
self-confidence (1)
218:14
self-esteem (2)
218:14;219:12
self-evident (1)

203:15
self-explanatory (1)
 156:10
self-standing (2)
 130:13,16
sell (1)
 100:11
semiconscious (1)
 211:11
send (15)
 9:2;12:17;16:2,6,6,
 14;22:11;37:4,19;
 38:1;63:14;64:6,18;
 66:15,21
sending (3)
 15:21;84:20;99:20
sense (9)
 53:14;54:9;57:17,
 18;150:5;176:11;
 203:1;217:3;219:9
sent (16)
 9:7;10:6,20;16:16;
 21:2;63:9,21;64:1;
 67:10;68:21;69:2;
 84:6,8;85:6;100:7;
 228:15
separate (4)
 84:5;209:6;212:2;
 236:8
September (2)
 102:16;111:12
serious (1)
 203:10
seriously (1)
 202:12
serve (1)
 142:10
served (4)
 8:6,10;14:20;
 80:13
serves (1)
 141:2
service (2)
 132:19;133:11
Services (1)
 67:16
set (13)
 24:3;29:15,16;
 105:3;129:4;149:2,
 12;158:6;166:9;
 169:3;172:17;174:8;
 237:6
setting (6)
 40:20;57:11,13;
 58:13;214:1,20
settings (1)
 159:17
seven (1)
 221:8
seven-page (3)
 113:15;130:2;
 151:20
several (3)

49:20;169:13;
 211:7
severity (4)
 88:20;202:13;
 220:11;221:3
sexual (1)
 132:14
share (3)
 32:10;48:1;155:5
shared (1)
 21:10
sharing (1)
 15:20
sheet (19)
 23:7;29:13;72:17;
 80:21;81:19;82:11;
 83:11;85:21;113:19;
 165:11;166:19;
 171:1;173:8;175:10,
 19;176:8;181:11;
 187:18;236:8
sheets (8)
 65:21;80:10,20;
 83:5;172:11;173:4,7,
 16
shop (1)
 31:17
short (3)
 124:12;189:10;
 218:7
shorthand (1)
 117:7
shortly (1)
 167:4
short-term (31)
 115:15;117:6,14,
 20;118:3,18;119:19;
 145:18;146:11,21;
 147:13;148:1,21;
 192:14,20;194:5,14,
 21;195:9,10,14,20;
 196:4,7,14;201:2;
 204:18;205:6,20;
 216:6;217:16
show (7)
 42:5;105:20;
 166:18;182:15;
 184:10;196:7;231:8
showed (3)
 61:8,9;140:7
showing (1)
 65:14
shown (1)
 83:15
shows (1)
 196:10
sick (1)
 36:11
side (14)
 39:17;47:5,5;
 114:4,8,21;115:17;
 116:9;182:1,1;200:5;
 201:15;215:3;233:12

sign (5)
 204:17;206:4,6;
 207:4;234:14
significant (3)
 209:5,10;210:12
signs (1)
 198:18
similar (1)
 104:16
simple (3)
 17:3;36:10;97:14
simplify (1)
 78:5
simply (6)
 12:17;13:4;16:6;
 35:11;186:1;216:17
single (2)
 214:6,15
sister (1)
 210:15
sit (2)
 149:2;227:3
site (4)
 87:7;107:4;109:2;
 114:7
sits (1)
 151:9
situation (7)
 36:16;43:15;44:8;
 45:4;70:9;94:12;
 163:4
sleepiness (1)
 200:8
slightly (1)
 39:21
slip (1)
 36:11
small (1)
 170:15
smoking (1)
 127:13
snapshot (3)
 142:21;183:9;
 193:11
Sober (1)
 99:5
social (3)
 159:9,12;172:8
software (4)
 177:20;185:3;
 187:2,3
sole (2)
 227:1;232:3
somebody (10)
 12:1;51:17;59:10,
 12;107:20;148:20;
 196:2;217:6;219:3,
 13
somehow (2)
 196:4;232:13
someone (38)
 12:18;21:19;28:2;
 37:12;39:15;47:17,

19;48:1;56:10,15;
 95:15;103:20;134:6;
 136:4;141:19;142:5;
 146:10;147:3,13;
 183:4;184:3;186:1,2;
 193:5,13;202:1;
 207:15;210:8,19;
 217:4,9,10,14;218:6;
 219:9;223:2,5;232:7
someone's (3)
 38:13;93:1;143:14
Sometime (1)
 73:15
Sometimes (9)
 45:7;47:16;54:11;
 66:17;67:1,2,2;
 163:7,8
somewhere (3)
 79:10;117:15;
 221:10
sorry (27)
 9:6;29:17;33:2;
 41:14;61:9;63:7;
 65:2;87:2;89:2;
 101:12;102:3;
 110:14;116:2;119:3;
 130:1;136:8;145:2;
 153:21;155:16;
 161:16,18;169:9;
 190:13;196:16;
 197:14;206:18;211:1
sort (24)
 18:12;39:21;
 45:18,18;53:8;97:21;
 104:3,3;116:13;
 130:13;148:16,17;
 157:21;163:14;
 166:16;167:2;
 174:20;186:5;
 195:17;201:8;
 203:10;205:15;
 219:8;229:10
sound (1)
 202:1
sounded (1)
 205:3
sounds (1)
 199:5
source (5)
 54:5;92:18;
 181:21;205:4;227:1
sources (4)
 92:17;172:6;
 220:21;221:4
Span (1)
 173:9
speak (12)
 7:16;45:5;46:7;
 89:19;95:7;124:2;
 129:2;171:18;
 187:21;203:20;
 204:1;205:18
speaking (1)

49:21
speaks (2)
 91:15,16
specialization (4)
 37:20;40:6;
 137:16,19
specialized (1)
 159:14
specialties (2)
 135:6,8
specific (12)
 35:4,15;37:8;
 52:14;54:18;56:14;
 133:7;137:16;152:2;
 162:21;193:6;209:19
specifically (22)
 8:11;13:20;20:14;
 22:9;43:2;66:8;
 75:10;85:2;90:8;
 104:21;107:16;
 108:2;121:12;
 132:17;133:14;
 134:6;167:4,7;174:2;
 196:7;221:18;222:12
specificity (1)
 43:6
speed (1)
 158:14
spend (1)
 166:18
spending (1)
 83:1
spendthrift (1)
 193:4
spent (1)
 25:10
split (1)
 230:18
splitting (1)
 141:6
SPODAK (51)
 5:2;6:3,8,8:17;
 13:4;14:8;15:4,9;
 21:7,13;23:17;24:13,
 16,18;59:20;63:7,14;
 64:5;67:7;68:15,17;
 70:21;73:5;83:15;
 85:21;86:5,8;100:21;
 101:8;106:20;
 112:16,18;115:5;
 124:13,16;125:16;
 129:14;131:2;
 134:15;149:13;
 151:4;155:19;
 189:13;196:17;
 221:13;230:11,15;
 231:2,6;235:8;
 236:13
Spodak' (1)
 235:13
Spodak's (3)
 5:6;13:16;112:14
spoke (11)

U.S. EEOC, et al. vs
Rite Aid Corporation

Michael K. Spodak, M.D.
November 13, 2009

21:16,17,19;22:4;
  29:12;64:9;66:4,9;
  92:5;203:16;204:3
**spoken (2)**
  23:2;223:8
**stable (1)**
  210:21
**staff (2)**
  141:12;170:4
**stairs (1)**
  201:19
**stamped (1)**
  68:5
**standalone (1)**
  148:13
**standard (14)**
  7:21;10:19;16:10;
  18:1,14;19:5;27:21;
  65:9;142:13;143:11,
  11;169:21;171:19;
  172:3
**standardized (5)**
  141:13;172:17;
  173:16;181:13;183:2
**standards (1)**
  60:19
**standing (5)**
  16:18;161:21;
  162:1;163:9;214:9
**stands (2)**
  14:15;173:3
**start (4)**
  36:8;66:16;156:8;
  198:14
**starting (7)**
  24:17;71:6;166:9;
  167:21;170:14;
  173:7;224:14
**starts (2)**
  36:7,7
**state (14)**
  24:15;80:9;98:16,
  19;99:6;111:6;
  132:12;173:8;
  210:21;211:11;
  235:1,9;237:1,4
**stated (15)**
  28:12,17;29:4;
  42:16;52:19;59:21;
  89:9,13;93:15;
  150:13;155:12;
  188:16;194:2,12;
  225:12
**statement (7)**
  24:12,19;145:17;
  146:19,20;179:10;
  234:20
**statements (4)**
  24:2,6;123:10;
  192:21
**states (1)**
  224:9
**stating (2) —**

119:8;121:6
**status (10)**
  117:12,16;119:2,3,
  4,15;123:7;173:8,10;
  182:2
**statutes (1)**
  132:12
**stay (1)**
  219:2
**stenographically (1)**
  237:10
**step (2)**
  17:4;68:13
**still (3)**
  152:12;153:2;
  201:13
**stone (1)**
  149:7
**stool (6)**
  194:18;214:6,16;
  226:20,21;229:16
**stop (3)**
  97:10;126:15;
  127:18
**storage (2)**
  17:14;120:16
**store (1)**
  17:20
**stored (11)**
  11:19;12:12,13,18;
  13:1,2,12,16;17:12,
  13,17
**stress (12)**
  93:11,20,21;94:3,
  16;103:19;104:2,5;
  138:3;162:14;205:5;
  211:18
**stressed (2)**
  93:4;94:21
**stresses (1)**
  47:15
**stressor (7)**
  92:21;94:5,6,11;
  95:5;203:10;210:13
**stressors (6)**
  47:21;93:9;162:7,
  11;187:12;212:14
**strictly (3)**
  47:9;187:7;235:12
**strike (3)**
  119:21;123:21;
  233:8
**stroke (1)**
  126:12
**stronger (1)**
  212:1
**strongly (2)**
  178:11;179:19
**stuck (1)**
  112:10
**studied (1)**
  195:8
**studies (1)**

196:6
**stuff (1)**
  128:3
**style (1)**
  172:19
**subject (4)**
  13:19;33:9;90:3;
  235:12
**subpoena (24)**
  8:6,11;9:13,21;
  10:5,17;11:8,11;
  12:3,17;13:10,13;
  14:2,3,9,20,21;20:19,
  21;23:21;80:13;
  81:17;176:18,21
**subpoenaed (2)**
  175:20;176:12
**subpoenas (2)**
  11:18,19
**substance (3)**
  22:2;32:5;162:11
**substantive (2)**
  29:19;30:16
**substantively (1)**
  42:18
**subsumed (1)**
  231:12
**successfully (1)**
  46:21
**suffer (3)**
  138:8;214:18;
  218:6
**suffered (8)**
  22:6;23:16;78:20;
  92:17;148:6;174:19;
  190:20;191:4
**suffers (1)**
  209:20
**sufficient (1)**
  45:14
**suggest (1)**
  206:8
**suggested (1)**
  99:12
**suggestion (1)**
  216:20
**suicidal (2)**
  180:1,10
**suicide (4)**
  180:2,16,18;
  211:20
**suitability (2)**
  32:12,18
**summarize (1)**
  77:17
**summarized (1)**
  26:13
**summarizing (1)**
  139:6
**summary (1)**
  157:2
**superior (1)**
  53:11

**supplemental (3)**
  13:15;99:4;150:2
**supplementation (2)**
  235:4,9
**supplemented (4)**
  136:16;137:5;
  176:14;234:19
**support (2)**
  35:16;148:9
**supports (3)**
  34:18;35:15;54:15
**supposed (4)**
  12:13,15;94:9;
  112:3
**sure (38)**
  6:13;12:6;13:8;
  22:19;24:8;27:20;
  30:19;33:1;35:18;
  40:3;42:7;45:2;
  50:16,19;58:9;59:13,
  14;80:8;91:16;97:7;
  100:18;116:21;
  125:10;134:1,11;
  144:16;148:16;
  154:20;189:20;
  190:4;202:11;211:5;
  219:12;221:20;
  222:12;224:14;
  232:20;233:2
**surgery (1)**
  210:18
**surprise (2)**
  207:13,21
**Susan (2)**
  237:3,18
**suspect (1)**
  54:16
**SUT (1)**
  25:7
**switch (2)**
  70:1;219:14
**sworn (2)**
  6:4;237:7
**symbolically (1)**
  218:20
**symptomatic (1)**
  47:1
**symptoms (6)**
  174:19;182:19;
  183:5,6;198:18;
  204:5
**system (1)**
  12:19

## T

**table (21)**
  9:11;31:20;32:9;
  42:6,9;62:4,5;70:16;
  71:4;72:4;79:17;
  82:2,4;86:7;97:5;
  99:4;105:6;111:17,
  17;115:9;139:17

**talk (6)**
  83:5;151:15,16;
  191:18;192:5;227:10
**talked (5)**
  31:1;34:1;35:5;
  45:20;189:16
**talking (18)**
  18:10,19;32:17;
  39:10;43:16,18;46:5;
  48:21;49:16;51:3;
  93:21;116:13;129:7;
  158:3;220:19;221:4;
  224:21;225:2
**tape (2)**
  20:8,12
**taped (3)**
  20:10,13,16
**tasks (1)**
  173:16
**tease (1)**
  196:1
**teenager (1)**
  126:17
**Tegretol (3)**
  114:9,12;200:3
**telephone (2)**
  15:16;25:8
**telling (6)**
  43:8;96:14;177:5;
  217:3,9;220:18
**ten (2)**
  110:17;136:13
**tend (3)**
  54:10;137:21;
  171:15
**tended (1)**
  74:20
**terminated (13)**
  118:12;121:7,16,
  18;134:6;148:7;
  192:3;201:3,3;204:8;
  218:5;219:10,15
**termination (11)**
  121:13;186:17;
  191:20;192:7;
  207:11,18;212:10,
  12;218:10,18;219:8
**terms (9)**
  7:14;34:11;50:8;
  55:2;104:10;129:2;
  149:3;210:3;226:18
**test (29)**
  139:1,3,12;172:15,
  15,16;175:4,5,9,12;
  176:7;181:7,12,14;
  182:18,21;183:2,11,
  15,17,20;184:14,18;
  186:5,6;187:14,15;
  188:2,9
**tester (1)**
  186:6
**testified (5)**
  6:6;38:15;206:17;

U.S. EEOC, et al. vs
Rite Aid Corporation

Michael K. Spodak, M.D.
November 13, 2009

231:18;233:3
testify (3)
  7:8,12;132:4
testifying (3)
  129:18;130:20;
  141:3
testimony (16)
  5:5;52:21;65:12,
  14;70:6;105:1;131:6,
  9;133:17;134:11;
  163:13;199:16;
  227:4;231:10;
  235:13;236:5
testing (7)
  25:12;80:1;176:6;
  182:5;185:21;187:9;
  188:21
tests (5)
  139:4,10;175:7;
  184:8;187:4
textbook (2)
  148:3;196:10
Thanks (1)
  126:9
therapist (5)
  36:18;153:9;
  159:14,19;226:9
therefore (4)
  12:16;30:15;
  144:12;205:19
thinking (2)
  96:10;213:18
Third (2)
  196:9;210:17
Thomas (2)
  81:17;83:18
thoroughly (6)
  58:5,10,11,18;
  144:13;163:18
though (6)
  39:16;43:2;84:5;
  94:1;122:21;219:7
thought (10)
  60:13;66:15;
  86:19;87:18;88:15;
  130:15;178:19;
  208:5;212:13;230:6
thoughts (6)
  96:16;116:13;
  117:1,2;180:15,18
thousands (1)
  56:12
threatened (1)
  207:10
three (10)
  20:1,2;22:20;23:2;
  41:4;136:13;148:2;
  156:15;157:14;
  170:14
throughout (2)
  193:9;224:16
thumb (1)
  198:18

Thursday (1)
  83:16
thus (2)
  110:10;176:2
timeline (1)
  5:4
timeliness (1)
  235:3
times (10)
  23:3;34:14;41:3,4;
  45:15;111:5;210:10;
  211:5;215:16;221:21
titled (1)
  229:18
today (9)
  7:7;9:12;31:5;
  71:5;92:8;113:12;
  131:5;223:21;231:10
Today's (1)
  8:8
together (1)
  213:11
told (13)
  27:14;28:10,16;
  30:13;60:5;77:12;
  79:13;116:18;
  120:11;139:12;
  157:1;207:15;208:3
tone (1)
  215:7
took (3)
  25:13;112:7;197:2
top (10)
  19:18;35:19;
  54:21;55:7;158:3;
  160:11;161:1,10;
  168:17;169:10
Topomax (2)
  114:9,12
total (3)
  26:16;67:17;
  162:19
totality (1)
  226:19
totally (3)
  149:6;151:3;
  226:10
toward (2)
  79:1;179:11
towards (2)
  76:12;160:11
Trail (2)
  173:9,9
trained (2)
  141:12;158:13
training (1)
  159:11
traits (1)
  172:20
transacted (1)
  31:19
transcript (10)
  7:20;102:14,20;

103:2,13,15;104:15;
  236:4,9;237:10
transposed (1)
  187:18
traumas (2)
  142:16;162:6
treat (3)
  36:3;137:10,17
treated (6)
  56:11;135:15;
  136:4,6;138:8;148:5
treating (11)
  32:20;36:7,17;
  45:5,11;51:4;56:10;
  147:20;153:12;
  225:4;226:9
treatises (1)
  35:16
treatment (15)
  57:6,7;137:14;
  166:7;208:9;213:20;
  214:5,17;215:4;
  221:14;222:4,9;
  224:9;226:5;228:19
trial (1)
  131:9
tried (6)
  77:17;204:15;
  205:2;209:4;212:18;
  213:3
tries (2)
  162:18;226:21
trouble (1)
  167:14
troublesome (3)
  200:5;203:8;
  205:16
truck (1)
  127:17
true (5)
  90:19;182:11;
  223:3;236:5;237:11
trust (1)
  150:4
truth (3)
  6:5,5,6
try (12)
  27:11;36:2,5;55:2;
  78:5;131:12,21;
  150:3;158:2;173:12,
  13;226:11
trying (5)
  56:6;137:20;
  222:20;226:15,18
TUC (1)
  67:17
Tuesday (1)
  73:16
turn (12)
  24:5;96:2;120:18;
  122:14,14,15;135:4;
  137:6;138:16;
  189:11;206:4;227:21

Turning (7)
  135:18;138:15;
  165:10;189:13;
  200:20;208:19;231:6
turns (3)
  143:7,8;144:7
twice (1)
  65:10
twitching (1)
  198:17
two (32)
  20:20;22:20;27:7;
  50:5;55:18;73:4;
  98:13,14;113:14;
  125:21;127:13;
  130:19;132:18;
  133:21;134:9;
  136:14;141:7;
  147:20;165:9;
  169:12;172:5;
  180:10,11;195:10;
  196:19;207:1;
  215:16;230:8,18;
  231:4;232:12;233:16
type (19)
  18:2,6;19:12;
  27:21;36:16;40:1;
  45:19;146:11,12;
  147:14;148:3;
  158:14;183:5,8,9;
  210:5;212:1,15,21
typed (4)
  17:10;19:11,15;
  161:12
types (4)
  18:15;152:20;
  161:2;191:13
typewriter (11)
  17:11,14,19;18:9,
  12,20;158:21;159:3,
  4,5;161:2
typewritten (3)
  158:6,8;160:8
typical (2)
  198:18;230:21
typically (16)
  29:2;34:10,12;
  39:14;50:5;51:10;
  138:2;140:21;
  153:19;162:9;
  164:12,21;171:15;
  183:4;186:4;191:15
typing (3)
  21:4;158:15;
  160:17
typo (1)
  154:10
typographical (1)
  18:4

                U

unappreciated (1)

211:16
unaware (4)
  82:2,10;123:4;
  225:13
unclear (1)
  118:16
uncooperative (1)
  140:13
under (22)
  6:17;7:6;12:12;
  36:13;37:4;38:5;
  40:4;44:12;53:8;
  58:12;91:12;104:20;
  138:16;153:17;
  161:2;162:7;173:15;
  174:21;186:4,19;
  210:3;231:12
undergoing (2)
  26:8;54:1
underlying (1)
  195:18
understate (2)
  54:11;88:20
understating (1)
  202:12
understood (4)
  7:5;10:7;118:15;
  205:5
undertook (1)
  140:14
underwear (1)
  211:7
underwent (2)
  115:19;222:6
unemployed (1)
  100:11
unemployment (1)
  186:18
unfair (1)
  214:11
Union (2)
  81:17;83:18
University (1)
  42:7
unless (1)
  232:7
unpredictable (1)
  209:11
unqualified (1)
  208:6
unquote (1)
  63:15
unresponsive (1)
  198:20
unsafe (1)
  74:17
unusual (4)
  37:15,18;149:12;
  211:9
up (34)
  12:20;18:2;22:13;
  23:14;49:20;74:15;
  75:2;86:9;87:14,16;

95:7;97:8,12;99:13;
  105:7;110:18;
  127:13;128:8;136:8;
  140:8;141:6;143:8;
  144:7;149:2;154:14;
  161:2;182:3;188:13;
  200:21;207:17;
  211:8;219:12;
  227:11;230:18
upon (5)
  16:11;41:16;43:5;
  58:4;80:13
upsetting (1)
  181:3
Urgent (1)
  67:17
use (5)
  141:15;171:19,21;
  176:9;187:5
used (4)
  19:12;170:1;
  183:14;188:2
useful (2)
  44:19;187:19
using (3)
  158:20;183:3;
  214:7
usually (3)
  34:15;104:4;141:8

**V**

vacuum (1)
  222:19
valid (3)
  32:14;58:7;183:21
validity (5)
  55:16;181:15;
  182:9;183:20;184:6
value (3)
  35:12;204:10;
  226:12
variety (1)
  148:1
various (20)
  22:7;25:5;30:19;
  36:14;53:18;54:1;
  60:11;84:18;100:5;
  114:4;156:6,7;173:4;
  190:1,16;201:15;
  207:15;211:3;
  224:10;228:20
verbal (1)
  188:9
verbatim (3)
  157:4,10,11
verify (2)
  150:9;230:8
verifying (1)
  63:20
version (4)
  15:13;132:12;
  169:18;170:1

versions (2)
  20:1,2
versus (8)
  32:12,19;52:1;
  55:4;56:5,9;150:3;
  195:9
view (2)
  80:19;142:20
violent (1)
  116:13
virtually (1)
  195:1
vision (1)
  200:9
visit (1)
  53:10
visited (1)
  38:3
voice (1)
  215:9
voluntary (2)
  147:9,13

**W**

wait (3)
  7:17,18;229:21
waiting (1)
  137:3
waiving (1)
  235:2
walk (3)
  25:3;71:6;96:11
walking (2)
  79:18;97:5
warehouse (1)
  120:16
way (27)
  7:20;15:18;16:15;
  79:1;82:7;85:10;
  103:5,9;108:2;
  123:10,15;140:13;
  141:16;164:10,11;
  181:21;183:4;
  186:14;187:11;
  188:6,12;199:5;
  214:14;219:16;
  228:2;235:2;237:13
weakness (1)
  200:8
wealth (1)
  193:8
Web (4)
  87:7;107:4;109:2;
  114:7
Wednesday (1)
  102:16
week (6)
  73:15;92:7,8;
  124:21;128:11;
  169:13
weekend (1)
  125:2

weeks (1)
  194:1
weight (2)
  198:10,13
welcome (1)
  175:18
well-validated (1)
  181:14
weren't (2)
  19:16;82:7
what's (8)
  36:2;48:2;57:6;
  105:18;129:12;
  197:4;206:21;217:17
whatsoever (1)
  216:11
wheel (1)
  94:11
whenever (1)
  37:2
Whereupon (21)
  6:2;8:17;23:17;
  67:7;68:15;70:21;
  86:5;100:21;106:20;
  112:16;115:5;
  124:13;125:16;
  129:14;131:2;
  134:15;149:13;
  155:19;196:17;
  230:11,15
whole (7)
  6:5;12:20;151:7;
  209:10;225:11,18,20
who's (4)
  38:3,3;49:9;
  210:17
Whose (5)
  156:15;160:8;
  161:4;170:17;171:6
who've (1)
  208:17
wife (4)
  88:5;139:21;
  204:2;234:3
wish (1)
  170:16
wishes (1)
  181:3
wishing (2)
  180:15,18
wit (1)
  237:2
withdrawn (2)
  179:12,15
within (9)
  56:14;90:21;91:2,
  8;92:8;137:17;
  142:7;191:7,9
within-named (1)
  237:5
without (13)
  13:5;14:11;50:4;
  54:3;68:10;75:6,7;

88:17;125:8;143:17,
  21;176:9;219:21
Witness (69)
  5:7;6:4;8:21;
  10:14;13:4;17:3,10;
  21:9;32:2,62:20;
  63:2;70:2,10;80:13;
  82:8,20;83:3,9,12;
  84:6;89:9;90:8;91:2;
  97:3,7;98:11;99:9;
  100:18;101:11;
  102:6,9;106:4,7,13,
  16;107:10;113:3,6;
  118:11;120:8;
  121:21;124:3,7;
  126:10;136:21;
  137:3;149:19;150:7,
  9;152:9;153:7;
  155:8;190:9;191:9;
  194:12;198:7;
  199:20;205:1;
  206:20;212:13;
  214:19;215:15,18;
  221:7;222:5;227:12;
  234:14;237:5,15
witnessing (1)
  103:20
witness's (1)
  83:9
Wootton (2)
  237:3,18
word (4)
  18:15;19:2;
  121:17;217:17
work (38)
  14:17;36:14;
  38:10;41:12;44:9;
  57:11,12;60:13,15;
  66:6,13;74:19;76:8;
  79:10;96:6,10,17;
  126:13,16;138:7;
  159:9,12;162:13,16;
  166:1;191:21;
  197:19;204:17,17;
  205:14,17;206:3;
  216:15;219:3,4,15,
  18,20
worked (1)
  141:18
Workers (3)
  34:7;138:2;229:19
workers' (2)
  138:1;193:16
working (6)
  38:6;44:12;58:12;
  120:13,16;231:19
workplace (30)
  33:14;34:2;38:2;
  39:19;40:20;41:1;
  43:14;44:11,17;
  53:10,11,12;56:9,13,
  17;57:2,21;58:1,14;
  65:20;75:2;78:14;

105:15;107:5;
  108:21;109:4;
  116:19;127:8;
  132:14;202:15
works (2)
  138:19;158:12
worried (1)
  92:19
wrapping (1)
  227:10
wrecked (1)
  127:16
write (3)
  177:12;184:16;
  187:3
writes (1)
  160:21
writing (6)
  36:8;149:19;
  160:17;228:11,17;
  231:9
written (8)
  139:16;146:12;
  149:7;160:13;
  166:20;185:4;196:9;
  234:19
wrong (4)
  110:15;164:7;
  219:20;220:1
wrote (4)
  150:10;152:5;
  161:9;171:14
wrung (1)
  226:20

**Y**

year (2)
  204:11;217:16
years (17)
  33:3,18;34:1;41:5;
  43:1,9;45:15;55:1;
  89:12;93:8;108:15;
  136:13,13,14;
  141:19;170:1;193:4
yes/no (2)
  171:9;172:15
yesterday (20)
  10:10;23:21;
  29:21;30:1,17;42:4;
  61:7,9,12,17,21;
  62:8;63:9;64:9;
  67:10,14;68:21;72:9;
  98:12;130:7